## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Linvel James Risner, on behalf of himself and those similarly situated, | Case No.  25-cv-4461 |
| Plaintiff, | **COMPLAINT -- CLASS ACTION** |
| v. | |
| Law School Admission Council, Inc., | |
| Defendant. | |

Plaintiff Linvel James Risner, on behalf of himself and all those similarly situated, brings this action against Defendant Law School Admission Council, Inc., for violations of the Sherman Antitrust Act.

Plaintiff, on behalf of himself and all others similarly situated, demands a trial by jury on all counts for which a right to trial by jury is allowed and, in support of this Complaint, alleges as follows:

### NATURE OF THE ACTION

1.    In 2025, more than 60,000 aspiring law students submitted more than 500,000 applications to law schools. Most paid application fees to schools that cost up to $105 per school. Those application fees varied per school, and schools could choose what fee to charge an applicant or whether to waive fees to woo applicants.

2.    Applicants paid additional and separate fees to LSAC, a middleman established and controlled by the law schools. These fees covered the LSAC application processing platform used by nearly all law schools. LSAC and the law schools fixed those processing fees for every ABA-approved law school: a $215 upfront fee, plus $45 per application. LSAC, which does little more than transmit basic

1

application information to law schools, collects an average of nearly $500 in fees from each applicant, totaling more than $30 million annually.

3.    This astronomical sum is untethered to any actual costs or the value of LSAC's Law School Application Platform in a competitive market. Application costs for modern electronic applications can be only a few dollars per application, so low that costs may not even be passed on to applicants. Indeed, the undergraduate Common Application, which offers a very similar application platform to LSAC, does not charge applicants a penny for its application platform. Instead, undergraduate schools accepting the Common Application charge (and often decide not to charge) a comprehensive application fee that includes the minimal application platform costs. Graduate business schools similarly incorporate the minimal application platform costs into competitive, school-specific application fees. Without LSAC's unlawful price fixing and monopolization of law school application platforms, law school applicants would not pay the mammoth, standalone LSAC platform fees.

4.    LSAC—an ostensible not-for-profit organization purportedly committed to making legal education "equitable and accessible" for all—has been wildly enriched by LSAC's anticompetitive conduct, as have LSAC's executives. In its most recent 501(c)(3) nonprofit filings for FY 2023, LSAC reported nearly $250 million in net assets—mostly securities investments. LSAC's then-CEO made more than $1 million in FY 2023. And LSAC reported compensating five other executives more than $400,000 in the same year.

5.    LSAC has violated federal antitrust law and gouged law school applicants attempting to follow their dreams. Injunctive relief, treble damages, and other remedies are appropriate to rectify LSAC's wrongdoing.

## VENUE AND JURISDICTION

6.    Plaintiff's claims arise under Sections 1, 2, and 3 of the Sherman Antitrust Act (15 U.S.C. § 1, *et seq.*). Plaintiff seeks damages under Section 4 of the Clayton Act (15 U.S.C. § 15), as well as injunctive relief under Section 16 of the Clayton Act (15 U.S.C. § 26).

7.    This Court has subject-matter jurisdiction over Plaintiff's claims under 15 U.S.C. § 15 (because they arise from injuries Plaintiff suffered by reason of conduct forbidden in the antitrust laws); 28 U.S.C. § 1331 (because they arise under the laws of the United States); and 28 U.S.C. § 1337(a) (because they arise under an Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies).

8.    This Court has personal jurisdiction over LSAC because it has its principal place of business in this District in Newtown, Pennsylvania.

9.    LSAC engaged in conduct inside the United States that caused direct, substantial, and reasonably foreseeable and intended anticompetitive effects upon interstate commerce within the United States.  LSAC's activities were within the flow of interstate commerce and were intended to, and did, have a substantial effect on interstate commerce of the United States. LSAC's platform is sold in the flow of interstate commerce.

10.    Venue is proper in this District pursuant to § 12 of the Clayton Act, codified at 15 U.S.C. § 22, and 28 U.S.C. § 1391(b)–(d), because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, a substantial portion of the affected interstate trade and commerce has been carried out in this District, and LSAC resides in this District.

## PARTIES

11.    Plaintiff Linvel James Risner is a citizen of Georgia domiciled in Georgia. He is above 18 years of age.

12.    Defendant Law School Admission Council, Inc. ("LSAC") is a Delaware corporation with its principal place of business in Newtown, Pennsylvania. LSAC is recognized as a not-for-profit membership corporation under 26 U.S.C. § 501(c)(3).

13.    LSAC's membership includes all 197 ABA-approved law schools in the United States ("Member Law Schools").[1]

## FACTUAL BACKGROUND

**The Law School Admission Council**

14.    LSAC was created and is operated, maintained, and controlled by its Member Law Schools.

15.    The Member Law Schools are direct competitors for law school applicants. They generally operate as independent decision makers except when they collude through LSAC.

---

[1] Several Canadian law schools also are LSAC members, but those schools are not at issue in this Complaint.

16. LSAC's three express purposes, according to its bylaws, are: "(a) To construct, administer and report scores for tests for admission to law school; (b) To conduct educational research; and (c) To provide services to law schools and the educational community."

17. LSAC states that it was "created by law school deans who wanted to make legal education accessible and equitable."[2]

18. The Member Law Schools elect LSAC's Board of Trustees, who manage or direct LSAC's business and affairs. As of the filing of this Complaint, every member of LSAC's Board of Trustees works for a Member Law School.

**LSAC's Law School Application Platform**

19. Every application cycle, more than 60,000 people apply to law school. An application cycle generally begins in the summer or fall of the year before matriculation. For instance, the 2026 application cycle will begin in summer or fall 2025 and run through summer 2026 for matriculation in the fall of 2026.

20. While applicants compete with other applicants for acceptance, each Member Law School also competes with each other to woo applicants to apply to, and ultimately attend, its institution.

21. Every Member Law School requires applicants to submit applications electronically through LSAC. No Member Law School permits applicants to apply using any other electronic processing method.

---

[2] *See LSAC Resources for Law School Deans*, LSAC, *available at* https://www.lsac.org/sites/default/files/media/2025-deans-resources.pdf.

22.    The Member Law Schools directed LSAC to develop a suite of software to process electronic applications. The software comprises both applicant-facing and Member Law School-facing elements. This Complaint collectively refers to LSAC's offerings to both applicants and Member Law Schools, including the application processing components and other features, as LSAC's "Law School Application Platform."

23.    On the applicant side, LSAC offers its platform under an umbrella called "Credential Assembly Service." According to LSAC's website:

> LSAC's Credential Assembly Service (CAS) simplifies the law school application process for both candidates and law schools. With CAS, your transcripts, letters of recommendation, and any other documents required for each of your law school applications only need to be sent one time to LSAC. All ABA-approved law school applications are available electronically through your CAS account as well, saving you time and effort. LSAC combines your documents with your LSAT score and forwards a full report to all the schools you apply to.[3]

24.    For the 2026 application cycle, LSAC charges applicants two types of fees for its Credential Assembly Service: a $215 mandatory subscription fee and a $45 per report fee. Since the 2022 application cycle, LSAC has charged at least $195 for its subscription fee and $45 per report. While a few applicants receive waivers for Credential Assembly Service fees, including based on financial need, the vast majority of applicants must pay these fees.

---

[3] *Credential Assembly Service (CAS)*, LSAC, *available at* https://www.lsac.org/applying-law-school/jd-application-process/credential-assembly-service-cas.

25.     The current $215 subscription fee is mandatory to apply to almost every law school and is active for five years. According to LSAC, the subscription fee includes:

- "Transcript summarization (as well as authentication and evaluation of academic records for internationally educated JD applicants, if applicable).

- Creation of your CAS Report (Note: CAS Reports cost $45 each. You will need to purchase a CAS Report for each law school to which you are applying.).

- Letter of recommendation processing.

- Electronic application processing for all ABA-approved law schools and some non-ABA-approved schools."[4]

26.     As noted above, applicants must pay $45 each time LSAC sends a Credential Assembly Service report to a Member Law School, which occurs each time an applicant applies to a school. The $45 flat fee does not vary based on the school to which an applicant applies. And the few member schools that permit applications by paper may still require applicants to pay for LSAC's Law School Application Platform.[5]

27.     LSAC, at the direction of the Member Law Schools that control it, sets the price it charges for the Credential Assembly Service subscription and reports.

---

[4] *Id.*

[5] *See J.D. Application Requirements*, Fordham Law School, https://www.fordham.edu/school-of-law/admissions/jd-admissions/apply-to-fordham-law/application-requirements/ (noting that Fordham offers paper applications but that "Every applicant must also register for the Credential Assembly Service (CAS)" and submit transcripts through CAS).

There is no variation in pricing based on the schools an applicant applies to. The prices are fixed for every Member Law School.

28.    The prices also do not vary based on application requirements. For instance, some schools do not require applicants to submit LSAT score reports and require no or few letters of recommendation. The Credential Assembly Service fees are the same for applications to those schools as for applications to schools that require LSAT score reports and more letters of recommendation.

29.    LSAC has charged applicants the following Credential Assembly Service fees since the 2022 application cycle:

| Application Cycle | Subscription | Each Report |
|---|---|---|
| 2022 | $195 | $45 |
| 2023 | $195 | $45 |
| 2024 | $200 | $45 |
| 2025 | $207 | $45 |
| 2026 | $215 | $45 |

30.    Importantly, the Credential Assembly Service fees are not the only fees that an applicant must pay as part of the application process. Applicants must also pay school-specific application fees (or receive a waiver) to most Member Law Schools to which they apply. While some Member Law Schools do not charge their own application fees, Member Law School application fees generally range from $50 to $105.

31.    Applicant fees paid to Member Law Schools do not cover the costs of an electronic application platform. Indeed, as LSAC states on its website, the fees LSAC charges applicants cover "Electronic application processing for all ABA-approved law schools and some non-ABA-approved schools."

32.     As a result, a single application to a Member Law School with a $90 application fee costs an applicant $340 total. If a second Member Law School also had a $90 application fee, that application would cost $135 total ($90 application fee + $45 Credential Assembly Service Report).

33.     Unlike applicants, law schools do not pay for the Application Platform. The Member Law Schools directed LSAC to provide LSAC's Law School Application Platform to the schools at no cost. The back-end software the schools use, which LSAC recently rebranded as "LSAC Unite," enables them to review and process applications submitted through LSAC, as well as manage enrollment. LSAC describes LSAC Unite as "a customer relationship and enrollment management platform that enables law schools to build, nurture, and manage the pipeline of prospective students."[6] LSAC has entered into agreements with each Member Law School confirming that the Member Law Schools do not pay LSAC for LSAC's Law School Application Platform, and LSAC elsewhere has confirmed that it generally provides LSAC Unite to Member Law Schools free of charge.

34.     Applicants' Credential Assembly Service fees thus are the sole fees paid by anyone for LSAC's Law School Application Platform.

35.     The Member Law Schools' direction to LSAC to formulate its Law School Application Platform in this way removed an economic incentive for Member Law Schools to be independent decision makers.

_____

[6] *See LSAC Resources for Law School Deans*, LSAC *available at* https://www.lsac.org/sites/default/files/media/2025-deans-resources.pdf.

9

36.     LSAC's revenue is far higher than the costs of LSAC's Law School Application Platform and far higher than any prices it could charge if the market were competitive.

**LSAC's Enrichment at the Expense of Applicants**

37.     The scheme by which the Member Law Schools and LSAC have eliminated significant and feasible competition on both the applicant and law-school side of its platform has proven incredibly lucrative for LSAC. According to its public tax filings, LSAC *collected $93 million in Credential Assembly Service fees* over just the last three reported years ($32,194,549 in FY 2023, $30,003,215 in FY 2022 and $31,335,192 in FY 2021).

38.     LSAC reported $238 million in total net assets at the end of 2022. A significant portion of those assets stem from the exorbitant and fixed fees that LSAC charges applicants.

39.     LSAC spends some of the fees it collects on massive compensation packages for executives. LSAC reported the following compensation in FY 2023:

    a.     Chief Executive Officer (until 6/30/24): $1,001,251

    b.     Chief Financial Officer: $539,231

    c.     Chief Strategy Officer: $470,650

    d.     Interim-President/CEO (from 7/1/24): $502,582

    e.     Chief Information Officer (until 3/13/24): $414,782

    f.     General Counsel and Corporate Secretary: $408,409

These compensation packages are higher than compensation packages for most law school deans.

40.    LSAC also reported paying $1.37 million on travel in FY 2023 and $3.97 million in FY 2022.

**Benefits to Member Law Schools from their Scheme with LSAC**

41.    To incentivize Member Law Schools to quash competition between themselves on application price and quality, they receive substantial benefits from their price-fixing agreement through LSAC.

42.    First, Member Law Schools receive stability and are insulated from competition. They do not have to concern themselves with market pressures to change their Application Platform based on what other law schools use. Nor do they have to determine whether to compete on price with other law schools for application platforms, such as by charging applicants less or fully absorbing the cost of such platforms.

43.    Second, LSAC uses the profits of the price-fixed application fees to pad its bank account and then kickback money to Member Law Schools. From FY 2013–2023, LSAC paid more than $6.5 million in grants to Member Law Schools, with 27 law schools receiving more than $100,000 during that period. And many individual payments are substantial. For instance, from FY 2020–2023, LSAC made the following direct payments to law schools of at least $50,000:

| Fiscal Year | School | Amount |
|---|---|---|
| 2023 | Seattle University | $50,000 |
| 2023 | North Carolina Central University | $64,332 |
| 2023 | Boston University | $100,000 |

| Fiscal Year | School | Amount |
|---|---|---|
| 2023 | Pennsylvania State University | $125,000 |
| 2023 | University of Denver | $70,404 |
| 2023 | Indiana University | $338,408 |
| 2022 | University of Memphis | $81,554 |
| 2022 | Seattle University | $103,971 |
| 2022 | Tulane University | $89,177 |
| 2022 | University of Puerto Rico | $94,125 |
| 2022 | University of Oregon | $94,125 |
| 2022 | Boston University | $114,000 |
| 2021 | University of Memphis | $69,000 |
| 2021 | University of Oregon | $63,617 |
| 2021 | University of Puerto Rico | $85,171 |
| 2021 | Seattle University | $60,000 |
| 2021 | Tulane University | $60,000 |
| 2021 | North Carolina Central University | $60,000 |
| 2021 | Boston University | $60,000 |
| 2020 | Duke University | $50,000 |
| 2020 | St. John's University | $102,026 |
| 2020 | University of Memphis | $50,000 |
| 2020 | University of Texas | $57,500 |
| 2020 | University of Akron | $108,058 |
| 2020 | University of Alabama | $96,000 |
| 2020 | University of Houston | $108,837 |
| 2020 | University of Oregon | $96,847 |
| 2020 | University of Puerto Rico | $90,334 |

44.     Third, Member Law Schools receive the LSAC Unite platform at no cost. Because Member Law Schools otherwise would have to develop or purchase an application review, applicant relationship, and enrollment management platform, this is a valuable incentive to Member Law Schools.

45.     These incentives provided to Member Law Schools cannot be matched by any competitor in the market for application platforms because a competitor would not have the profits from price fixing to provide these incentives.

**Comparative Competitive Markets for Application Processing**

46.     Robust competition exists for secure application platforms in other sectors, confirming that LSAC and its Member Law Schools have unlawfully restrained competition and created and maintained a monopoly with LSAC's Law School Application Platform.

47.     Competitive markets for application platforms encourage competition on price because the costs for application platforms are borne by the schools that choose to use certain platforms. The schools then compete with each other as independent market participants on the price of their total application fees— including whether to pass along processing costs to applicants. This competitive market differs sharply from the restrained, monopolistic market established by LSAC and its Member Law Schools where (1) schools bear no application platform costs and thus do not compete with each other regarding whether to charge application platform fees and (2) the prices paid by applicants are fixed with feasible, significant competition barred by the schools and LSAC.

48.     Market competition has resulted in at least two models for higher-education application processing: (1) a centralized model where applicants apply to many schools through a central application service and (2) a decentralized model where schools are responsible for hosting their own applications. Both models can be operated competitively, significantly lowering costs and increasing choice for applicants, as compared to the uncompetitive model for Member Law Schools, which fixes the prices for part of the application fee.

13

### Centralized Application Processing

49.    The undergraduate Common Application operates as a centralized application service very similar to LSAC. Common Application applicants can apply directly through the Common Application's website. The Common Application offers most of the same features as does LSAC, including soliciting and accepting letters of recommendation, compiling and reporting background demographic information and GPA, and other general processing features. It also offers a backend platform for undergraduate admissions offices to review applications.

50.    Notably, like LSAC, the Common Application is a membership organization controlled by the schools who use the application. Unlike LSAC, the Common Application and its members have not fixed prices for application platform fees.

51.    Unlike LSAC, the Common Application does not charge applicants any fees for its application platform. Instead, the Common Application charges member schools a $2,500 flat fee per year, a $3.76–$4.80 fee per application (depending on the platform a school uses), and a $2.00 payment processing fee if a school requires an application fee.[7]

52.    Individual schools determine the fee that they will charge applicants, or whether to charge any fee. More than 500 Common Application schools charge no

---

[7] *See Pricing & Fees*, Common App, *available at* https://membersupport.commonapp.org/s/pricing. The Common Application also charges a one-time implementation fee for new member schools.

application fee.[8] Thus, an applicant applying to one of these schools would incur no application costs. Those Common Application schools have made competitive decisions not to pass application costs to applicants, presumably with the goal of increasing applications.

53.     Such competition and benefits do not occur in the price-fixed, monopolistic market established by LSAC and its Member Law Schools. Applicants must bear the costs of the application platform regardless of the school to which they apply. And as illustrated by the fees charged to undergraduate schools by the Common Application, LSAC's fees charged to law school applicants dwarf what a centralized application service could charge in a competitive market where schools and the centralized service have not insulated themselves from competition.

54.     The Common Application and similar competitive centralized application systems underscore that a centralized system does not require fixing prices. LSAC could offer a centralized application platform that encourages competition. It has chosen instead to restrict and prevent competition at applicants' expense.

***Decentralized Application Processing***

55.     Other schools and programs have adopted a decentralized model where the school builds or contracts with a vendor to host its own application instance. In particular, many graduate schools do not rely on centralized membership

---

[8]  *See Explore Colleges*, Common App, *available at* commonapp.org/explore.

organizations to provide an application service. The costs to applicants of a decentralized model are also very low compared to LSAC's fees.

56.    For example, graduate business schools each have their own applications and associated fees. And like law school applications, business school applications collect pertinent documents, including test scores, GPA data, and other applicant information. Unlike law schools, however, the business schools themselves charge and collect all fees. The price paid by business school applicants to business schools incorporates both the application platform software (like that paid to LSAC by applicants) and the institution-specific costs of applying (like that paid to the individual schools by would be law students). Business schools thus compete with each other on price for the all-in cost to a business school applicant.

57.    By way of example, the application fees at private business schools historically considered some of the best schools in the country can reach $250–$275.[9] But application fees to less historically prestigious or lower-ranked schools can be significantly lower, as low as $30 per application.[10] This competition in price to woo applicants to a school is the hallmark of a healthy, open market.

58.    Business schools can engage in this application-fee competition because the actual per-applicant costs for their decentralized application software are very

---

[9] *See 2025-2026 Application Guide*, University of Pennsylvania Wharton School, *available at* https://mba.wharton.upenn.edu/application-guide; *Application Process*, Harvard Business School, *available at* https://www.hbs.edu/mba/admissions/application-process.
[10] *Apply to MBA*, University of Florida Warrington College of Business, *available at* https://warrington.ufl.edu/mba/apply/.

low. For instance, Georgia Tech uses the same application software for its business school as it does for all other graduate programs. That software is provided by an outside vendor. Georgia Tech pays that vendor a few dollars per application. With that low cost, it charges a $95 all-in application fee.

59.    In contrast, as noted above, a student applying to one law school pays LSAC $260 solely for LSAC's Law School Application Platform, more than a 10,000% markup on the per-application cost. And to reiterate, this fee is only for LSAC's Law School Application Platform. A law school applicant still must pay any school-specific application fee set and charged by each law school.

60.    Multiple outside vendors provide application platforms for business schools, other graduate and professional schools, and undergraduate programs. Those include Salesforce, Oracle, Technolutions, and others.

61.    Because law school admissions do not pose any unique technical requirements that could not be addressed by experienced vendors, these vendors very likely would be competitive forces in the relevant market if not substantially foreclosed by LSAC and its Member Schools. Such competition would drive down the price of LSAC's Law School Application Platform and incentivize increases in its quality. However, LSAC and its Member Schools have substantially foreclosed access to that market with their agreements that prohibit price competition on a major part of the application fee.

62.    Competitive alternatives would be present if not foreclosed by the price-fixing agreement and LSAC's leverage of its profits from the price fixing. Indeed, out

of 28 active law schools that are not LSAC members, as identified on LSAC's website,[11] only one uses LSAC's Law School Application Platform. The remainder host their applications on their own websites, using either vendors or processing software that they developed themselves. In this situation, applicants do not pay LSAC, but rather the school or vendor. The extremely low adoption rate outside of the Member Law Schools demonstrates that LSAC's Law School Application Platform did not obtain its dominance, and does not maintain its dominance, by having a superior product.

**Irrational Conduct by Member Law Schools**

63.     Top ranked law schools are forgoing significant application fees to support the price-fixing scheme that they have entered into with LSAC and other Member Law Schools.

64.     As noted above, highly ranked business schools command high application fees, often $250 or above. This is because there is significant demand for those schools based on their reputation and the expectation that applicants will have increased earning potential or career opportunities by attending those schools. Applicants are willing to pay high fees to apply. In contrast, lower ranked business schools can compete against higher-ranked schools for more applicants by charging a lower application fee.

65.     Lower ranked law schools have largely forfeited their ability to compete on total application fee price. While some law schools do not charge school-specific

---

[11] *See Other Law Schools*, LSAC, *available at* https://www.lsac.org/choosing-law-school/find-law-school/other-law-schools.

application fees, they still require that applicants use LSAC's Law School Application Platform and pay Credential Assembly Service fees. Thus, applications to such schools still cost $215 + $45 for each application.

66.     This stands in stark contrast to lower ranked business schools who use low, all-in application fees to attract applicants who might not otherwise apply to their schools.

67.     In sum, the law schools' price-fixing through LSAC has created a market where the Application Platform fees cost the same no matter the law school to which an applicant applies. This would not be the case in a competitive market.

**RELEVANT MARKETS**

68.     LSAC's conduct is unlawful in at least two relevant markets: the market for providing students with the education for a juris doctor degree (the "J.D. Education Market"), and the market for a platform to handle applications to law school (the "Law School Application Platform Market").

**J.D. Education Market**

69.     The J.D. Education Market includes the 197 Member Law Schools and other law schools in the United States, including its territories and the District of Columbia.

70.     The schools in the J.D. Education Market are direct competitors with each other and with other U.S. law schools for applicants to law school. Each school usually operates as an independent decision maker, one exception being when they collude through LSAC.

71.    In the alternative, the J.D. Education Market includes submarkets in which certain law schools compete with other certain law schools for applicants with comparable GPA, test scores, and other admissions criteria as may be determined by LSAC's own application data.

72.    The geographic scope of the J.D. Education Market does not extend to countries outside the United States because most, if not virtually all, prospective students considering applying to law school consider U.S. law schools as a distinct service because of its benefits for future employment in the United States.

**Law School Application Platform Market**

73.    The Law School Application Platform Market is the market for a platform to handle applications to U.S. law schools. This market includes the LSAC Law School Application Platform and the other application platforms used by the small number of U.S. law schools (less than 15%) that do not use the LSAC Law School Application Platform.

74.    These other law school application platforms are created and maintained by the schools themselves or provided by a vendor other than LSAC.

75.    The Member Law Schools compete for applicants, and thus each is a competitor in the market for the platform for handling applications to law school. All of the Member Law Schools have chosen to use LSAC's Law School Application Platform.

76.    The geographic scope of the Law School Application Platform Market is the United States, including its territories and the District of Columbia. LSAC is

involved in the market throughout the United States, including in the District of Columbia. This market does not include applications to non-U.S. law schools.

77.    Neither of the two relevant markets in this case relates to schools other than law schools, such as undergraduate schools or other graduate programs. Because law school is the only available option to receive a J.D. degree and become a lawyer in nearly every state in the country, medical school, business school, undergraduate or masters legal programs, or other schools are not acceptable substitutes for law schools.

## CLASS REPRESENTATIVE ALLEGATIONS

78.    Plaintiff paid for a Credential Assembly Service subscription and for seven Credential Assembly Service Reports in the 2023 application cycle, which began in Summer 2022 for matriculation in Fall 2023. He paid LSAC $195 for the subscription in October 2022 and $315 for the report fees in January and February 2023.

79.    The fees were paid directly to LSAC for use of its application platform to apply to law schools in the United States.

80.    Plaintiff was not permitted to apply by other means.

81.    LSAC's unlawful conduct allowed LSAC to overcharge Plaintiff for his Credential Assembly Service fees.

## CLASS ACTION ALLEGATIONS

82.    Plaintiff brings claims, *infra*, on behalf of similarly situated persons against Defendant under Fed. R. Civ. P. 23(a) and 23(b)(3) and seeks certification of

the class defined as follows: All individuals in the United States, including its territories and the District of Columbia, who paid Application Platform fees to LSAC.

83.     The class period begins four years before the filing of this lawsuit.

84.     Plaintiff reserves the right to amend these definitions as discovery proceeds and to conform to the evidence.

85.     Excluded from the Class are Defendant, its agents, representatives, and employees; any judge to whom this action is assigned; and any member of that judge's staff and immediate family.

86.     While the exact number of the Nationwide Class is unknown at this time, Plaintiff submits that LSAC's publicly available data shows that 60,000 applicants have applied to Member Law Schools each application cycle since 2021.

87.     Because the number of potential Class Members is so numerous, individual joinder of these members is impracticable.

88.     Plaintiff further alleges the Class Members will be ascertainable through discovery, including, but not limited to, Defendant's electronic records and databases, third-party discovery, and discovery concerning the identity of people who paid LSAC's fees for Application Platform.

89.     There are common questions of law and/or fact shared by Plaintiff and each Class Member. The common questions of law and/or fact include, but are not limited to, the following:

a.     whether LSAC entered into or facilitated an agreement which restrained competition;

b.      whether the agreement is unlawful;

c.      whether LSAC maintains a monopoly;

d.      whether LSAC uses unlawful means to maintain its monopoly;

e.      whether LSAC's conduct injured consumers; and

f.      the appropriate nature of class-wide injunctive or other equitable relief.

90.      Certification of the Class under Fed. R. Civ. P. 23(a) and 23(b)(3) is appropriate as to the members of the putative class in that common questions predominate over any individual questions and a class action is superior for the fair and efficient adjudication of this controversy. All Class Members were subject to the same conduct by LSAC, as such conduct is LSAC's standard business practice to be applied consistently nationwide.

91.      A class action will cause an orderly and expeditious administration of claims by the members of the Class, will foster economies of time, effort, and expenses, and will ensure uniformity of decisions.

92.      Plaintiff's claims are typical of the claims of the Class pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) since they are based on and arise out of identical facts constituting the wrongful conduct of Defendant.

93.      Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of other class members, and he will fairly and adequately protect their interests. Additionally, Plaintiff is cognizant of his responsibility as a class representative, and he has retained experienced counsel fully

capable of, and intent upon, vigorously pursuing the action. Plaintiff's counsel has extensive experience in class action litigation.

94.    The Class Members have suffered the same or similar injury as the Plaintiff, including actual damages.

### COUNT I
### HORIZONTAL RESTRAINT OF TRADE
### IN THE J.D. EDUCATION MARKET
### IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT,
### 15 U.S.C. § 1

95.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth in paragraphs 1–94 as if fully set forth herein.

96.    This claim is brought by Plaintiff individually and on behalf of the Class.

97.    Law schools compete with each other for applicants in the J.D. Education Market. Law schools compete for applicants based on qualities including price.

98.    The Member Law Schools that use LSAC's Law School Application Platform—which are the vast majority of law schools in the J.D. Education Market— have used LSAC as a smokescreen cover to fix the price of two parts of the fee to apply to law school—a $215 fee for the Credential Assembly Services subscription and a $45 fee per Credential Assembly Services report—in violation of Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1). These Member Law Schools control LSAC, and through that control they have been able to fix the price of these fees to be the same regardless of school.

99.    The Member Law Schools made this agreement through LSAC, which they formed and maintain with a stated purpose in its bylaws to "provide services to law schools[.]" LSAC Bylaws ¶ 3.

100.    The Member Law Schools exercise control over LSAC through, e.g., their election of the Board of Trustees, which manages LSAC's "business and affairs." LSAC Bylaws ¶ 3. Each Member Law School has a vote for the Board of Trustees members. As of July 2025, every Trustee is employed by an LSAC Member Law School.

101.    The Member Law Schools direct the development, operation, and implementation of the LSAC Law School Application Platform through their operation of LSAC.

102.    Through their control of LSAC, the Member Law Schools have used LSAC to facilitate concerted action between Member Law Schools to fix the price of the subscription and report fees, which nearly every Member Law School requires applicants to pay.

103.    LSAC is a separate legal entity from the Member Law Schools. LSAC has conspired along with the Member Law Schools to fix the price of these fees for its Law School Application Platform. LSAC benefits from the supracompetitive profits it earns from the price-fixed fees, using that to build up more than $250 million in net assets, pay its executives lavishly for a nonprofit, and kickback money to the Member Law Schools.

104.   The Member Law Schools each know that LSAC collects fixed fees for its Law School Application Platform from applicants. Indeed, many Member Law Schools discuss LSAC's collection of these fees on their websites.

105.   The Member Law Schools have explicitly agreed to restrict competition over the total fee to apply to law school in the J.D. Education Market through their operation of LSAC and direction of LSAC to provide its Law School Application Platform for a fixed price charged to applicants and provided free to the Member Law Schools. At the very least it is reasonable to infer an implicit agreement from the parallel conduct that every Member Law School uses LSAC for its Law School Application Platform and nearly all refuse to accept applications in any other manner. This is contrary to Member Law Schools' interests to compete for applicants by offering more favorable and cost-effective application platforms for applicants. These Member Law Schools' agreements with LSAC and refusal to accept applications in any other manner is not independently determined parallel conduct because of the Member Law Schools' membership in and control of LSAC.

106.   LSAC also serves as the "hub" in a "hub-and-spoke" restraint of trade involving LSAC and the Member Law Schools as "spokes."

107.   LSAC entered into agreements with each Member Law School under which LSAC agreed to provide the Member Law School with a free Law School Application Platform. In exchange, the Member Law Schools agreed that LSAC could charge applicants a fixed and uniform price for Law School Application Platform fees for every Member Law School.

108. Member Law Schools entered into a "rim" agreement with each other when they elected representatives of the Member Law Schools to serve on LSAC's Board of Trustees and direct LSAC's business affairs. The Member Law Schools' concerted conduct included fixing the price for Law School Application Platform fees.

109. The Member Law Schools' agreement, through and with LSAC, intentionally, directly and proximately caused the overcharging of Plaintiff and Class Members to apply to law school. The Law School Application Platform fees that LSAC charged far exceed both the actual costs of processing applications and the fees that would be charged in a competitive market. Plaintiff thus seeks damages in an amount to be proven at trial under Section 4 of the Clayton Act (15 U.S.C. § 15), on behalf of himself and the Nationwide Class.

110. The restrained trade affects interstate commerce for several reasons, including because applicants in states across the country who apply to law schools across the country were overcharged by LSAC for Law School Application Platform fees.

111. The Member Law Schools' agreement to fix the subscription and report fees for law school applications constitutes a *per se* violation of the Sherman Act. The price fixing of the fees is not a necessary, appropriate, or procompetitive, aspect of law school applications. The schools could easily direct LSAC to allow them to compete on price for law school applications. But, instead, LSAC's Law School Application Platform is a smokescreen cover for price fixing between the Member Law Schools that require their applicants to use the Law School Application Platform.

Given the lack of procompetitive benefits or justification, the price fixing is also necessarily a violation of the Sherman Act according to the Rule of Reason.

112.    There are no procompetitive benefits of the Member Law Schools' agreement, by and through LSAC, to fix prices for the subscription and report fees, nor was there a legitimate or sufficient business justification.   Any ostensible procompetitive benefit was pretextual or could have been achieved by less restrictive means.

113.    LSAC, as conduit for, participant in, facilitator of, and beneficiary of an agreement to restrict trade between Member Law Schools, is liable for the damages resulting from such agreement, including the overpayments by applicants to LSAC for its Law School Application Platform fees.

114.    Plaintiff's and Class Members' injuries are of the type the antitrust laws were designed to prevent because the injuries are higher costs and limited quality from an agreed restriction on competition. These injuries flow directly from that which makes Defendant's conduct unlawful: the agreed restriction on competition. Plaintiff is suing, on behalf of Class Members, to recover for injuries that he and the Class Members personally suffered, most notably the supracompetitive Law School Application Platform fees that he and Class Members paid to LSAC, which would have been lower or nonexistent absent the Member Law Schools' unlawful conduct through LSAC.

## COUNT II
## HORIZONTAL RESTRAINT OF TRADE IN THE
## LAW SCHOOL APPLICATION PLATFORM MARKET,
## IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT,
## 15 U.S.C. § 1

115.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth in paragraphs 1–94 as if fully set forth herein.

116.    This claim is brought by Plaintiff individually and on behalf of the Class.

117.    LSAC entered into and engaged in unlawful concerted action with the Member Law Schools, which unreasonably restrained trade in violation of Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1).

118.    LSAC is operated by the Member Law Schools, which compete in the Law School Application Platform Market.

119.    The Member Law Schools exercise control over LSAC through, e.g., their election of the Board of Trustees, which manages LSAC's "business and affairs." LSAC Bylaws ¶ 3. Each Member Law School has a vote for the Board of Trustees members. As of July 2025, every Trustee is employed by an LSAC Member Law School.

120.    The Member Law Schools direct the development, operation, and implementation of the LSAC Law School Application Platform through their operation of LSAC.

121.    LSAC facilitated an agreement by and amongst Member Law Schools to fix prices in the Law School Application Platform Market by agreeing with the Member Law Schools that LSAC will charge each applicant a set price of $215 for a Credential Assembly Service subscription plus $45 per Credential Assembly Service

report, regardless of the school to which an applicant applies. Nearly every Member Law School requires applicants to use LSAC's Law School Application Platform.

122.   LSAC, in agreement with the Member Law Schools that control it, chose to set its pricing in this way rather than charging the schools to use the platform and enabling the schools to independently choose how much to charge each applicant, as the undergraduate Common Application does for its member schools.

123.   In practice, this agreement has set a fixed price for law school application platforms for nearly every applicant to nearly every Member Law School.

124.   At the direction of Member Law Schools that control LSAC, LSAC provides its Law School Application Platform to LSAC Member Law Schools free of charge. This arrangement is confirmed by LSAC's agreements with the Member Law Schools.

125.   The Member Law Schools agreed that LSAC would not charge them for its application platform, and they maintain their membership in LSAC under such a guarantee.

126.   The Member Law Schools each know that LSAC collects fixed fees for its Law School Application Platform from applicants. Indeed, many Member Law Schools discuss LSAC's collection of these fees on their websites.

127.   The Member Law Schools have explicitly agreed to restrict competition over the application platform fee in the Law School Application Platform Market through their operation of LSAC and direction of LSAC to provide its Law School Application Platform for a fixed price charged to applicants and provided free to the

Member Law Schools. At the very least it is reasonable to infer an implicit agreement from the parallel conduct that every Member Law School uses LSAC for its Law School Application Platform and nearly all refuse to accept applications in any other manner. This is contrary to Member Law Schools' interests to compete for applicants by offering more favorable and cost-effective application platforms for applicants. These Member Law Schools' agreements with LSAC and refusal to accept applications in any other manner is not independently determined parallel conduct because of the Member Law Schools' membership in and control of LSAC.

128.    LSAC also serves as the "hub" in a "hub-and-spoke" restraint of trade involving LSAC and the Member Law Schools as "spokes."

129.    LSAC entered into agreements with each Member Law School under which LSAC agreed to provide the Member Law School with a free Law School Application Platform. In exchange, the Member Law Schools agreed that LSAC could charge applicants a fixed and uniform price for Law School Application Platform fees for every Member Law School.

130.    Member Law Schools entered into a "rim" agreement with each other when they established, joined, and maintained LSAC as a 501(c)(3) membership organization.

131.    Member Law Schools further entered into a "rim" agreement with each other when they elected representatives of the Member Law Schools to serve on LSAC's Board of Trustees and direct LSAC's business affairs.

132.    The Member Law Schools' agreement, by and through LSAC, intentionally, directly and proximately caused the overcharging of Plaintiff and Class Members. The Law School Application Platform fees that LSAC charged far exceed both the actual costs of processing applications and the fees that would be charged in a competitive market. Plaintiff thus seeks damages in an amount to be proven at trial under Section 4 of the Clayton Act (15 U.S.C. § 15), on behalf of himself and the Nationwide Class.

133.    The Member Law Schools' agreement, by and through LSAC, further has restricted the ability for feasible competition in the Law School Application Platform Market. Competitors to LSAC cannot feasibly win business from any Member Law School because they cannot provide a platform for free and kickback money from applicants to the Member Law Schools in the form of grants. Nor can any competitor possibly win business from any applicant because Member Law Schools have agreed to not permit applicants to use application platforms other than LSAC's. This further protects the price-fixing conspiracy with LSAC, because Member Law Schools do not provide an option for applicants to avoid the fees charged by LSAC.

134.    The restrained trade affects interstate commerce for several reasons, including because applicants in states across the country who apply to law schools across the country were overcharged by LSAC for Law School Application Platform fees.

135.    The Member Law Schools' agreement to fix the Law School Application Platform fee constitutes a *per se* violation of the Sherman Act. The price fixing in

LSAC's Law School Application Platform of the Law School Application Platform fee is not a necessary, appropriate, or procompetitive, aspect of the Law School Application Platform. LSAC's Law School Application Platform could easily be adjusted to allow for competition based on price for the Law School Application Platform. But, instead, the LSAC's Law School Application Platform is a smokescreen cover for price fixing between the Member Law Schools that require their applicants to use the Law School Application Platform. Given the lack of procompetitive benefits or justification, the price fixing is also necessarily a violation of the Sherman Act according to the Rule of Reason.

136.    There are no procompetitive benefits of the Member Law Schools' agreement, by and through LSAC, to fix prices for the Law School Application Platform, nor was there a legitimate or sufficient business justification.    Any ostensible procompetitive benefit was pretextual or could have been achieved by less restrictive means.

137.    LSAC, as conduit for, participant in, facilitator of, and beneficiary of an agreement to restrict trade between Member Law Schools, is liable for the damages resulting from such agreement, including the overpayments by applicants to LSAC for the Law School Application Platform fee.

138.    Plaintiff's and Class Members' injuries are of the type the antitrust laws were designed to prevent, and flow from that which makes Defendant's conduct unlawful. Plaintiff is suing, on behalf of Class Members, to recover for injuries that he and the Class Members personally suffered, most notably the supracompetitive

Law School Application Platform fees that he and Class Members paid to LSAC, which would have been lower or nonexistent absent LSAC's unlawful conduct.

## COUNT III
## MONOPOLIZATION
## VIOLATION OF SECTION 2 OF THE SHERMAN ACT,
## 15 U.S.C. § 2

139.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth in paragraphs 1–94 as if fully set forth herein.

140.    This claim is brought against LSAC by Plaintiff individually and on behalf of the Class.

141.    LSAC has willfully acquired and maintained a monopoly over the Law School Application Platform Market. It acquired and maintained a market share exceeding 85%, which forecloses that substantial share of the market from the many potential competitors that offer services that could compete.

142.    All 197 LSAC Member Law Schools use LSAC's Law School Application Platform. One of 28 active non-member schools uses LSAC's Law School Application Platform, according to LSAC's website.

143.    No other significant competitors exist in this market or can feasibly exist because of LSAC's willful maintenance of its monopoly through anticompetitive practices.

144.    LSAC has constructed illegitimate and insurmountable barriers to entry for competitors by structuring LSAC's Law School Application Platform in such a way that competitors have no feasible way to access potential customers on either side of the platform. These barriers include using the revenue from the price-fixed

Application Platform fee to provide its service in the Law School Application Platform Market for free to law schools.

145.    Potential competitors could not feasibly sell alternative application platforms to the Member Law Schools that use LSAC's Law School Application Platform. Each of the Member Law Schools that use LSAC's Law School Application Platform has chosen to use that platform despite knowing it charges a price-fixed fee. No competitor could feasibly, or legally, provide a competing platform to Member Law Schools at no cost and while providing kickbacks to schools using price-fixed fees extracted from applicants, as LSAC does.

146.    LSAC also enters into exclusive agreements with all its Member Law Schools for LSAC's Law School Application Platform. These agreements are *de facto* exclusive agreements because they are entered into by LSAC with the members that control LSAC and have a biased interest in LSAC's continued monopolization of the market. The agreements are for one-year terms with automatic renewal.

147.    Nor could any potential competitor feasibly sell alternative application platforms to applicants because nearly all Member Law Schools prohibit the use of alternative application platforms by applicants, as part of their agreements with, operation of, and membership in LSAC. Indeed, nearly all Member Law Schools require applicants to use LSAC's Law School Application Platform.

148.    The lack of any feasible competition has enabled LSAC to charge fees for the Application Platform that are far above those that could be charged in a

competitive market, and LSAC exploited its monopoly power to charge supracompetitive fees.

149.    Further evidence of LSAC's monopoly power in the Law School Application Platform Market is that LSAC has recently increased the amount of the Law School Application Platform fee but there has not been a decrease in the number of Law School Application Platform fees paid or an increase in the use of competing products. In every application cycle since 2023, LSAC has increased the Credential Assembly Service Subscription Fee. Law school applicants (and thus Law School Application Platform fees) also have increased every year since the 2023 cycle, with the 2025 cycle seeing more than a 23% increase in applicants.

150.    There are no procompetitive benefits of LSAC's monopolization scheme, nor was there a legitimate or sufficient business justification. Any ostensible benefits or justifications do not offset the harm caused by LSAC's anticompetitive and unlawful conduct.

151. LSAC's monopolization scheme directly and proximately caused Plaintiff and Class Members to be overcharged for Application Platform as compared to what they would be charged in a competitive market.

152.    Plaintiff's and Class Members' injuries are of the type the antitrust laws were designed to prevent, and flow from that which makes Defendant's conduct unlawful. Plaintiff is suing, on behalf of Class Members, to recover for injuries that he and the Class Members personally suffered, most notably the supracompetitive

Application Platform fees that he and class members paid to LSAC, which would have been lower or nonexistent absent LSAC's unlawful conduct.

## **PRAYER FOR RELIEF**

Plaintiff and the Class Members seek the following relief:

a.    Certify the Class;

b.    Enter a judgment awarding Plaintiff and the Class Members treble damages for the injuries they suffered as a result of LSAC's unlawful conduct;

c.    Award to Plaintiff and Class Members of their costs of suit, including reasonable attorneys' fees and expenses, pursuant to 15 U.S.C. § 15(a);

d.    Order that LSAC, including its directors, officers, parents, employees, agents, successors, and members, be enjoined and restrained from, in any manner, directly or indirectly, committing any additional violations of the law as alleged herein; and

e.    Such other relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff respectfully demands a trial by jury on all issues that can be tried to a jury.

Dated: August 4, 2025                    Respectfully submitted,

/s/ *Peter M. McCall*
Peter McCall (PA Bar No. 315917)
HILGERS GRABEN PLLC
301 Grant Street, Suite 270
Pittsburgh, PA 15219
Telephone: (314) 464-9964
Email: pmccall@hilgersgraben.com

William Burgess (Pro Hac Vice Forthcoming)
1230 Peachtree Street N.E., 19th Floor
Atlanta, GA 30309
Telephone: 404-595-7747
Email: wburgess@hilgersgraben.com

Bennett Rawicki (Pro Hac Vice Forthcoming)
7859 Walnut Hill Lane, Suite 335
Dallas, TX 75230
Telephone: 469-640-6842
Email: brawicki@hilgersgraben.com

*Counsel for Plaintiff and the Proposed Class*