## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LINVEL JAMES RISNER, *on behalf of himself and those similarly situated*,<br><br>     Plaintiff,<br><br>  v.<br><br>LAW SCHOOL ADMISSION COUNCIL, INC.,<br><br>     Defendant. | Civil Action No.: 2:25-cv-04461-JFM<br><br>ORAL ARGUMENT REQUESTED |

## MEMORANDUM OF LAW IN SUPPORT OF LAW SCHOOL ADMISSION COUNCIL, INC.'S MOTION TO DISMISS COMPLAINT WITH PREJUDICE

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

BACKGROUND ..................................................................................................2

ARGUMENT ......................................................................................................4

I.     Counts I and II Fail Because Plaintiff Has Not Alleged Concerted Action........................4

     A.     The Challenged Conduct Is Unilateral Price Setting ................................4

     B.     Plaintiff Has Not Plausibly Alleged A Horizontal Conspiracy
           Among The Member Law Schools ..................................................8

           1.     Plaintiff alleges no direct evidence of an agreement. ...............9

           2.     Plaintiff alleges no circumstantial evidence of an agreement.....................9

           3.     Any theory based on Member Law Schools' separate agreements
               with LSAC is not pled and not viable. ..............................13

II.     Counts I And II Fail Because Any Alleged Agreement Is Not An Unreasonable
      Restraint Of Trade .................................................................13

     A.     Any Alleged Agreement Is Subject To The Rule Of Reason ...............14

     B.     Under The Rule Of Reason, Both Counts I And II Fail.........................15

           1.     Count I fails to state a rule of reason claim. .......................15

               i.     The J.D. Education markets are implausible. ...............15

               ii.     The Complaint does not allege competitive harm in the
                   J.D. Education markets ..........................................16

           2.     Count II fails to state a rule of reason claim .......................18

               i.     The "Law School Application Platform Market" is
                   implausible ........................................................18

               ii.     The Complaint does not allege competitive harm in the Law
                   School Application Platform market. ...........................18

III.     Count III Fails To State A Monopolization Claim ...........................................20

     A.     LSAC Does Not Have Monopoly Power..........................................20

     B.     Plaintiff Does Not Allege Any Exclusionary Conduct .........................22

IV.     Plaintiff Has Not Plausibly Alleged That He Has Antitrust Standing.............................23

CONCLUSION..................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*All. Cancer Specialists, P.C. v. Thomas Jefferson Univ. Hosps. Inc.*,
   2023 WL 6118527 (E.D. Pa. Sept. 18, 2023) ...........................................................6

*Am. Needle, Inc. v. Nat'l Football League*,
   560 U.S. 183 (2010)......................................................................5, 6, 7, 8, 14

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
   459 U.S. 519 (1983)...............................................................................23

*In re Baby Food Antitrust Litig.*,
   166 F.3d 112 (3d Cir. 1999).....................................................................8, 9

*BanxCorp v. Bankrate, Inc.*,
   847 F. App'x 116 (3d Cir. 2021) ............................................................21, 22

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007).........................................................................4, 5, 9, 22

*Bldg. Materials Corp. of Am. v. Rotter*,
   535 F. Supp. 2d 518 (E.D. Pa. 2008) ............................................................18

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*,
   441 U.S. 1 (1979)..............................................................................14, 15

*Broadcom Corp. v. Qualcomm Inc.*,
   501 F.3d 297 (3d Cir. 2007), and (2) .........................................................20, 21

*Brotech Corp. v. White Eagle Int'l Techs. Grp., Inc.*,
   2003 WL 22797730 (E.D. Pa. Nov. 18, 2003) ....................................................18

*Brunson Commc'ns, Inc. v. Arbitron, Inc.*,
   239 F. Supp. 2d 550 (E.D. Pa. 2002) ...........................................................11

*Choh v. Brown Univ.*,
   753 F. Supp. 3d 117 (D. Conn. 2024)..........................................................16, 17

*City of Oakland v. Oakland Raiders*,
   20 F.4th 441 (9th Cir. 2021) ....................................................................24

*Consol. Metal Prods., Inc. v. Am. Petrol. Inst.*,
   846 F.2d 284 (5th Cir. 1988) ....................................................................12

*Copperweld Corp. v. Independence Tube Corp.*,
 467 U.S. 752 (1984)................................................................................4, 5

*Dai v. SAS Inst. Inc.*,
 2025 WL 2078835 (N.D. Cal. July 18, 2025)...................................................9, 10

*Davis v. Hanna Holdings, Inc.*,
 2025 WL 1737782 (E.D. Pa. June 23, 2025) .......................................................12

*Deborah Heart & Lung Ctr. v. Virtua Health, Inc.*,
 833 F.3d 399 (3d Cir. 2016).............................................................................17

*Dickson v. Microsoft Corp.*,
 309 F.3d 193 (4th Cir. 2002) ...........................................................................13

*Eichorn v. AT&T Corp.*,
 248 F.3d 131 (3d Cir. 2001)...........................................................................17

*Eisai, Inc. v. Sanofi Aventis U.S., LLC*,
 821 F.3d 394 (3d Cir. 2016)...........................................................................22

*In re EpiPen Direct Purchaser Litig.*,
 2022 WL 1017770 (D. Minn. Apr. 5, 2022) .......................................................13

*Fresh Made, Inc. v. Lifeway Foods, Inc.*,
 2002 WL 31246922 (E.D. Pa. Aug. 9, 2002) .......................................................15

*FTC v. Ind. Fed'n of Dentists*,
 476 U.S. 447 (1986)......................................................................................14

*In re Generic Pharms. Pricing Antitrust Litig.*,
 394 F. Supp. 3d 509 (E.D. Pa. 2019) ................................................................10

*Host Int'l, Inc. v. MarketPlace, PHL, LLC*,
 32 F.4th 242 (3d Cir. 2022) ...........................................................................23

*Howard Hess Dental Lab'ys, Inc. v. Dentsply Int'l, Inc.*,
 602 F.3d 237 (3d Cir. 2010)...........................................................................13

*In re Ins. Brokerage Antitrust Litig.*,
 618 F.3d 300 (3d Cir. 2010)...................................................................*passim*

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
 466 U.S. 2 (1984).........................................................................................17

*Kloth v. Microsoft Corp.*,
 444 F.3d 312 (4th Cir. 2007) ...........................................................................25

*Kotteakos v. United States*,
    328 U.S. 750 (1946)..................................................................................13

*LePage's Inc. v. 3M*,
    324 F.3d 141 (3d Cir. 2003).................................................................20, 22

*In re Lower Lake Erie Iron Ore Antitrust Litig.*,
    998 F.2d 1144 (3d Cir. 1993)...............................................................23, 24

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)..................................................................................11

*McNair v. Synapse Grp. Inc.*,
    672 F.3d 213 (3d Cir. 2012)......................................................................25

*Mid-W. Paper Prods. Co. v. Cont'l Grp., Inc.*,
    596 F.2d 573 (3d Cir. 1979)......................................................................25

*Moratis v. West Penn Multi-List, Inc.*,
    2024 WL 4436425 (W.D. Pa. Oct. 7, 2024) .............................................12

*Nanavati v. Burdette Tomlin Mem'l Hosp.*,
    857 F.2d 96 (3d Cir. 1988)..........................................................................6

*Ohio v. Am. Express Co.*,
    585 U.S. 529 (2018)......................................................................19, 20, 21

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
    555 U.S. 438 (2009)....................................................................................4

*Peerless Heater Co. v. Mestek, Inc.*,
    2000 WL 637082 (E.D. Pa. May 11, 2000) ...............................................6

*Penn. v. NCAA*,
    948 F. Supp. 2d 416 (M.D. Pa. 2013) ......................................................17

*Phila. Taxi Ass'n v. Uber Techs., Inc.*,
    886 F.3d 332 (3d Cir. 2018)......................................................................20

*Power Analytics Corp. v. Operation Tech., Inc.*,
    2018 WL 10231437 (C.D. Cal. July 24, 2018)........................................22

*Prescient Med. Holdings, LLC v. Lab'y Corp. of Am. Holdings*,
    2019 WL 635405 (D. Del. Feb. 14, 2019) ...............................................16

*In re Processed Egg Prods. Antitrust Litig.*,
    821 F. Supp. 2d 709 (E.D. Pa. 2011) .........................................................5

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
    124 F.3d 430 (3d Cir. 1997)..........................................................................15

*Rock v. NCAA*,
    928 F. Supp. 2d 1010 (S.D. Ind. 2013) .......................................................16

*Siegel Transfer, Inc. v. Carrier Express, Inc.*,
    54 F.3d 1125 (3d Cir. 1995)............................................................................8

*Texaco Inc. v. Dagher*,
    547 U.S. 1 (2006).....................................................................................4, 14

*Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross & Blue Shield*,
    552 F.3d 430 (6th Cir. 2008) .......................................................................16

*Tunis Bros. Co. v. Ford Motor Co.*,
    952 F.2d 715 (3d Cir. 1991).........................................................................15

*United States v. Brown Univ.*,
    5 F.3d 658 (3d Cir. 1993).............................................................................14

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1996).......................................................................................7

*United States v. H&R Block, Inc.*,
    833 F. Supp. 2d 36 (D.D.C. 2011) ................................................................7

*United States v. Syufy Enters.*,
    903 F.2d 659 (9th Cir. 1990) .......................................................................21

*US Airways, Inc. v. Sabre Holdings Corp.*,
    938 F.3d 43 (2d Cir. 2019)...........................................................................19

*Warren Gen. Hosp. v. Amgen Inc.*,
    643 F.3d 77 (3d Cir. 2011)...........................................................................25

*Weiss v. York Hosp.*,
    745 F.2d 786 (3d Cir. 1984)......................................................................7, 8

*Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop., Inc.*,
    89 F.4th 430 (3d Cir. 2023) ...........................................................13, 14, 15

*Yeager's Fuel, Inc. v. Pennsylvania Power & Light Co.*,
    953 F. Supp. 617 (E.D. Pa. 1997) ...............................................................22

*ZF Meritor, LLC v. Eaton Corp.*,
    696 F.3d 254 (3d Cir. 2012).........................................................................22

**Docketed Cases**

*Durbal v. Association of American Medical Colleges*,
  No. 25-cv-2537 (D.D.C.) ...........................................................................................................2, 7

**Other Authorities**

Areeda & Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and
  Their Application* (5th ed. 2025)...................................................................................................4

## INTRODUCTION

For decades, aspiring law students have used the centralized application platform offered by LSAC, which streamlines the process of compiling the various law school application components and seamlessly transmits completed applications to applicants' intended schools. All 197 American Bar Association-approved law schools that are members of LSAC ("Member Law Schools") accept applications submitted through this platform, giving applicants a one-stop shop for applying to all schools they may wish to attend.

Despite the obvious benefits of this integrated system, Plaintiff wrongly deems LSAC's operation of its application platform both the product of a supposed price-fixing agreement among the Member Law Schools and also exclusionary conduct to support LSAC's supposed monopoly. But the Complaint is miles short of plausibly alleging that either is true. All three counts—two brought under Section 1 of the Sherman Act and the third claiming "monopolization"—fail as a matter of law, and the Complaint should be dismissed with prejudice for the following reasons:

*First*, Counts I and II fail because Plaintiff has not plausibly alleged concerted action. LSAC sets the fees it charges applicants who use its application platform. Unilateral conduct can never violate Section 1. Plaintiff alleges no facts that any Member Law School is even involved in setting LSAC's fees, and even if he had, such intrafirm coordination between LSAC and its corporate members is, as a matter of law, not concerted action.

*Second*, the purported conspiracy among the Member Law Schools to fix application fees is implausible. There are no facts alleged at all about how the supposed conspiracy was formed, amongst whom, and when. Nor can the Member Law Schools' use of LSAC's application platform and participation in LSAC as an organization raise a plausible inference of a conspiracy. There is no dispute that LSAC's platform is efficient to use for both applicants and schools, and Plaintiff offers no reason to believe the schools use it because of an agreement rather than to obtain these

1

obvious benefits unilaterally. Moreover, countless courts have rejected Plaintiff's contention that mere membership in an organization like LSAC can establish a conspiracy.

*Third*, assuming Plaintiff had plausibly alleged a conspiracy, it would not be an unreasonable restraint of trade in violation of Section 1. This is because, at most, Plaintiff has alleged LSAC is a joint venture, and pricing decisions made by joint ventures are, under controlling Supreme Court authority, never subject to *per se* treatment. Under the operative rule of reason, Plaintiff's claims fail because he does not plausibly allege that the agreement harmed competition, and price competition among law schools continues unimpaired.

*Fourth*, Plaintiff's monopolization claim fails because the allegedly monopolized market—"Law School Application Platforms"—is implausible, and Plaintiff himself concedes that sophisticated firms outside the market easily could, and have, developed application platforms to compete with LSAC's. Moreover, there is no exclusionary conduct as a matter of law because the alleged agreement is implausible, as is Plaintiff's cursory attempt to recharacterize it as "exclusive dealing." In any event, Plaintiff alleges no facts suggesting anyone was excluded from the market.

*Finally*, Plaintiff lacks antitrust standing to pursue any of his claims. The Complaint's own allegations confirm that LSAC's fee structure reduces, rather than increases, the cost of applying to law school. Plaintiff's theory that the challenged conduct caused him to pay more is built on nothing but implausible speculation, requiring dismissal of his claims.

At bottom, this case needlessly looks to upend a system that has reliably served prospective law students and law schools alike well for many years. It falls woefully short of alleging anything resembling an antitrust violation, and should be dismissed with prejudice.

## BACKGROUND

This lawsuit, like a nearly identical one filed by Plaintiff's lawyers on the same day relating to medical school, *see* Compl., *Durbal v. Association of American Medical Colleges*, No. 25-cv-

2537 (D.D.C. Aug. 4, 2025), ECF No. 1 ("*Durbal* Compl."), seeks to attack a system that efficiently allows students and law schools alike to process over 500,000 applications per year, Compl. ¶1. LSAC is a not-for-profit membership corporation whose purpose is to "construct, administer and report scores for tests for admission to law school," "conduct educational research," and "provide services to law schools and the educational community." *Id.* ¶16. LSAC's founders aimed to "make legal education accessible and equitable." *Id.* ¶17. In service of those goals, among other things, LSAC provides grants to certain Member Law Schools, *id.* ¶43, and administers the well-known Law School Admission Test ("LSAT"). It also operates a platform used by its Member Law Schools and others to process prospective students' applications to law schools. *Id.* ¶¶21, 62.

LSAC's application platform "simplifies the law school application process" by centralizing an applicant's transcripts, recommendation letters, personal statements, score reports, and other documents. Compl. ¶¶21-23. When an applicant applies to a particular law school, LSAC sends that school a report compiling this information. *Id.* ¶23. Law schools can use LSAC's platform to review these applications and "manage enrollment." *Id.* ¶33.

As with business school, medical school, and other graduate school application platforms, LSAC charges applicants fees for using its platform. Compl. ¶¶24, 56-58. For the 2026 admission cycle, applicants pay a $215 up-front subscription fee, and a $45 fee per report sent to each law school they apply to. *Id.* ¶¶24-26. Most of LSAC's Member Law Schools also charge school-specific application fees that generally range from $50 to $105. *Id.* ¶30. Plaintiff Linvel James Risner alleges that he used LSAC's platform to apply to law school and paid the associated fees in 2022. *Id.* ¶¶11, 78. He does not allege that he sought or was denied a fee waiver, even though they are available. *Id.* ¶24. He also does not allege he was accepted to any of the (unnamed) schools he purportedly applied to, that he went to law school, or that he became a lawyer.

**ARGUMENT**

I.    **COUNTS I AND II FAIL BECAUSE PLAINTIFF HAS NOT ALLEGED CONCERTED ACTION**

Counts I and II fail and should be dismissed because Plaintiff has not plausibly alleged that the fees on which his claims are based are the product of an agreement, rather than set unilaterally.

"'[T]he existence of an agreement is the hallmark of a Section 1 claim.'" *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 315 (3d Cir. 2010). Section 1 "require[s] 'some form of concerted action,'" *id.*, and "does not reach conduct that is wholly unilateral," *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984). "The crucial question" in a Section 1 case is thus "whether the challenged anticompetitive conduct 'stem[s] from independent decision or from an agreement.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553 (2007). To state a claim, a plaintiff must plead "enough factual matter" "to suggest that an agreement was made" and exclude the possibility that the alleged conspirators acted independently. *Id.* at 556-57.

Plaintiff has not done so. Instead, his Complaint makes clear that LSAC sets its fees unilaterally, precluding a Section 1 claim. And beyond that, Plaintiff has failed to plausibly allege a horizontal conspiracy among LSAC's Member Law Schools to fix fees.

A.    **The Challenged Conduct Is Unilateral Price Setting**

Plaintiff alleges that the supposedly supracompetitive fees it challenges are determined by a single entity—LSAC—which "sets the price it charges for the Credential Assembly Service subscription and reports." Compl. ¶27. "[P]rice setting by a single entity" is unilateral conduct, not concerted action. *See Texaco Inc. v. Dagher*, 547 U.S. 1, 6 (2006); Areeda & Hovenkamp, *Antitrust Law* ¶1477 (trade associations "selling in their own right … can fairly be regarded as single entities whose selling decisions are not 'price-fixing conspiracies'"). "As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009). Single-

4

entity price-setting can never form the basis of a Section 1 claim. *Copperweld*, 467 U.S. at 768.

Plaintiff's conclusory allegation that LSAC's prices are set "at the direction of the Member Law Schools that control it," Compl. ¶27, does not change this conclusion, for three reasons.

*First*, there are no facts alleged that the Member Law Schools "direct[ed]" LSAC to do anything. Courts require more than "generic reference to 'Defendants'"—or in this case, supposed non-party coconspirators—"tacked on to a conclusory verb form to connect an" entity to the challenged conduct. *In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709, 720 (E.D. Pa. 2011). That is all Plaintiff offers. The Complaint contains no facts outlining how the schools' purported direction was given, who gave it, or when. While Plaintiff alleges that the Member Law Schools "elect LSAC's Board of Trustees, who manage or direct LSAC's business and affairs," Compl. ¶18; *see also id.* ¶¶100, 119, he provides no explanation of how—if at all—LSAC's Board is even involved in determining LSAC's fees, let alone how Member Law Schools' limited function of electing Board members somehow involves "direct[ing]" LSAC to make particular pricing decisions. The allegation that LSAC's fees are set at the Member Law School's "direction" is thus entirely conclusory and cannot be credited. *Twombly*, 550 U.S. at 555.

*Second*, even if Plaintiff had plausibly alleged that the Member Law Schools are involved in LSAC's pricing decisions, that still would not constitute concerted action. A single entity cannot conspire with itself. LSAC is a membership corporation whose members include the Member Law Schools. Compl. ¶¶12-13. Section 1 does not cover the "internally coordinated conduct of a corporation" or "internal 'agreement[s]'" within a firm—such as between a corporation and its members—"to implement a single, unitary firm's policies." *Copperweld*, 467 U.S. at 769-71. "[A]greements within a single firm" are thus "presum[ed]" to be "independent action," not concerted action. *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 200 (2010).

*Third*, the presumption of independent action holds here. It can only be rebutted "in rare cases" upon a showing that (1) "the parties to the agreement act[ed] on interests separate from those of the firm itself," and in so doing (2) deprived the relevant market of "actual or potential competition." *Am. Needle*, 560 U.S. at 195, 200-01. Plaintiff does not plausibly allege either.

The Complaint contains no allegations that any Member Law School had or acted on any "interests separate from" those of LSAC itself in purportedly directing LSAC to set fees. *Am. Needle*, 560 U.S. at 200. As discussed, the Complaint alleges no facts at all about any school's involvement in setting those fees. Instead, the Complaint alleges that the schools' "economic interests" are "completely aligned with that of" LSAC. *Peerless Heater Co. v. Mestek, Inc.*, 2000 WL 637082, at *6 (E.D. Pa. May 11, 2000). Plaintiff alleges that the schools share in LSAC's success through "direct payments" in the form of "substantial" grants to certain schools. Compl. ¶43. Nothing in the Complaint "suggests that by participating in" LSAC, any school is "acting for that [school's] own interests and against the interests of [LSAC]." *All. Cancer Specialists, P.C. v. Thomas Jefferson Univ. Hosps. Inc.*, 2023 WL 6118527, at *12 (E.D. Pa. Sept. 18, 2023). The schools "st[and] to gain or lose from the successful operation of [LSAC's application platform] as d[oes] [LSAC] itself." *Nanavati v. Burdette Tomlin Mem'l Hosp.*, 857 F.2d 96, 118 (3d Cir. 1988).

Plaintiff also does not plausibly allege, as he must, that any Member Law School is an actual or potential competitor of LSAC. *See Am. Needle*, 560 U.S. at 197. Plaintiff alleges that LSAC competes in one market: the Law School Application Platform market. Compl. ¶73. Member Law Schools are consumers—not actual or potential competitors—in this alleged market.

No Member Law School is alleged to operate a law school application platform or have any intention or even the capability of doing so. Indeed, Plaintiff does not identify a single non-member law school that developed its own application platform. Nor do schools generally develop

6

their own application platforms: undergraduate colleges use the Common Application, Compl. ¶49, while medical schools use a centralized application platform developed by the Association of American Medical Colleges, *see Durbal* Compl. That is for good reason. Using a common system across schools "simplifies the … application process for both candidates and … schools." Compl. ¶23. And as numerous courts have recognized, self-supplying a product is difficult and depends upon, among other things, whether the school has the resources and incentive to do so—none of which is plausibly alleged. *See, e.g.*, *United States v. Grinnell Corp.*, 384 U.S. 563, 574 (1996) (proprietary security systems "are not realistic alternatives for most concerns"); *United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 57-60 (D.D.C. 2011) (manual tax preparation requires "effort, resources, and time investment"). Plaintiff's unexplained allegation that "[t]he Member Law Schools compete for applicants, and thus each is a competitor in the market for the platform for handling applications to law school," Compl. ¶75, is entirely conclusory and cannot be credited.

Even more implausible—and likewise unalleged—is the notion that a Member Law School would or could enter the market in competition with LSAC by developing an application platform to sell to other law schools, as would need to be the case for it to qualify as LSAC's potential competitor. *See Am. Needle*, 560 U.S. at 200 (NFL teams were potential competitors in IP market because each could "grant[] … licenses to use its trademarks" in competition with one another and challenged IP licensing joint venture). Plaintiff does not allege that any law school has ever done such a thing, nor any facts suggesting any school would assume the risks and costs of doing so. Member Law Schools are therefore consumers, not competitors, of application platforms.

In these circumstances, the Third Circuit has repeatedly held that firms are legally incapable of conspiring with intrafirm entities that have "no interest in competition with" the firm. *Weiss v. York Hosp.*, 745 F.2d 786, 817 (3d Cir. 1984). In *Weiss*, the court held that a "hospital

could not, as a matter of law, conspire with [its] medical staff" regarding "staff privilege decisions" the staff made "on behalf of the hospital" because "the medical staff operated as an officer of a corporation would in relation to the corporation" and "as an entity had no interest in competition with the hospital." *Id.* Likewise, the court held in *Siegel Transfer, Inc. v. Carrier Express, Inc.* that a corporation is incapable of conspiring with agents that "d[o] not compete with" their corporate principal. 54 F.3d 1125, 1135 (3d Cir. 1995).

That law controls here. Plaintiff has alleged nothing to suggest that the Member Law Schools compete with, or have any interest in competing with, LSAC. As a result, LSAC is not capable of conspiring with the Member Law Schools on decisions made within LSAC. Any internal coordination among LSAC and the Member Law Schools on fee-setting decisions— which, again, is not plausibly alleged—would therefore not be concerted action as a matter of law. *Am. Needle*, 560 U.S. at 200. LSAC's fees are set unilaterally, and the Section 1 claims fail.

### B.    Plaintiff Has Not Plausibly Alleged A Horizontal Conspiracy Among The Member Law Schools

Even assuming LSAC's pricing decisions *could* amount to concerted action, Plaintiff has pled no facts raising a plausible inference that they are, in fact, the product of an agreement among the Member Law Schools. A plaintiff has two ways to plead an agreement. It can either plead "direct evidence" of a conspiracy that "is explicit and requires no inferences to establish" the agreement, *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 118 (3d Cir. 1999), such as "a document or conversation explicitly manifesting the existence of the agreement in question," *Ins. Brokerage*, 618 F.3d at 324 n.23. Or it can plead circumstantial evidence of a conspiracy through parallel conduct accompanied by "plus factors" which place the parallel conduct "'in a context that raises a suggestion or a preceding agreement'" and "'tend[s] to rule out the possibility that the defendants were acting independently.'" *Id.* at 321-22. Plaintiff does not plausibly allege either.

### 1.    Plaintiff alleges no direct evidence of an agreement.

Plaintiff offers no factual allegations "explicit[ly]" showing that the Member Law Schools agreed with one another to do anything regarding LSAC's application platform, let alone fix the fees LSAC charges. *See Baby Food*, 166 F.3d at 118. Indeed, the Complaint provides no factual detail at all about any Member Law School's participation in an alleged horizontal conspiracy. Plaintiff instead lumps the alleged coconspirators together and makes conclusory allegations directed towards them as a group—including that they "explicitly agreed to restrict competition over the total fee to apply to law school," Compl. ¶¶105, 127, and "that LSAC could charge applicants a fixed and uniform price for Law School Application Platform fees," *id.* ¶107. These allegations "furnish[] no clue as to which of the" Member Law Schools "(much less which of their employees) supposedly agreed, or when and where the illicit agreement took place" and are exactly the kind of vague, conclusory allegations the Supreme Court condemned in *Twombly*, 550 U.S. at 565 n.10. They certainly do not amount to direct evidence of a horizontal agreement.

### 2.    Plaintiff alleges no circumstantial evidence of an agreement.

Plaintiff also fails to plead circumstantial evidence of a horizontal agreement. His Complaint asks the Court to "infer an implicit agreement from the" supposedly "parallel conduct that every Member Law School uses LSAC for its Law School Application Platform," based on two pieces of supposed additional context: (1) using LSAC's platform "is contrary to Member Law Schools' interests to compete for applicants by offering more favorable and cost-effective application platforms"; and (2) the challenged conduct "is not independently determined parallel conduct because of the Member Law Schools' membership in and control over LSAC." Compl. ¶¶105, 127. This theory of circumstantial evidence fails on every level.

*First*, Plaintiff fails to plausibly allege parallel conduct. The Complaint contains no "facts about when any of the" schools "began to use" LSAC's application platform. *Dai v. SAS Inst. Inc.*,

2025 WL 2078835, at *3 (N.D. Cal. July 18, 2025). To show parallel conduct, Plaintiff was required to plead facts suggesting that the schools' actions were "'reasonably proximate in time.'" *In re Generic Pharms. Pricing Antitrust Litig.*, 394 F. Supp. 3d 509, 525 (E.D. Pa. 2019). Because he did not, the alleged parallel conduct is implausible. *Dai*, 2025 WL 2078835, at *4.

*Second*, Plaintiff's conclusory allegation that using LSAC's platform is contrary to the Member Law Schools' self-interest, Compl. ¶¶105, 127, is belied by the Complaint's allegations and does not make economic sense.

The Complaint itself provides an "obvious alternative explanation" to an agreement for why the schools would use LSAC's platform. *Ins. Brokerage*, 618 F.3d at 322-23. The schools do so because it "simplifies the law school application process." Compl. ¶23. As the Complaint explains, centralized application platforms like LSAC's provide several advantages. Applicants can "apply to many schools through a central application service" with a uniform report summarizing their credentials and assembling their letters of recommendation. *See id*. ¶¶25, 48-49. A centralized system "enables [schools] to review and process applications … as well as manage enrollment" all in one place. *See id.* ¶¶33, 49. This contrasts with decentralized application platforms, which require applicants to collect and submit the same "test scores, GPA data, and other applicant information" to multiple systems. *Id.* ¶56. None of these benefits depend on an agreement. It is thus clear that "the rationality of each [school's] decision to" use LSAC's platform "does not presuppose concerted action," and is instead manifestly rational unilateral conduct. *Ins. Brokerage*, 618 F.3d at 332.

Plaintiff does not allege that it is irrational for the schools to use LSAC's platform to obtain these benefits, but only that doing so under the platform's current pricing structure is irrational. Compl. ¶¶63-66. These allegations make little sense. On one hand, Plaintiff claims that "[t]op

ranked law schools are forgoing significant application fees" because "[a]pplicants are willing to pay high fees to apply" that the schools could collect on their own, without LSAC collecting a portion of them. *Id.* ¶¶63-64. But Plaintiff does not even attempt to explain why highly ranked law schools would participate in a price-fixing scheme that *lowers* what they could earn in application fees. Courts do not infer the existence of a conspiracy where, as here, plaintiff's theory "'makes no economic sense.'" *Brunson Commc'ns, Inc. v. Arbitron, Inc.*, 239 F. Supp. 2d 550, 563-64 (E.D. Pa. 2002); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-98 (1986) (conspiracies to lower prices typically make no economic sense).

On the other hand, Plaintiff alleges that "[l]ower ranked law schools have largely forfeited their ability to compete on total application fee price" because the fees applicants pay to LSAC are included in the total application fee paid by applicants to those schools. Compl. ¶¶65-66. But again, Plaintiff does not explain why the lower ranked schools would agree to participate in a conspiracy to enrich a separate entity—LSAC—that supposedly hobbles the schools' own ability to compete for applicants. The allegation that LSAC pays "kickback[s]" through grants to certain Member Law Schools does not supply an explanation: there are no facts alleged that the grants are tied to revenues earned from applications to the recipient schools, made in exchange for continued use of the application platform, or relate in any way to the recipients' use of LSAC's platform. *Id.* ¶43. Rather than showing, as Plaintiff needed to, that the Member Law Schools' conduct would be irrational but for the supposed conspiracy, *Ins. Brokerage*, 618 F.3d at 331-32, all these allegations do is show that entering the purported conspiracy would itself be irrational for all concerned, and that it is therefore implausible, *see Brunson*, 239 F. Supp. 2d at 563-64 (agreement implausible where alleged conspirator "had no rational motive to join a conspiracy").

*Third*, Plaintiff wrongly relies on Member Law Schools' participation in a membership-

based organization and independent use of LSAC's application platform as circumstantial evidence of a conspiracy. A membership-based group like LSAC "is not by its nature a 'walking conspiracy.'" *Consol. Metal Prods., Inc. v. Am. Petrol. Inst.*, 846 F.2d 284, 293-94 (5th Cir. 1988). And the law is clear that "joining a trade organization, helping develop its rules, and enforcing those rules"—the latter two of which are not even alleged here—"do not plausibly establish the existence of a … horizontal agreement among competitors." *Davis v. Hanna Holdings, Inc.*, 2025 WL 1737782, at *9 (E.D. Pa. June 23, 2025). In the *Insurance Brokerage* case, plaintiffs alleged that defendants carried out a conspiracy by participating in an industry group, exercising "control" over its affairs, and "adopt[ing]" and adhering to an allegedly anticompetitive policy. 618 F.3d at 313, 349. The Third Circuit rejected this theory, explaining that "neither defendants' membership in the [group], nor their common adoption of the trade group's suggestions, plausibly suggest conspiracy." *Id.* at 349. Nor did allegations "that the defendant brokers collaborated in crafting" the policy "insofar as [they] allegedly 'control[led] the affairs of [the association]," *id.*, and "sat on [the association's] Board of Directors," *id.* at 381.

That case law squarely disposes of Plaintiff's theory here. All Plaintiff alleges is membership in and (with no details at all) governance of LSAC by the Member Law Schools, and their independent use of LSAC's application platform. *See* Compl. ¶¶27, 43, 100, 107, 119. None of this establishes that the schools "acted other than independently" or that their actions were "the product of an agreement." *Ins. Brokerage*, 618 F.3d at 349-50. Courts have repeatedly rejected claims that participation in and purported "control" over membership organizations suffices to show an agreement among the members. *Id.* at 349; *Davis*, 2025 WL 1737782, at *9-10; *Moratis v. West Penn Multi-List, Inc.*, 2024 WL 4436425, at *4 (W.D. Pa. Oct. 7, 2024).

### 3.    Any theory based on Member Law Schools' separate agreements with LSAC is not pled and not viable.

Without a horizontal agreement among the Member Law Schools, Plaintiff has alleged, at most, a "rimless" wheel, which courts have repeatedly held cannot establish a Section 1 violation. A rimless wheel involves "various [entities]"—here, the Member Law Schools—"enter[ing] into separate agreements with a common [entity]"—here, LSAC—but with no connection with one another other than the common entity's involvement in each transaction. *Dickson v. Microsoft Corp.*, 309 F.3d 193, 203 (4th Cir. 2002); *Kotteakos v. United States*, 328 U.S. 750, 755 (1946). Every circuit to address the question—the Second, Fourth, Fifth, and Sixth—has "'held rimless hub-and-spokes conspiracies do not violate § 1 of the Sherman Act.'" *In re EpiPen Direct Purchaser Litig.*, 2022 WL 1017770, at *7 (D. Minn. Apr. 5, 2022). And even if such a claim were viable, Plaintiff has not alleged it. He challenges a single alleged horizontal agreement among the Member Law Schools and a purported "hub-and-spoke" arrangement that is dependent on the existence of the same horizontal agreement. Compl. ¶¶105-08, 127-30. Plaintiff has not even attempted to challenge separate agreements, let alone allege that "every single agreement … had anticompetitive effects" on its own. *See Howard Hess Dental Lab'ys, Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 256-57 (3d Cir. 2010) (rejecting attempt to convert failed hub-and-spoke into rimless wheel conspiracy theory). Accordingly, absent a plausibly alleged horizontal agreement—which there is not—the Section 1 claims must be dismissed. *Id.*

## II.    COUNTS I AND II FAIL BECAUSE ANY ALLEGED AGREEMENT IS NOT AN UNREASONABLE RESTRAINT OF TRADE

Even assuming Plaintiff has plausibly alleged an agreement, he has not plausibly pled that it constitutes an unreasonable restraint of trade. Whether an agreement is "unreasonable" can be assessed under either the *per se* rule or the rule of reason. "The rule of reason 'presumptively applies' in § 1 cases." *Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop., Inc.*, 89 F.4th 430,

438 (3d Cir. 2023). *Per se* treatment "is reserved for only those agreements that are 'so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality.'" *Texaco*, 547 U.S. at 5. Plaintiff's attempts to state a claim under either framework fail.

### A.    Any Alleged Agreement Is Subject To The Rule Of Reason

Plaintiff alleges that the supposed conspiracy challenged in Counts I and II is *per se* illegal. Compl. ¶¶111, 135. He is wrong, for two reasons, and the *per se* claim must be dismissed.

*First*, assuming arguendo that Plaintiff had plausibly alleged that "[t]he Member Law Schools directed LSAC to develop a suite of software to process electronic applications," Compl. ¶22, LSAC would be a joint venture in which "multiple sources of economic power cooperat[e] to produce a product." *Am. Needle*, 560 U.S. at 199. "[T]he pricing decisions of a legitimate joint venture"—like LSAC is alleged to be—"do not fall within the narrow category of activity that is *per se* unlawful under § 1 of the Sherman Act." *Texaco*, 547 U.S. at 8. That is because joint venture price-setting is "not a pricing agreement between competing entities with respect to their competing products." *Id.* at 6; *see also Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 9 (1979) ("*BMI*"). This aligns with the well-established rule that *per se* treatment is inappropriate when the restraint is "'essential if the product is to be available at all.'" *Am. Needle*, 560 U.S. at 203. Whether set by agreement or not, setting the fees at which LSAC offers its application platform is plainly "necessary to market the product." *BMI*, 441 U.S. at 23.

*Second*, rule of reason analysis is also required because the challenged conduct has facially procompetitive benefits. *See FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 459 (1986); *United States v. Brown Univ.*, 5 F.3d 658, 669 (3d Cir. 1993); *Winn-Dixie Stores*, 89 F.4th at 435. Plaintiff recognizes that LSAC's platform benefits law school applicants. It allows them to use a single service to apply to multiple schools at once, "saving [applicants] time and effort" and sparing them the burdensome process of repetitively uploading the same application materials to multiple

14

separate platforms. *See* Compl. ¶¶23, 25, 48-49, 56. Those benefits are enhanced as more law schools use the same application platform. Accordingly, an agreement among all of the Member Law Schools to use LSAC's platform would "increase economic efficiency" for applicants, precluding *per se* treatment. *BMI*, 441 U.S. at 20-23.

**B.    Under The Rule Of Reason, Both Counts I And II Fail**

**1.    Count I fails to state a rule of reason claim.**

Count I alleges a restraint in either the "J.D. Education Market," meaning "the market for providing students with the education for a juris doctor degree," or, "[i]n the alternative," unspecified "submarkets" comprised of "certain law schools" that are not identified. Compl. ¶¶68, 71. This claim fails because the alleged markets are implausible (or unspecified), and Plaintiff fails to plausibly allege, as he must, that the "'challenged restraint has a substantial anticompetitive effect that harms consumers in'" these alleged markets. *Winn-Dixie Stores*, 89 F.4th at 438.

**i.    The J.D. Education markets are implausible.**

A valid relevant market must include "commodities reasonably interchangeable by consumers for the same purpose," which are "characterized by a cross-elasticity of demand." *Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715, 722 (3d Cir. 1991). "Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand … the relevant market is legally insufficient and a motion to dismiss may be granted." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997).

The alleged "J.D. Education" market is implausible. There are no facts alleged suggesting that all law schools are reasonably interchangeable with one another, and Plaintiff has thus entirely failed to explain "why they are appropriately in the same product market." *Fresh Made, Inc. v. Lifeway Foods, Inc.*, 2002 WL 31246922, at *5 (E.D. Pa. Aug. 9, 2002). The Complaint alleges students seek out top schools "based on their reputation and the expectation that applicants will

have increased earning potential or career opportunities by attending those schools." Compl. ¶64. "[I]t is implausible to suggest[] that lower-[ranked law schools] offer the same high level of in-kind benefits" to students as top law schools, and Plaintiff does not allege they do. *Rock v. NCAA*, 928 F. Supp. 2d 1010, 1022 (S.D. Ind. 2013). "Plaintiff['s] decision to lump all [law] schools into the same market regardless of material distinctions" renders the alleged market implausible. *Id.*

It is no answer that Plaintiff has proposed unspecified "submarkets" in the alternative. These "fail for the simple reason that Plaintiff[] do[es] not actually propose the contours of a relevant market." *Choh v. Brown Univ.*, 753 F. Supp. 3d 117, 133 (D. Conn. 2024) (dismissing claim based on alleged market with participants that were "not identified"). The Complaint does not say "which [law schools] are a part of the" alleged submarkets, "let alone which … are reasonably interchangeable." *Prescient Med. Holdings, LLC v. Lab'y Corp. of Am. Holdings*, 2019 WL 635405, at *6 (D. Del. Feb. 14, 2019). "Without an explanation of" which law schools are supposedly competitors in these submarkets, "the court cannot determine the boundaries of the relevant product market and must dismiss the case for failure to state a claim." *Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 437 (6th Cir. 2008).

> ii. **The Complaint does not allege competitive harm in the J.D. Education markets.**

The supposed harm Plaintiff identifies is that the alleged agreement impairs schools' ability to "compete on price for law school applications." Compl. ¶111. But Plaintiff's own allegations contradict this theory. The Complaint makes clear that—to the extent application fees are a meaningful dimension of competition among law schools at all—the alleged agreement does not harm market-wide competition nor does it harm consumers.

Plaintiff explains that, in addition to the fees to use LSAC's platform, "most Member Law Schools" charge applicants school-specific fees ranging from $50 to $105. Compl. ¶30. Thus, the

total application fee to apply to a particular school includes both the fees charged by LSAC and the fee charged by the school. Plaintiff alleges that the total application fee for schools in an unrestrained market would be based on "[a]pplicants['] … willing[ness] to pay," which reflects "demand for those schools." *Id.* ¶64. Accordingly, in an unrestrained market, if LSAC's fees were less than applicants' willingness to pay to apply for a given school, that school could rationally charge an additional fee to capture the applicants' full willingness to pay. But that is exactly what Plaintiff alleges the Member Law Schools do. *Id.* ¶30. The Complaint contains no allegations that, by charging a school-specific fee, schools are doing anything other than setting their total application fee in accordance with school-specific demand to match applicant willingness to pay. And it is illogical to believe—and Plaintiff does not allege—that law schools that have already chosen to charge an additional fee and set their total application fee above LSAC's fees would, absent the supposed agreement, change course and decide to lower their total application fee rather than keeping it the same and collecting "significant application fees" themselves. *Id.* ¶63.

Moreover, Plaintiff does not identify any school that refrained from charging a school-specific fee because LSAC's fees already exceed applicants' willingness to pay to apply to that school. Only those schools would have an incentive to lower their total application fee absent the alleged agreement. If any such schools exist, they are a small minority, given that "most" schools charge additional fees. Compl. ¶30. Regardless, as a matter of law, a restraint affecting only a small subset of schools' pricing cannot cause "anticompetitive effects on the overall market." *Deborah Heart & Lung Ctr. v. Virtua Health, Inc.*, 833 F.3d 399, 403-04 (3d Cir. 2016); *see, e.g.*, *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 30 (1984); *Eichorn v. AT&T Corp.*, 248 F.3d 131, 140 (3d Cir. 2001); *Penn. v. NCAA*, 948 F. Supp. 2d 416, 431 (M.D. Pa. 2013); *Choh*, 753 F. Supp. 3d at 133-34.

17

**2.    Count II fails to state a rule of reason claim.**

Count II alleges a restraint in the "Law School Application Platform Market." This market is implausible, and Plaintiff fails to allege the supposed agreement harmed competition within it.

### i.    The "Law School Application Platform Market" is implausible.

There is not a single allegation—even a conclusory one—that there are no reasonably interchangeable substitutes for Law School Application Platforms or about the cross-elasticity of demand for them. Compl. ¶¶73-76. This does not "provide any factual basis nor analysis to support [Plaintiff's] bare assertion" of the relevant market—precisely the circumstances in which courts dismiss antitrust claims on market definition grounds. *See, e.g.*, *Bldg. Materials Corp. of Am. v. Rotter*, 535 F. Supp. 2d 518, 525 (E.D. Pa. 2008); *Brotech Corp. v. White Eagle Int'l Techs. Grp., Inc.*, 2003 WL 22797730, *5, *8 (E.D. Pa. Nov. 18, 2003). That mandates dismissal of Count II.

Nothing in the Complaint plausibly suggests it is appropriate to limit the relevant market to only the subset of application platforms that specifically facilitate law school applications—and there is ample reason to believe it is inappropriate. According to Plaintiff, "law school admissions do not pose any unique technical requirements," Compl. ¶61, and at least one university "uses the same application software … for all [of its] graduate programs," *id.* ¶58. The most natural inference from the Complaint is thus that a supplier of general application platforms could support law school applications and compete with LSAC and other law school-specific application platforms. The alleged market therefore "does not encompass any interchangeable substitute products," which, coupled with Plaintiff's failure to "allege that there are no substitutes," requires dismissal. *Brotech*, 2003 WL 22797730, at *5.

### ii.    The Complaint does not allege competitive harm in the Law School Application Platform market.

As alleged, the Law School Application Platform market is a market for a two-sided

transaction "platform to handle applications to U.S. law schools." Compl. ¶73. "The key feature of transaction platforms is that they cannot make a sale to one side of the platform without simultaneously making a sale to the other." *Ohio v. Am. Express Co.*, 585 U.S. 529, 535 (2018) ("*Amex*"). That is the case here. As the Complaint explains, LSAC's application platform "comprises both applicant-facing and Member Law School-facing elements." Compl. ¶22. When an applicant uses the platform to submit an application, a school on the other side uses the platform to receive the application. *See id.* ¶¶23, 33. Applicants and schools using the platform thus "jointly consume a single product"—transactions processing a law school application. *Amex*, 585 U.S. at 545. The relevant market for a two-sided transaction platform "must *always* include both sides of the platform." *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 56 (2d Cir. 2019).

Thus, determining whether the alleged agreement harmed competition in this market requires examining its effects on the "market as a whole," meaning both the applicant-side and the school-side of the platform. *Amex*, 585 U.S. at 546-47. Here, Plaintiff "wrongly focus[es] on only one side of the two-sided" application platform market. *Id.* at 547. The only competitive harm alleged in the Complaint is higher fees charged to applicants. *See* Compl. ¶¶23-32, 53. But "[e]vidence of a price increase on one side of a two-sided transaction platform cannot by itself demonstrate an anticompetitive exercise of market power." *Amex*, 585 U.S. at 547. On the school side of the market, Plaintiff alleges only benefits: for instance, schools "receive the LSAC … platform at no cost" and are eligible to receive ancillary services, including grants. Compl. ¶¶43-44. There are no allegations that law schools would somehow benefit *more* absent the challenged conduct. At minimum, to proceed on a theory of harm based on supracompetitive pricing, Plaintiff was required to allege that "the net prices charged to" users on both sides "*combined* exceeded the prices that would have been charged" absent the challenged conduct. *US Airways*, 938 F.3d at 59;

*Amex*, 585 U.S. at 548. The Complaint does not allege what the combined cost of application processing transactions across both sides of the platform would be absent the alleged agreement, or otherwise allege any facts sufficient to show net harm accounting for both sides, and thus has failed to plausibly allege harm to "the market as a whole." *Amex*, 585 U.S. at 546-47.

## III.    COUNT III FAILS TO STATE A MONOPOLIZATION CLAIM

Count III, which asserts that LSAC unlawfully monopolized the Law School Application Platform market, should also be dismissed. To state a monopolization claim under Section 2, Plaintiff must plausibly allege: (1) "the possession of monopoly power in the relevant market," *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 306-07 (3d Cir. 2007), and (2) "exclusionary or predatory conduct without a valid business justification," *LePage's Inc. v. 3M*, 324 F.3d 141, 152 (3d Cir. 2003). Neither of these elements is plausibly alleged.

### A.    LSAC Does Not Have Monopoly Power

A plaintiff can show monopoly power through "indirect evidence," which requires sufficiently alleging a "relevant market" in which "a firm has a dominant share" protected by "significant 'entry barriers.'" *Broadcom*, 501 F.3d at 307. It can also offer "direct evidence of supracompetitive prices and restricted output." *Id.* Plaintiff does not plausibly allege either.

*First*, Plaintiff cannot rely on indirect evidence because the alleged Law School Application Platform market is implausible. *See supra* p.18. He also does not allege any significant barriers to entry, and the Complaint makes clear none exist. The Complaint alleges that "law school admissions do not pose any unique technical requirements" and that "multiple outside vendors" such as "Salesforce, Oracle, Technolutions, and others" could readily enter the market. Compl. ¶¶60-61. Plaintiff indeed alleges that some already have. *Id.* ¶74 ("vendor[s] other than LSAC" provide other platforms). He thus concedes new firms can easily enter, so the market lacks entry barriers. *Phila. Taxi Ass'n v. Uber Techs., Inc.*, 886 F.3d 332, 342 n.6 (3d Cir. 2018).

Plaintiff's conclusory allegation that LSAC's provision of its platform to law schools "at no cost … while providing kickbacks"—really, grants—"to schools using price-fixed fees," creates "insurmountable barriers to entry for competitors," Compl. ¶¶144-45, does not establish an entry barrier at all, let alone a "significant" one. There are no facts alleged suggesting a new entrant could not offer schools its platform for free as LSAC allegedly does. Plaintiff fails to explain why a competitor could not challenge LSAC by charging applicants less than the supposed "more than a 10,000% markup on the per-application cost" LSAC charges while still offering the platform at no cost to schools. *Id.* ¶59. Nor does he allege any impediment to a new competitor using fees charged on the applicant side to offer its platform at a negative price on the school side—a competitive strategy transaction platform operators routinely employ. *See, e.g.*, *Amex*, 585 U.S. at 536-37 (credit cards charge merchants fees and "might well *lose* money on the cardholder side by offering rewards"). If anything, LSAC's alleged school-side pricing practices are "efficient, aggressive competition," which is not "a structural barrier to entry." *United States v. Syufy Enters.*, 903 F.2d 659, 667 (9th Cir. 1990).

*Second*, Plaintiff fails to plead direct evidence of monopoly power. Doing so requires alleging *both* supracompetitive pricing *and* reduced output. *Broadcom*, 501 F.3d at 307; *BanxCorp v. Bankrate, Inc.*, 847 F. App'x 116, 120 (3d Cir. 2021). Plaintiff concedes that LSAC's output has surged, with "applicants … increas[ing] every year since the 2023 cycle" and "the 2025 cycle seeing more than a 23% increase in applicants." Compl. ¶149. Thus, "[e]ven assuming the prices were supracompetitive," Plaintiff thus does "not offer sufficient evidence to find monopoly power through direct evidence." *BanxCorp*, 847 F. App'x at 120. In any case, the Complaint's supracompetitive pricing allegations are deficient. Plaintiff relies on the allegation that LSAC increased its applicant fee "[i]n every application cycle since 2023." Compl. ¶149. But "price

increases, without more, do not constitute supracompetitive pricing." *BanxCorp*, 847 F. App'x at

120. Moreover, the supposed "increases" in the fee—ranging from 2.5% to 3.8% year over year,

Compl. ¶29—are so minor as to reflect simply an inflation adjustment, an "obvious alternative

explanation" Plaintiff makes no attempt to rule out, *Twombly*, 550 U.S. at 567.

### B.    Plaintiff Does Not Allege Any Exclusionary Conduct

Exclusionary conduct must "cause anticompetitive effects in the relevant market." *Eisai,*

*Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 407 (3d Cir. 2016). With no showing that the

implausible agreement underlying his Section 1 claims harmed market-wide competition, *see*

*supra* pp.18-20, the agreement could not be exclusionary even if it were plausible.

Further, Plaintiff offers only the cursory, conclusory allegation that LSAC provides its

application platform to schools pursuant to "exclusive agreements" and challenges those

agreements as exclusive dealing. Compl. ¶146. "An exclusive dealing arrangement is an agreement

in which a buyer agrees to purchase certain goods or services only from a particular seller for a

certain period of time," *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 270 (3d Cir. 2012), and

"requires 'the purchaser not to deal in the goods of a competitor of the seller,'" *Yeager's Fuel, Inc.*

*v. Pennsylvania Power & Light Co.*, 953 F. Supp. 617, 655 (E.D. Pa. 1997). There are no factual

allegations that the schools' agreements with LSAC include any such terms, so Plaintiff has not

"plausibly allege[d] that [the challenged] agreement[s] require[] exclusivity." *Power Analytics*

*Corp. v. Operation Tech., Inc.*, 2018 WL 10231437, at *15-18 (C.D. Cal. July 24, 2018). Nor are

there any facts supporting Plaintiff's alternative theory that the agreements are supposedly "*de*

*facto* exclusive agreements." Compl. ¶146. Nothing about their terms is even alleged, so it is not

possible to infer—as is required—that LSAC somehow implicitly conditioned access to its

platform on schools forgoing the use of any other platform. *ZF Meritor*, 696 F.3d at 286-88;

*LePage's*, 324 F.3d at 158-59.

**IV.    PLAINTIFF HAS NOT PLAUSIBLY ALLEGED THAT HE HAS ANTITRUST STANDING**

Private plaintiffs bringing claims under the federal antitrust laws must show that they have "antitrust standing," which is a "far more limiting" test than standing under Article III. *Host Int'l, Inc. v. MarketPlace, PHL, LLC*, 32 F.4th 242, 249 (3d Cir. 2022). To find antitrust standing, courts must "evaluate the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 (1983). The purpose of the inquiry is to "determine if [a] plaintiff has suffered an injury which bears a causal relation to an alleged antitrust violation," in service of which courts consider the following factors:

> (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages.

*In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1165 (3d Cir. 1993). "[D]irect[ness] … of the injury" is "all-important" and often "absorbs the question of causal connection." *Id.*

Plaintiff's theory of injury is too speculative and attenuated from the challenged conduct to confer antitrust standing. He alleges that, absent the challenged conduct, the application fees that he paid LSAC "would have been lower or nonexistent" and that some unspecified combination of law schools and application platforms would have charged him less. Compl. ¶¶114, 138, 152.

*First*, Plaintiff has alleged no facts supporting his assertion that LSAC or its pricing structure caused him to pay more in application fees than he otherwise would have. As the Complaint explains, LSAC charges applicants an up-front subscription fee to use the platform and

then a lower per-application fee for each school to which they apply. Compl. ¶29. Thus, much of

the costs of processing applications LSAC allegedly passes on to applicants are only passed on

once. And according to Plaintiff, the average applicant applies to about eight schools. *See id.* ¶1

(500,000 applications submitted by 60,000 individuals in 2025). Plaintiff entirely fails to explain

how this system leads to higher costs instead of *lowering* the overall cost of applying to law school.

Instead, Plaintiff's own allegations confirm that LSAC's pricing structure reduces fees for

applicants as compared to his proposed alternatives. For example, Plaintiff alleges that Georgia

Tech charges "a $95 all-in application fee" for its graduate programs. Compl. ¶58. A prospective

law student submitting eight applications pays LSAC a total of $575. *See id.* ¶29. The same student

applying to eight schools using separate platforms and Georgia Tech's $95 per-application pricing

would pay $760. Plaintiff also alleges that some schools would *increase* their fees, which Plaintiff

suggests would rise to between $250-$275 per application for "[t]op ranked law schools." *Id.* ¶¶57,

63-64. That is more than it costs to apply to just one school through LSAC, and the gap only

widens as the number of applications increases because the fee for additional applications through

LSAC is just $45. *See id.* ¶29. Thus, based solely on Plaintiff's allegations—which provide no

information about which or how many schools he applied to—there is no reason to believe that

LSAC's pricing increased the total amount Plaintiff spent to apply to law school, and significant

reason to believe it lowered it. He has thus failed to plausibly allege a "causal connection between

the antitrust violation and the harm" asserted. *Lower Lake Erie*, 998 F.2d at 1165.

*Second*, Plaintiff fails to allege a "direct[] … injury" because there are "too many

speculative links in the chain of causation" between the alleged violation and his injury. *See City

of Oakland v. Oakland Raiders*, 20 F.4th 441, 459-60 (9th Cir. 2021); *Lower Lake Erie*, 998 F.2d

at 1168 ("missing links in the causation chain" weigh against standing). Plaintiff's overcharge

theory depends on a series of unsupported and speculative inferences, such as that, absent the challenged conduct (1) other application platforms would enter the market to drive fees down; or (2) schools would develop their own platforms rather than using LSAC; and (3) those alternative platforms would offer a pricing structure resulting in a lower overall cost of applying to law school. The Complaint offers no facts to support any of these inferences, let alone all of them.

"[T]he Supreme Court has consistently emphasized the difficulty in calculating how market forces work on the different purchasers and sellers in an economic system." *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 93 (3d Cir. 2011). The Third Circuit has accordingly held that a plaintiff lacks antitrust standing when their theory requires the court to "attempt to ascertain what price the defendants' competitors would have charged had there not been a conspiracy," which is, "at the very least … highly conjectural." *Mid-W. Paper Prods. Co. v. Cont'l Grp., Inc.*, 596 F.2d 573, 584 (3d Cir. 1979). That is particularly true here where, as Plaintiff explains, law schools would set application fees based on, among other things, school-specific assessments of "[a]pplicants['] … willing[ness] to pay high fees to apply," Compl. ¶64, and "competitive decisions" of whether "to pass application costs to applicants," *id.* ¶52. The Complaint offers no assurance that "'creat[ing] in hindsight'" this complex but-for world "'that never came into existence'" would be anything other than "'entirely speculative and beyond the competence of a judicial proceeding,'" and Plaintiff thus lacks antitrust standing. *Kloth v. Microsoft Corp.*, 444 F.3d 312, 325 (4th Cir. 2007).

Separately, and in all events, Plaintiff lacks standing to pursue his claim for injunctive relief. Compl., Prayer(d). He does not allege that he intends to apply to law school again and thus has not "show[n] that he is 'likely to suffer future injury' from the defendant's conduct." *McNair v. Synapse Grp. Inc.*, 672 F.3d 213, 223 (3d Cir. 2012).

## CONCLUSION

Plaintiff's Complaint should be dismissed with prejudice for the reasons set forth herein.

Dated: October 9, 2025                  Respectfully submitted,

/s/ *Alan E. Schoenfeld*

Alan E. Schoenfeld (*pro hac vice*)
David Z. Gringer (*pro hac vice*)
Paul Vanderslice (*pro hac vice*)
WILMER CUTLER PICKERING
 HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: (212) 230-8800
Alan.Schoenfeld@wilmerhale.com
David.Gringer@wilmerhale.com
Paul.Vanderslice@wilmerhale.com

Medha Gargeya (*pro hac vice*)
Kimberly Chen (*pro hac vice*)
WILMER CUTLER PICKERING
 HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: (202) 663-6000
Medha.Gargeya@wilmerhale.com
Kimberly.Chen@wilmerhale.com

George P. Varghese (Pennsylvania Bar No. 94329)
WILMER CUTLER PICKERING
 HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
George.Varghese@wilmerhale.com

*Attorneys for Defendant Law School Admission Council, Inc.*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing does not exceed 25 pages, exclusive of the cover page, table of contents, table of authorities, and signature page, and adheres to the requirements set forth in Section 9 of this Court's policies and procedures.

Dated: October 9, 2025                          /s/ *Alan E. Schoenfeld*
                                                Alan E. Schoenfeld