**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| Linvel James Risner, on behalf of himself and those similarly situated, | Case No.  25-cv-4461-JFM |
| Plaintiff, | |
| v. | |
| Law School Admission Council, Inc., | |
| Defendant. | |

**<u>PLAINTIFF'S RESPONSE AND MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS</u>**

i

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT .................................................................................. 1

BACKGROUND .................................................................................................... 1

LEGAL STANDARD.............................................................................................. 3

ARGUMENT ....................................................................................................... 4

    I.    The Council Violated Sherman Act Section 1 by Setting CAS Fees for All
    Member Law Schools. ............................................................................. 4

        A.    Applicant Alleges Concerted Action from Setting CAS Fees at the Same
        Price for Each School................................................................. 4

        B.    The Council's Setting of CAS Fees at the Same Price for Each School Is
        *Per Se* Illegal Price Fixing. ..................................................... 11

        C.    The Council's Price Fixing Is Illegal Under the Rule of Reason. ............ 13

        D.    Applicant Sufficiently Defines Two Relevant Markets............................ 14

    II.    Applicant States a Section 2 Claim for Monopolization. .................................... 17

        A.    There Is Direct and Indirect Evidence of Monopoly Power. .................... 17

        B.    Applicant Alleges Exclusionary Conduct. ................................................. 20

    III.    Applicant Alleges Antitrust Standing. .................................................. 23

CONCLUSION.................................................................................................... 25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Allen-Myland, Inc. v. IBM Corp.*,
  33 F.3d 194 (3d Cir. 1994)........................................................................................25

*Alvord-Polk, Inc. v. F. Schumacher & Co.*,
  37 F.3d 996 (3d Cir. 1994)......................................................................................4, 5

*Am. Needle, Inc. v. NFL*,
  560 U.S. 183 (2010)................................................................................................6, 9

*Arizona v. Maricopa Cnty. Med. Soc'y*,
  457 U.S. 332 (1982)..............................................................................................6, 12

*Broadcom Corp. v. Qualcomm*,
  501 F.3d 297 (3d Cir. 2007)......................................................................................18

*Choh v. Brown University*,
  753 F.Supp.3d 118 (D. Conn. 2024).........................................................................16

*Copperweld Corp. v. Independence Tube Corp.*,
  467 U.S. 752 (1984).....................................................................................................7

*Costar Grp., Inc. v. Commer. Real Est. Exch., Inc.*,
  141 F.4th 1075 (9th Cir. 2025) .................................................................................18

*Davis v. Hanna Holdings, Inc.*,
  787 F.Supp.3d 42 (E.D. Pa. 2025) ..............................................................................6

*Duke Energy Carolinas, LLC v. NTE Carolinas II LLC*,
  111 F.4th 337 (4th Cir. 2024) ...................................................................................23

*In re Generic Pharms. Pricing Antitrust Litig.*,
  394 F.Supp.3d 509 (E.D. Pa. 2019) ............................................................................9

*Goldfarb v. Va. State Bar*,
  421 U.S. 773 (1975)......................................................................................................6

*Greystone Mortg., Inc. v. Equifax Workforce Sols. LLC*,
  No. 24-cv-2260-JFM, 2025 WL 540012 (E.D. Pa. Feb. 18, 2025) ........................3, 21, 22, 24

*Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*,
  602 F.3d 237 (3d Cir. 2010)......................................................................................10

*In re Ins. Brokerage Antitrust Litig.*,
618 F.3d 300 (3d Cir. 2010)..............................................................5, 8, 14

*Interstate Circuit, Inc. v. United States*,
306 U.S. 208 (1939)..................................................................................8

*LePage's, Inc. v. 3M*,
324 F.3d 141 (3d Cir. 2003)..............................................................21, 22

*Lifewatch Servs. v. Highmark Inc.*,
902 F.3d 323 (3d Cir. 2018)..........................................................4, 9, 15, 17

*In re Lower Lake Erie Iron Ore Antitrust Litig.*,
998 F.2d 1144 (3d Cir. 1993)...................................................................23

*Marchbanks Truck Serv. v. Comdata Network, Inc.*,
No. 07-cv-01078-JKG, 2011 WL 11559549 (E.D. Pa. Mar. 29, 2012)...................................21

*In re Modafinil Antitrust Litig.*,
837 F.3d 238 (3d Cir. 2016)..............................................................23, 24

*Moratis v. W. Penn Multi-List, Inc.*,
No. 2:23-cv-2061, 2024 WL 4436425 (W.D. Pa. Oct. 7, 2024)...............................................7

*Muhammad v. NAR*,
No. 5:24-cv-5543-JFL, 2025 WL 2171143 (E.D. Pa. July 31, 2025)......................................6

*Mylan Pharms. Inc. v. Warner Chilcott Pub. Ltd. Co.*,
838 F.3d 421 (3d Cir. 2016)..............................................................17, 18

*Nat'l Soc'y of Prof'l Eng'rs v. United States*,
435 U.S. 679 (1978)................................................................................11

*NCAA v. Alston*,
594 U.S. 69 (2021)................................................................................16

*Ohio v. American Express Co.*,
585 U.S. 529 (2018)..............................................................................14, 18

*In re Processed Egg Prods. Antitrust Litig.*,
881 F.3d 262 (3d Cir. 2018)....................................................................24

*Rock v. NCAA*,
928 F.Supp.2d 1010 (S.D. Ind. 2013) ....................................................16

*Siegel Transfer, Inc. v. Carrier Express, Inc.*,
54 F.3d 1125 (3d Cir. 1995)......................................................................7

*In re Suboxone Antitrust Litig.*,
    64 F.Supp.3d 665 (E.D. Pa. 2014) (Goldberg, J.)......................................................15, 19, 20

*In re Surescripts Antitrust Litig.*,
    608 F.Supp.3d 629 (N.D. Ill. 2022) ................................................................................23

*Teva Pharms. USA, Inc. v. Corcept Therapeutics, Inc.*,
    No. 24-cv-03567, 2025 WL 2637507 (N.D. Cal. Sept. 12, 2025).........................................23

*Texaco Inc. v. Dagher*,
    547 U.S. 1 (2006).....................................................................................................7, 12

*United States v. Apple, Inc.*,
    791 F.3d 290 (2d Cir. 2015)............................................................................................11

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) ..........................................................................................20

*United States v. Teva Pharmaceuticals USA, Inc.*,
    No. 20-cr-200-RBS, 2022 WL 7578988 (E.D. Pa. Oct. 13, 2022) .........................................14

*W. Penn Allegheny Health Sys. v. UPMC*,
    627 F.3d 85 (3d Cir. 2010)........................................................................................13, 20

*Weiss v. York Hospital*,
    745 F.2d 786 (3d Cir. 1984).............................................................................................8

*ZF Meritor, LLC v. Eaton Corp.*,
    696 F.3d 254 (3d Cir. 2012)...........................................................................................22

## STATUTES

Sherman Act Section 1 (15 U.S. Code § 1) .....................................................................4, 5, 7, 9

Sherman Act Section 2 (15 U.S. Code § 2) ..................................................................17, 20, 23

## OTHER AUTHORITIES

Fed. R. Civ. P. 12(g)(2).................................................................................................20

Rule 12(b)(6)...............................................................................................................3

Rule 12(g) .................................................................................................................21

## PRELIMINARY STATEMENT

When a high school student applies to college using the centralized Common Application, the college pays no more than $4.80 for the electronic application platform. When a soon-to-be business student applies to business school, the school also pays only a few dollars for application processing. Yet when an aspiring law student electronically applies to any ABA-approved law school, *the applicant pays* processing fees to a middleman the law schools created, the Law School Admission Council: a $215 one-time fee and a $45 fee per application. The Council's application platform is not orders of magnitude better than those for undergraduate and business schools. The staggering annual revenue of more than $30 million—10 times higher than what the Council would receive under the Common Application's pricing structure—stems from anticompetitive and monopolistic conduct that exploits captive law school applicants.

Applicant Linvel James Risner's Complaint details the unlawful practices that keep the Council's racket humming. The Complaint explains how the Council and its 197 member schools set uniform and supracompetitive prices for application processing fees and describes the Council's efforts to shield itself from any competition that might threaten its prosperity. The Council's scattershot arguments for dismissal twist the allegations and misstate the applicable law to downplay the Council's misconduct. Applicant respectfully requests that the Court deny the motion.

## BACKGROUND

Law school deans formed the Council as a not-for-profit membership organization and directed it to "provide services to law schools[.]" Compl. ¶¶ 4, 16–

17, DI 1. The Council's U.S. membership (collectively "Member Law Schools") control the Council because they elect and sit on its Board of Trustees, which manages the Council's "business and affairs" according to its Bylaws. *Id.* ¶¶ 13, 18, 100.

Each year the Member Law Schools compete with each other for law school applicants, including on price. *Id.* ¶¶ 20, 97. Member Law Schools require nearly all applications be submitted through a central platform developed and operated by the Council. *Id.* ¶ 21. The Council brands the platform to applicants as the "Credential Assembly Service" ("CAS"). *Id.* ¶ 23. For the 2026 application cycle, the Council charges applicants a $215 "subscription" fee and a $45 fee per application (collectively "CAS Fees"). *Id.* ¶¶ 24, 29–31. CAS Fees are in addition to school-specific application fees that can cost up to $105. *Id.* ¶ 30. Every year, the Council processes applications from more than 60,000 students, which in 2025 amounted to more than 500,000 applications. *Id.* ¶ 1. The Council collected more than $30 million from CAS Fees in each of the last three reported tax years, which contributed to the $238 million in total net assets for the not-for-profit organization. *Id.* ¶¶ 37–38.

Other application platforms for higher education cost far less than the Council's. They charge the competitor schools, rather than captive applicants, for the platforms, and the schools compete on the prices that they charge applicants. *Id.* ¶ 47. For instance, the Common Application, a similar centralized platform operated by a membership organization of undergraduate schools, charges schools at most $4.80 per application and a $2,500 flat fee per school per year. *Id.* ¶ 51. The schools then

decide whether and how much to pass this fee to applicants, and more than 500 schools do not pass the fees on to applicants. *Id.* ¶ 52.[1]

Applying the Common Application's pricing structure to the Council's law school application numbers (approximately 500,000 applications to 197 schools), the Council would receive approximately $2.9 million in revenue. The Council collected 10 times more in CAS Fees in each of the last three reported tax years. *Id.* ¶ 37. The Council's CAS Fees also far outpace prices of single-school application vendors, which charge business schools and others only a few dollars per application. *Id.* ¶ 58.

Although no Member Law School permits electronic applications by any means other than through CAS, 27 of the 28 non-member law schools use other application platforms and thus do not charge the uniform CAS Fees. *Id.* ¶¶ 21, 142. The Council also has built barriers to exclude competition by other platforms, including by eliminating competitive economic incentives with its platform structure, entering into de facto exclusive agreements with Member Law Schools, and providing kickbacks to Member Law Schools. *Id.* ¶¶ 144–47.

## LEGAL STANDARD

This Court correctly denies motions to dismiss under Rule 12(b)(6) when the "complaint contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Greystone Mortg., Inc. v. Equifax Workforce Sols.*

---

[1] The Common Application charges a $2 payment processing fee if it collects the school-specific application fees for the school. *See* Compl. ¶ 51. That fee thus is not comparable to CAS Fees, which are imposed independent of a school-specific application fee. *Id.* ¶¶ 30, 51. The Common Application's one-time startup fee also is not comparable to the application-based CAS Fees. *See id.* ¶ 51 n.7.

*LLC*, No. 24-cv-2260-JFM, 2025 WL 540012, at *2 (E.D. Pa. Feb. 18, 2025) (quotations and citations omitted).

## ARGUMENT

### I.    The Council Violated Sherman Act Section 1 by Setting CAS Fees for All Member Law Schools.

A Section 1 claim requires "alleg[ing] (1) an agreement (2) to restrain trade unreasonably." *Lifewatch Servs. v. Highmark Inc.*, 902 F.3d 323, 331 (3d Cir. 2018). The Complaint plausibly pleads two Section 1 counts by alleging that, in the markets for both a law school education and for an application platform for law school admissions, the Council has committed concerted action among Member Law Schools that unreasonably restrained the price of CAS Fees.

### A.    Applicant Alleges Concerted Action from Setting CAS Fees at the Same Price for Each School.

"[S]ection 1 liability is predicated upon some form of concerted action." *Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 999 (3d Cir. 1994). As explained below, the Council's fixing of CAS Fees at the same amount for each Member Law School can be considered concerted action in any of the following senses: (1) an action by an association of competitors is direct evidence of concerted action; (2) the parallel conduct of Member Law Schools and plus factors are circumstantial evidence of concerted action orchestrated through the Council; or (3) Member Law Schools knowingly making the same agreement with the same, central entity is hub-and-spoke concerted action.

### 1. The Council's Setting of CAS Fees the Same for All Member Law Schools Is Concerted Action.

The Council overlooks a wealth of binding caselaw to argue it was not concerted action to set CAS Fees at the same price for every school. The Council is an "association of competing [schools]. As such, when [the Council] takes action it has engaged in concerted action so as to trigger potential section 1 liability." *Alvord-Polk*, 37 F.3d at 1007. The Complaint is replete with allegations that Member Law Schools both compete with each other and created and control the Council. Compl. ¶¶ 14, 17, 18, 20, 97, 100. Because the Council is an association of competitors, it is "liable for concerted action if it acted as an entity." *Alvord-Polk*, 37 F.3d at 1007. No other proof of agreement is necessary.

The Council errs in arguing that Applicant needed to allege details about how the Council started the price-fixing policy or which members were involved or directed the Council. Def.'s Mem. of Law ("Mem.") at 1, 5, DI 22-1. In *Alvord-Polk*, for example, the Third Circuit reversed the district court's reasoning that there was no concerted action because there was no board resolution directing the association to perform the challenged conduct. 37 F.3d at 1007–08. Such evidence was unnecessary because "when [the association] takes action it has engaged in concerted action so as to trigger potential section 1 liability." *Id.*; *see also In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 349 (3d Cir. 2010) (reasoning that association's publication of position statement "plausibly show[ed] that defendants agreed to work together").

The Supreme Court also has repeatedly imposed Section 1 scrutiny on the action of an association of competitors without requiring separate evidence that the

association's members agreed with the action. *See, e.g.*, *Am. Needle, Inc. v. NFL*, 560 U.S. 183, 200 (2010) (finding concerted action by association of NFL teams without mentioning whether any teams agreed with conduct at issue)[2]; *Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 348, 357 (1982) (holding that foundation of doctors setting fees its member doctors could charge was *per se* illegal); *Goldfarb v. Va. State Bar*, 421 U.S. 773, 776–77, 783 (1975) (holding that "a purely voluntary association of attorneys" publishing a fee schedule for prices to charge clients "constitute[d] a classic illustration of price fixing").

Recent decisions confirm that "if 'the plaintiff adequately alleges that the [association's] policy or rule is the agreement itself, then it need not allege any further agreement.'" *Muhammad v. NAR*, No. 5:24-cv-5543-JFL, 2025 WL 2171143, at *11 (E.D. Pa. July 31, 2025) (quoting *Relevent Sports, LLC v. U.S. Soccer Fed'n, Inc.*, 61 F.4th 299, 308 (2d Cir. 2023)).

The Memorandum overlooks this precedent and misinterprets other opinions.

The Council uses ellipses to selectively quote *Davis v. Hanna Holdings, Inc.*: "'joining a trade organization, helping develop its rules, and enforcing those rules'— the latter two of which are not even alleged here—'do not plausibly establish the

---

[2] The Council misinterprets *American Needle* in several respects. *See* Mem. at 6. Concerted action by an entity is "rare" only when considering "single firm[s]" in general, not when the entity is an association of competitors. 560 U.S. at 200. An association is a "vehicle for ongoing concerted activity" when its members have "economic interests that are distinct," even if those interests are not adverse to the association, as the Council suggests. *Compare id.* at 201 *with* Mem. at 6. A plaintiff need not show that the members would compete *with the association*; the "relevant inquiry" is whether the association's action deprives the marketplace of independent decision making between the member–competitors. *Am. Needle*, 560 U.S. at 195.

existence of a . . . horizontal agreement among competitors.'" Mem. at 12 (quoting 787 F.Supp.3d 42, 60 (E.D. Pa. 2025) (Beetlestone, J.)). The ellipses omit the key qualifier "prior and separate" before "horizontal agreement." Judge Beetlestone added that qualification because, as she explained, either (1) "'a policy or rule is in service of a plan to restrain competition'" and further evidence is needed, or (2) ""the policy or rule is the agreement itself'" and "the plaintiff 'need not allege any further agreement.'" *Id.* at 58 (quoting *Relevent*, 61 F.4th at 308). Applicant's claims are the second type because he challenges the Council's policy of charging the same CAS Fees for every school. This distinction also distinguishes *Moratis v. W. Penn Multi-List, Inc.* because the conduct alleged there (steering customers) was not association policy. *See* Mem. at 12 (citing No. 2:23-cv-2061, 2024 WL 4436425 (W.D. Pa. Oct. 7, 2024)).

The Council cherry-picks language to write, "'[p]rice setting by a single entity' is unilateral conduct, not concerted action." Mem. at 4 (quoting *Texaco Inc. v. Dagher*, 547 U.S. 1, 6 (2006)). *Texaco* did not mention unilateral conduct. Actually, it assumed concerted action by judging the joint venture's price setting under Section 1.

The Council adds language in between quoted sections of *Copperweld Corp. v. Independence Tube Corp.* to misstate that the Supreme Court excluded all agreements between "a corporation and its members" from Section 1. Mem. at 5 (quoting parts of 467 U.S. 752, 769–71 (1984)). *Copperweld* only excluded agreements between a company and its employees or subsidiaries. It did not address associations of separate companies.[3] *American Needle* did, though, and found concerted action.

---

[3] Neither did the Council's cited cases *Siegel Transfer, Inc. v. Carrier Express, Inc.*,

Binding caselaw requires treating the Council's actions as an entity as concerted action. This is particularly appropriate given the control that the competitor Member Law Schools have over the Council: electing all of the Trustees, who are all employees of the Member Law Schools and who manage the "business and affairs" of the Council. *See* Compl. ¶¶ 27, 33, 98.

### 2. The Parallel Conduct of 197 Member Law Schools Adopting the Council's CAS Fees Is At Least Circumstantial Evidence of Concerted Action.

Even if the Court does not find sufficient direct evidence of a conspiracy from the Council's conduct, there is sufficient circumstantial evidence. Circumstantial evidence of an agreement requires alleging "parallel conduct" and "facts that, if true, would establish at least one 'plus factor[.]'" *Ins. Brokerage*, 618 F.3d at 322–23.

Applicant alleges parallel conduct because all Member Law Schools require their applicants to use the Council's application platform for electronic applications, and thus require those applicants to pay uniform CAS Fees. Compl. ¶ 21.

The Council again stretches caselaw to argue Applicant needed to plead *when* the conspiracy began. *See* Mem. at 9–10 (quoting part of *Dai v. SAS Inst. Inc.*, No. 24-cv-02537, 2025 WL 2078835, at *4 (N.D. Cal. July 18, 2025)). But "[i]t is elementary that an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators." *Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 227 (1939). The Council also truncates another quotation to imply that the parallel conduct must be "'reasonably proximate in time.'" Mem. at 10 (quoting *In*

---

54 F.3d 1125, 1135 (3d Cir. 1995) (a corporation and its agents) or *Weiss v. York Hospital*, 745 F.2d 786, 817 (3d Cir. 1984) (a hospital and its staff). *See* Mem. at 7–8.

*re Generic Pharms. Pricing Antitrust Litig.*, 394 F.Supp.3d 509, 525 (E.D. Pa. 2019) (Rufe, J.)). That quoted language was what a court found *sufficient to deny* a motion to dismiss. *Generic Pharms.*, 394 F.Supp. at 509. "[A] history of concerted activity does not immunize conduct from § 1 scrutiny." *Am. Needle*, 560 U.S. at 198. Even so, Applicant has alleged closely timed actions because the Member Law Schools have been re-deciding each year, with each new application cycle, to require applicants to apply through CAS and therefore pay the price-fixed fee. *See* Compl. ¶¶ 19, 21.

Along with parallel conduct, Applicant alleges more than the one plus factor required to plead circumstantial evidence of a conspiracy. Plus factors "include evidence (1) that the defendant had a motive to enter into a conspiracy, (2) that the defendant acted contrary to its interests, or (3) implying a traditional conspiracy," or "the improbability that the same . . . decision would be reached by nearly all the competitors independently." *LifeWatch*, 902 F.3d at 333–35 (citations omitted). Applicant has sufficiently alleged several of these plus factors.

**Motive.** Applicant pleads three bases for the Member Law Schools' motive to enter into a conspiracy. *First*, the schools received stability and did not have to make independent, market-based decisions about fees for an application platform. Compl. ¶¶ 42, 47. *Second*, schools receive kickback "grants" from the Council using CAS Fee revenue and thus are motivated to cooperate with the Council and increase the kickback pot. *Id.* ¶ 43. *Third*, Member Law Schools receive their end of the application platform for free. *Id.* ¶ 44.

**Acting Contrary to Interests**. Applicant also has pleaded that some Member Schools acted contrary to their interests by foregoing the ability to compete on price, which is typical in comparable markets where many schools charge very low or no fees. *See* Compl. ¶¶ 52, 65–66, 105, 127. The Council attempts to refute this plus factor by arguing the "obvious alternative explanation" of the benefits of a centralized platform, Mem. at 10, but Applicant does not challenge that, *see* Compl. ¶¶ 48–51. Schools also acted contrary to their own interests by charging set prices rather than undercutting each other to attract more applicants and revenue.

**Improbability of Same Decision Without an Agreement.** CAS Fees are the same for all 197 Member Law Schools using the Council's application platform. Compl. ¶¶ 21, 26. It is highly improbable that 197 independent schools would decide to charge the same amount for fees unless they agreed to do so.

### 3. Applicant Also Sufficiently Pleads a Hub-and-Spoke Conspiracy Orchestrated Through the Council.

A third plausible option for finding concerted action is the hub-and-spoke conspiracy in which each Member Law School agreed to the same contract and arrangement with the Council, which each Member Law School knows will result in the Council charging the same price for CAS Fees for each school. A hub-and-spoke conspiracy "involves a hub, generally the dominant purchaser or supplier in the relevant market, and the spokes, made up of the distributors involved in the conspiracy. The rim of the wheel is the connecting agreements among the horizontal competitors (distributors) that form the spokes." *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 255 (3d Cir. 2010) (citations omitted).

The Council's argument that Applicant pleaded merely a "rimless" hub-and-spoke conspiracy, Mem. at 13, ignores multiple facts about the rim between the Member Law Schools. There is an implicit "rim" agreement between the Member Law Schools because each entered into a "spoke" agreement with the Council to use the platform and relinquish the school's independent ability to set the application-fee price, knowing that all other Member Law Schools who agreed to use the platform would also agree with the Council's charging the same price for all schools. *See* Compl. ¶¶ 104, 126. A more-explicit rim agreement is not required because the spokes know about their competitors' similar vertical agreements, and those agreements are only in each spoke's interest if the other spokes also agreed. *See, e.g.*, *United States v. Apple, Inc.*, 791 F.3d 290, 312–13, 316, 319–20 (2d Cir. 2015) (affirming bench trial verdict that Apple "orchestrated a conspiracy" among "competitors" where multiple competitors signed vertical agreements with Apple that would have been against competitors' interests if acting independently). Similarly here, it would not be in any Member Law School's interest to charge supracompetitive application platform fee prices unless it knew other schools had agreed to the same; otherwise schools could undercut each other on price to compete for applicants.

## B. The Council's Setting of CAS Fees at the Same Price for Each School Is *Per Se* Illegal Price Fixing.

"[A]n agreement that interferes with the setting of price by free market forces is illegal on its face." *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692 (1978) (citation and quotation omitted). The Council's policy to set the same price for CAS Fees for each school using the platform is thus *per se* illegal price fixing. The

Council's policy is concerted action between competitors (*see supra* § I.A), and "[p]rice-fixing agreements between two or more competitors, otherwise known as horizontal price-fixing agreements, fall into the category of arrangements that are *per se* unlawful." *Texaco*, 547 U.S. at 5.

The Council cannot qualify for the exception recognized in *Texaco*. *See* Mem. at 14. There, Texaco and Shell had started a joint venture to compete with other companies in a region new to both venturers, and that joint venture set the price at which it sold its product. *Texaco*, 547 U.S. at 5–6. The Supreme Court characterized the antitrust claim as a challenge to the very existence of the joint venture because it challenged "the core activity of the joint venture itself." *Id.* at 7–8. Here, in contrast, the Member Law Schools would independently set the price for application platforms if the Council's leaders did not decide for them, as shown by the application platform fees charged for undergraduate and business schools. Compl. ¶¶ 47, 111. The fixing of CAS Fees is "not a necessary, appropriate, or procompetitive[] aspect of law school applications." *Id.* ¶ 111. The schools easily could direct the Council to allow them to compete on price for platform processing fees, as undergraduate and business schools do. *Id.* ¶ 47. Such competition also could lead Member Law Schools to pressure the Council, which they control, to reduce the overall costs of the platform to be more in line with comparable systems. *See id.* They refuse to do so, instead fixing supracompetitive prices. *E.g. id.* ¶¶ 111, 135. Therefore, the price fixing is *per se* illegal. *See, e.g.*, *Maricopa Cnty. Med. Soc'y*, 457 U.S. at 348, 356 & n.33 (holding that

association's price fixing was *per se* illegal because it was "not a 'necessary consequence'" to the association's procompetitive activity).

Because the restraint of trade Applicant challenges is *per se* illegal, this Court need not judge the restraint under the rule of reason and need not scrutinize the definition of the relevant market. Nevertheless, Applicant sufficiently alleges both, as explained below in Sections I(C) and (D).

### C.    The Council's Price Fixing Is Illegal Under the Rule of Reason.

Under the rule of reason, Applicant "satisf[ies] the unreasonable-restraint element by alleging that the conspiracy produced anticompetitive effects in the relevant markets. Anticompetitive effects include increased prices, reduced output, and reduced quality." *W. Penn Allegheny Health Sys. v. UPMC*, 627 F.3d 85, 100 (3d Cir. 2010) (citations omitted). Applicant pleads both increased prices and reduced output, confirming that the Council's price fixing is an unreasonable restraint of trade in the J.D. Education Market and the Law School Application Platform Market.

The Complaint contains numerous details supporting Applicant's allegation that CAS Fees are higher than they would be in a competitive market. *See, e.g.*, Compl. ¶¶ 3, 24–27, 36, 47. For example, similar fees to apply to other types of schools are much lower. *Id.* ¶¶ 51–52, 57–59. And the Council's annual revenue from CAS Fees exceeds 10 times what its revenue would be with the Common Application's competitive pricing structure. *Id.* ¶¶ 37–38, 51. Applicant thus pleads higher prices both for himself and for the platform as a whole.

Applicant also alleges reduced market output. Fewer competing application platform providers have entered the market than would have in a competitive

market. *See* Compl. ¶ 61. Applicant alleges that several experienced vendors have the technical capability to develop competing platforms and would enter the market to drive down prices absent an unlawful restraint. *Id.* at ¶¶ 61–62.

The Council's arguments that Applicant does not plead competitive harm are unavailing. *See* Mem. at 16–17. For Count I, the Council contends that applicants do not pay supracompetitive CAS Fees because otherwise schools would roll the value of CAS Fees into their school-specific application fees. *Id.* That argument confirms the concerted action alleged. As alleged, CAS Fees are significantly higher than what similar competitive markets bear. Compl. ¶¶ 51 (Common Application pricing), 58–59 (vendor platform pricing). If Member Schools simply incorporate those supracompetitive fees into their own application fees at the same amount the Council now charges, it confirms that they have agreed to fix the price of a portion of their application fees. And for Count II, the Council's argument that Applicant does not plead the costs of the platform as a whole, *see* Mem. at 19, ignores the detailed allegations outlined above.[4]

### D.   Applicant Sufficiently Defines Two Relevant Markets.

Because Applicant has alleged *per se* illegal price-fixing, Applicant is "relieved of the obligation to define a market and prove market power." *Ins. Brokerage*, 618 F.3d at 316–17 (collecting cases).[5]

---

[4] Because Applicant alleges supracompetitive pricing for the platform as a whole and for applicants, the Court need not determine whether the Council's platform is a one-sided platform through which the costs are shifted to applicants or a two-sided platform like in *Ohio v. American Express Co.*, 585 U.S. 529 (2018).

[5] The contrary statement in *United States v. Teva Pharmaceuticals USA, Inc.*, No. 20-

Nonetheless, Applicant sufficiently defines "the outer boundaries" of two relevant markets: the J.D. Education Market (Count I) and the Law School Application Platform Market (Count II).[6] *See LifeWatch*, 902 F.3d at 337 (quotations omitted). The Third Circuit instructs courts to be "cautious before dismissing for failure to state a relevant market" because market definition is a "deeply fact-intensive inquiry." *Id.* (citation omitted). This Court thus may dismiss only if the market definition (1) fails to "reference interchangeability or cross-elasticity of demand" or (2) alleges a proposed market that "clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor[.]" *Id.* (citation omitted). Neither scenario exists here.

### 1.    The J.D. Education Market is Sufficiently Defined.

Count I pleads the outer boundaries of a product market of competitors providing a juris doctor degree, comprising all 197 Member Law Schools and other non-Member Law Schools. Compl. ¶¶ 68–70. The Complaint explains why the market is not broader: other educational programs like business and medical schools are not acceptable substitutes because they do not confer J.D. degrees. *Id.* ¶ 77. Because these allegations "reference" interchangeability and cross-elasticity of demand, and "plausibly explained why other similar products do not fall within the relevant market," the Complaint sufficiently defines the relevant market. *In re Suboxone Antitrust Litig.*, 64 F.Supp.3d 665, 713 (E.D. Pa. 2014) (Goldberg, J.).

---

cr-200-RBS, 2022 WL 7578988, at *3 (E.D. Pa. Oct. 13, 2022), a criminal case, cannot be squared with this binding Third Circuit law for civil cases.

[6] The Law School Application Platform Market also applies to Count III.

The Council objects that higher-ranked law schools do not belong in the same market as lower-ranked law schools, Mem. at 16, but the Supreme Court implicitly approved of a similar market definition in *NCAA v. Alston*: "the market for athletic services in men's and women's Division I basketball and FBS football, wherein each class member participates in his or her sport-specific market." 594 U.S. 69, 81 (2021). The Supreme Court did not object to a market that included all FBS football programs, even though there are indisputably distinctions between top programs (University of Georgia) and programs that have not had a winning season in years (University of Massachusetts). The Council's reliance on the pre-*Alston*, out-of-circuit opinion *Rock v. NCAA* is misplaced. Mem. at 16 (citing 928 F.Supp.2d 1010 (S.D. Ind. 2013)). Moreover, unlike *Alston* and here, *Rock* pleaded "unique" attributes to narrow the market that were not shared by all institutions. *Id.* at 1020. The relevant attribute here—accepting applications for a J.D.-conferring program—is common to all law schools. And finally, unlike in *Choh v. Brown University*, 753 F.Supp.3d 118, 132 (D. Conn. 2024), the market is not impermissibly vague or narrow because it covers all law schools, not an arbitrary or unidentified subset. *See* Compl. ¶¶ 69–70.

## 2. The Law School Application Platform Market is Sufficiently Defined.

Counts II and III allege the outer boundaries for a product market for any "platform to handle applications to U.S. law schools." Compl. ¶ 73. As with the J.D. Education Market, Applicant explains why the market does not include applications to other educational programs, which precludes dismissal. Compl. ¶ 77.

The Council contends the market definition excludes platforms that "could support law school applications." Mem. at 18. Not so. Applicant's alleged market encompasses any platform that could support law school applications—i.e. "a platform to handle applications to U.S. law schools"—whether or not the platform is actively used for law school applications. Compl. ¶ 73. This is clear because Applicant pleads that the market includes platforms created by or provided to law schools that do not use the Council's platform—less than 15% of this market. *Id*. If the Council somehow argues that the market should include platforms that cannot process law school applications, such products would not be reasonably interchangeable for law schools. *LifeWatch*, 902 F.3d at 337; *see also* Compl. ¶ 73. The exact identification of platforms that could handle law school applications is a question for fact and expert discovery and trial. *LifeWatch*, 902 F.3d at 337.

## II.    Applicant States a Section 2 Claim for Monopolization.

The Council has used multiple anticompetitive practices to maintain its 85% market share of the Law School Application Platform Market. This states a claim for monopolization under Sherman Act Section 2, which has two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Mylan Pharms. Inc. v. Warner Chilcott Pub. Ltd. Co.*, 838 F.3d 421, 433 (3d Cir. 2016).

### A.    There Is Direct and Indirect Evidence of Monopoly Power.

Monopoly power can be pleaded with either direct evidence of anticompetitive effects or indirect evidence of a dominant share of the relevant market and barriers

to enter that market. *Broadcom Corp. v. Qualcomm*, 501 F.3d 297, 307 (3d Cir. 2007). Importantly, pleading direct evidence does not require defining the relevant market. *Id.* at 307 n.3. Applicant pleads direct evidence of both supracompetitive pricing and reduced competition. Applicant also pleads indirect evidence of the Council's large market share and the effective barriers to entry.

### 1.    The Complaint Alleges Direct Evidence of Market Power.

Applicant pleads direct evidence that the Council exercises monopoly power because it charges supracompetitive prices and restricts competitive output. A plaintiff may establish monopoly power through direct evidence of "supracompetitive pricing *or* restricted output." *Mylan*, 838 F.3d at 434 (emphasis added). The Council argues both must be pleaded, but relies on mistaken dicta from a non-precedential opinion. *See* Mem. at 21 (citing *BanxCorp v. Bankrate, Inc.*, 847 F. App'x 116, 120 (3d Cir. 2021)). *Mylan* states the Third Circuit's current, binding explanation, which is supported by the Supreme Court's opinion in *Ohio v. American Express Co.*, 585 U.S. 529 (2018), and by detailed reasoning in the recent opinion *Costar Grp., Inc. v. Commer. Real Est. Exch., Inc.*, 141 F.4th 1075, 1087 (9th Cir. 2025).

Regardless, Applicant pleads both supracompetitive pricing and restricted output. The Council charges a $215 subscription fee and $45 per application despite true costs being "only a few dollars per application." Compl. ¶¶ 3, 24. Further evidence is the Common Application, a "very similar application platform to LSAC's [CAS]" with "most of the same features," which does not charge applicants at all and only charges schools a flat fee of $2,500 per year and $3.76–$4.80 per application. *Id.*

¶¶ 49–51. As explained above, the Council's pricing structure thus results in more than 10 times higher revenue than the Common Application's. *Id.* ¶¶ 37–38, 51.

This supracompetitive pricing has not been reduced by competition because the Council also restricts the output of additional platforms competing to process applications to law school. The Member Law Schools have little, if any, incentive to adopt another system because the Council does not charge the schools for the platform, kicks back some of the revenue from the supracompetitive fees in grants to the Member Law Schools, and gives the Member Law Schools the stability of knowing that other members are not competing on the price of CAS Fees. *See* Compl. ¶¶ 144–46. Competing platforms have only reached 15% of the market, despite many different platforms being available for schools to use, which is further evidence that the Council has restricted overall output. Accordingly, Applicant pleads monopoly power by direct evidence. *Suboxone*, 64 F.Supp.3d at 712 (direct evidence pleaded where (1) the defendant successfully impaired and excluded competition, (2) which resulted in supracompetitive prices, and (3) "no firm was able to respond to [the defendant's] high prices by increasing output of competing goods").

> **2.  Applicant Pleads the Council's Dominant Share of, and Entry Barriers in, the Relevant Market.**

For good measure, Applicant also pleads indirect evidence of the Council's market power. As discussed in Section I(D)(2) *supra*, the Complaint sufficiently defines the Law School Application Platform Market at the pleading stage. Applicant also alleges several barriers to entry in that market. Because those barriers to entry

also establish the Council's exclusionary conduct to maintain its monopoly, Applicant discusses those barriers below in Section II(B).

**B.    Applicant Alleges Exclusionary Conduct.**

The Complaint alleges several types of exclusionary conduct under Section 2: the structure of the Council's law school application platform, exclusive dealing agreements, and kickbacks paid to Member Law Schools. This conduct also pleads barriers to entry that the Council established. *See United States v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001) ("Entry barriers are factors . . . that prevent new rivals from timely responding to an increase in price above the competitive level.").[7]

"Exclusionary conduct is that which prevents actual or potential rivals from competing or impairs their opportunities to do so effectively." *Suboxone*, 64 F.Supp.3d at 678 (citations and quotations omitted). "Anticompetitive conduct can come in too many different forms, and is too dependent upon context, for any court or commentator ever to have enumerated all the varieties." *W. Penn Allegheny Health Sys.*, 627 F.3d at 109 (citations omitted). Moreover, courts "look to the monopolist's conduct taken as a whole rather than considering each aspect in isolation." *Id*. at 108.

The Council only addressed one type of exclusionary conduct—exclusive dealing agreements—which means the Motion cannot be granted on this element of Applicant's Section 2 claim. *See* Fed. R. Civ. P. 12(g)(2) ("[A] party that makes a motion under this rule must not make another motion under this rule raising a

---

[7] The Council conflates technical barriers to development with market entry barriers. Mem. at 20. It is true that several vendors could develop platforms to compete with the Council. Compl. ¶¶ 60–61. Such technical feasibility underscores the entry barriers the Council constructed.

defense or objection that was available to the party but omitted from its earlier motion."); *Marchbanks Truck Serv. v. Comdata Network, Inc.*, No. 07-cv-01078-JKG, 2011 WL 11559549, at *19, (E.D. Pa. Mar. 29, 2012) (applying Rule 12(g) to reject dismissal argument raised for the first time on reply).

Nonetheless, Applicant explains below why he sufficiently pleads exclusive dealing and the other types of exclusionary conduct.

### 1.    Applicant Alleges De Facto Exclusive Agreements.

The Council entered into de facto exclusive deals with each law school using the Council's application platform.

As this Court recently held, "the law is clear that . . . de facto exclusive dealing may be unlawful. And an agreement does not need to be 100% exclusive in order to meet the legal requirements of exclusive dealing." *Greystone*, 2025 WL 540012, at *4 (quoting *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 282 (3d Cir. 2012)). The question under Third Circuit precedent is whether an agreement induces the customer into long-term loyalty. *See LePage's, Inc. v. 3M*, 324 F.3d 141, 158–60 (3d Cir. 2003) (affirming jury verdict finding the defendant's discounts to induce the distributors to award 3M business constituted anticompetitive conduct). Indeed, this Court recently held that a plaintiff sufficiently pleaded a de facto exclusive agreement where the defendant allegedly "shares a portion of its monopoly profits . . . to induce [data providers] to provide their data exclusively." *Greystone*, 2025 WL 540012, at *4.

Applicant has alleged that the Council's agreements with Member Law Schools are de facto exclusive agreements for at least two reasons. *First*, the Council enters into these agreements with its own membership that directed it to provide services

to law schools. Compl. ¶¶ 146–47. The Member Law Schools thus are induced into long-term loyalty because of their control of and involvement with the Council.

*Second*, the Council offers financial incentives for loyalty. From FY 2013–FY 2023, the Council paid Member Law Schools more than $6.5 million in grants and thus "share[d] a portion of its monopoly profits" with schools to induce exclusivity. *Id.* ¶ 43; *Greystone*, 2025 WL 540012, at *4. The Council also offers the LSAC Unite backend platform for free in exchange for Member Law Schools' continued use of the Council's platform. Compl. ¶¶ 33, 146. This offer is akin to a rebate or discount because Member Law Schools receive the platform for no cost to them. Because LSAC Unite is part of the Council's application platform, Member Law Schools must use the Council's platform to receive the benefit. These financial incentives motivate schools to stay loyal as in *LePage's, ZF Meritor,* and *Greystone*.

The Council's challenge to this allegation incorrectly seeks to impose an explicit exclusivity requirement that does not exist in the Third Circuit. *See* Mem. at 22 (contending Applicant must plead that the Council "conditioned access to its platform on schools forgoing the use of any other platform"). Applicant has plausibly pleaded de facto exclusivity agreements.

### 2.    Applicant Alleges Other Exclusionary Conduct.

Also exclusionary is the Council's platform design and the kickbacks paid by the Council to Member Law Schools.

The Council designed its platform to remove opportunities for competitors to enter the market by shifting all costs from the law schools that decide which platform to adopt to the applicants who must use the schools' chosen platform. The Fourth

Circuit recently recognized such cost-shifting constitutes exclusionary conduct: "[C]ross-subsidization can produce anticompetitive consequences, as some customers make up for the discount by paying higher prices." *Duke Energy Carolinas, LLC v. NTE Carolinas II LLC*, 111 F.4th 337, 359 (4th Cir. 2024); *see also In re Surescripts Antitrust Litig.*, 608 F.Supp.3d 629, 637, 647–48 (N.D. Ill. 2022) (holding that discounts to induce exclusivity satisfied plaintiffs' Section 2 pleading burden).

The Council also excludes competition by using its supracompetitive pricing to pay kickbacks to law schools in the form of free access to the LSAC Unite system for all Member Law Schools and also large grants to various schools each year. Compl. ¶¶ 42, 145; *see Teva Pharms. USA, Inc. v. Corcept Therapeutics, Inc.*, No. 24-cv-03567, 2025 WL 2637507, at *8, *16 (N.D. Cal. Sept. 12, 2025) (denying motion to dismiss Section 2 claim based in part on alleged kickbacks and collecting cases holding that allegations of kickbacks plead a Sherman Act claim).

## III.    Applicant Alleges Antitrust Standing.

The Council incorrectly argues Applicant lacks antitrust standing because his injury is supposedly "too speculative and attenuated from the challenged conduct." Mem. at 23.

As a threshold matter, the degree of speculativeness or directness of the harm is merely one of five factors to consider in determining antitrust standing, as explained by the opinion cited by the Council. *See In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1165–66 (3d Cir. 1993). The Council does not argue any other factor, which means the Court need not consider any of the other four factors. *See In re Modafinil Antitrust Litig.*, 837 F.3d 238, 264 n.31 (3d Cir. 2016)

("not analyz[ing] the other factors of antitrust standing" "[b]ecause the parties only dispute . . . the 'directness' factor").

This factor of direct or speculative injury—which the Council correctly notes is "'all-important,'" Mem. at 23 (quoting *Lower Lake Erie Iron Ore*, 998 F.2d at 1165)—weighs in favor of finding antitrust standing here. The Third Circuit finds antitrust standing in price-fixing cases where "the Purchasers are in a direct relationship with the antitrust violators and seek to recover for higher prices set by those violators." *In re Processed Egg Prods. Antitrust Litig.*, 881 F.3d 262, 275 (3d Cir. 2018); *see also Modafinil*, 837 F.3d at 265 ("When . . . the anticompetitive conduct is price-fixing, the only customers who will have antitrust standing are the direct customers of the conspiracy members."). Here, Applicant is a direct purchaser from the Council: "He paid LSAC $195 for the subscription in October 2022 and $315 for the report fees in January and February 2023." Compl. ¶ 78.

The Council tries arguing "Plaintiff has alleged no facts supporting his assertion that LSAC or its pricing structure caused him to pay more in application fees than he otherwise would have." Mem. at 23. The Council overlooks the fact that the Common Application platform for undergraduate applications "does not charge applicants any fees," Compl. ¶ 51, and that business-school applications can cost as little as $30, *id.* ¶ 57. The Council also argues Applicant might have paid more to apply if the prices were not fixed. Mem. at 24. This argument hypothesizes details outside the Complaint, which this Court rejected when recently denying a similar motion to dismiss. *See Greystone*, 2025 WL 540012, at *2 (declining to consider

defendant's argument why the alleged increased pricing "may be" a speculative injury). Furthermore, the Council cites no precedent for dismissing a price-fixing case because some purchasers might pay more if the prices were not fixed. That possibility would be a "Get Out of Jail Free" card for every price-fixing conspiracy. In actuality, "[t]he amount of the damage is not important for antitrust standing; it is sufficient that some damage has occurred." *Allen-Myland, Inc. v. IBM Corp.*, 33 F.3d 194, 201 (3d Cir. 1994). Applicant has alleged damage from supracompetitive fees he otherwise would not have paid. *E.g.*, Compl. ¶ 114.[8]

## CONCLUSION

For the foregoing reasons, the Court should deny the motion in full. Moreover, because any defects may be cured by amendment, including with additional allegations learned after the filing of this Complaint, Applicant respectfully requests dismissal without prejudice should the Court grant the motion.

Dated: October 30, 2025                     Respectfully submitted,


                                            /s/ *Peter M. McCall*
                                            Peter McCall (PA Bar No. 315917)
                                            HILGERS GRABEN PLLC
                                            301 Grant Street, Suite 270
                                            Pittsburgh, PA 15219
                                            Telephone: (314) 464-9964
                                            Email: pmccall@hilgersgraben.com

---

[8] Dismissal of the request for permanent injunctive relief is premature and unnecessary.

William Burgess (Pro Hac Vice)
1372 Peachtree Street NE
Atlanta, GA 30309
Telephone: 404-595-7747
Email: wburgess@hilgersgraben.com

Bennett Rawicki (Pro Hac Vice)
7859 Walnut Hill Lane, Suite 335
Dallas, TX 75230
Telephone: 469-640-6842
Email: brawicki@hilgersgraben.com

*Counsel for Plaintiff and the Proposed Class*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was filed electronically through this Court's ECF System and is available for viewing and downloading from this Court's ECF System. I further certify that an electronic copy of the foregoing was served upon all parties of record through this Court's ECF System.

Dated: October 30, 2025                    By:    /s/ *Peter M. McCall*                    
                                                   Peter M. McCall