**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| LINVEL JAMES RISNER | : | CIVIL ACTION |
| | : | |
| v. | : | NO.  25-4461 |
| | : | |
| LAW SCHOOL ADMISSION | : | |
| COUNCIL, INC. | : | |

**MEMORANDUM**

**MURPHY, J.**                                                                                      **April 28, 2026**

Motions to dismiss in antitrust cases like this one can be thorny.  On the one hand, the

pleading standards are the same as any other case.  But on the other, the layered analysis of

antitrust law can make it difficult to cut a path to discovery.  One thing is for certain: the plaintiff

must state the claim in the complaint, not in the briefing in opposition to the motion to dismiss.

This case is about the Law School Admissions Council, which is a central clearinghouse for law-

school applicants.  Mr. Risner sued the LSAC on behalf of a nationwide class, alleging that it

fixed application-services prices and maintained a monopoly in violation of the Sherman Act.

Mr. Risner has standing, and his allegations make sense in broad strokes.  But they are also

unclear and self-contradictory.  To rebut the LSAC's detailed arguments urging dismissal, Mr.

Risner advances unwarranted assumptions, self-serving interpretations, and purported new

factual allegations.  Focusing on the complaint, as we must, each of Mr. Risner's claims falls

short: the purported economic markets are implausible, the alleged antitrust harms are

nearsighted, and there are insufficient allegations of the LSAC's monopoly power.  As such, we

grant the LSAC's motion to dismiss, but without prejudice and with leave to amend.

## I.    Factual Allegations

Created by law school deans "to make education accessible and equitable," the LSAC

serves to "construct, administer, and report" test scores for admission to law school, "conduct

educational research," and "provide services to law schools and the educational community."  DI 1 at ¶¶ 14, 16-17.  All 197 American Bar Association-approved law schools are LSAC members.  *Id.* at ¶ 13.  The LSAC's Board of Trustees is elected by the member law schools, and consists entirely of member law school employees.  *Id.* at ¶ 18.

### A.  The LSAC's application software

At the direction of the law schools, the LSAC developed software to process electronic applications.[1]  *Id.* at ¶ 22.  The software comprises both "applicant-facing and Member Law School-facing elements."  *Id.*  On the applicant side is the LSAC's "Credential Assembly Service," through which applicants submit transcripts, letters of recommendation, and other application documents to the LSAC all at once, saving them "time and effort."  *Id.* at ¶ 23.  The LSAC, acting as a "middleman," transmits those materials to an applicant's chosen law schools.  *Id.* at ¶¶ 2, 23.

On the law school-facing side of the LSAC's software, schools can review applications and manage enrollment through its "LSAC Unite" product.  *Id.* at ¶ 33.  LSAC Unite is a "customer relationship and enrollment management platform that enables law schools to build, nurture, and manage the pipeline of prospective students."  *Id.* (internal quotations omitted).  The law schools do not pay for the LSAC's application platform, having "directed" the LSAC to provide its platform at no cost.  *Id.* at ¶ 33. The LSAC has entered into separate agreements with each ABA-approved law school for access to its application platform, each of which confirms that the law schools do not pay for its services.  *Id.*  Those agreements are for one-year terms with automatic renewals upon their expiration.  *Id.* at ¶ 146.

---

[1] The complaint does not identify when the law schools directed the LSAC to develop its software, or which law schools purportedly directed the LSAC to do so.

### B.  Demand for law school is high

Each year, tens of thousands of students will apply to law school.  *Id.* at ¶¶ 1, 19.  In 2025, there were over 60,000 applicants, amounting to over 500,000 law school applications — a 23% increase in applicants from the previous year.  *Id.* at ¶¶ 1, 19, 149.  To apply to law school in 2026, an applicant must pay the LSAC a minimum of $260: an initial fee of $215 for its application processing platform, and an additional $45 per application.  *Id.* at ¶¶ 2, 21, 59.  The $215 upfront cost provides access to the LSAC's application services for five years and includes transcript summarization and authentication, creation of a CAS report, letter of recommendation processing, and electronic application processing.  *Id.* at ¶ 25.  Over the last five years, the LSAC's subscription fee has increased with each application cycle:

| Application Cycle | Subscription | Each Report |
|---|---|---|
| 2022 | $195 | $45 |
| 2023 | $195 | $45 |
| 2024 | $200 | $45 |
| 2025 | $207 | $45 |
| 2026 | $215 | $45 |

*Id.* at ¶ 29.

Some applicants may receive waivers for the LSAC's fees, including for financial need, but most applicants will pay these costs as part of the application process.  *Id.* at ¶ 24.  Absent fee waivers, there is a uniform $45 fee charged per application, regardless of the varying application requirements of each school.  *Id.* at ¶¶ 26-28.  Outside fees paid to the LSAC, applicants also pay school-specific fees ranging from $50 to $105, for which they may also seek a waiver.  *Id.* at ¶ 30.

Mr. Risner says the LSAC's application scheme has been profitable: over the last three

years, the LSAC has collected $93 million in fees.  *Id.* at ¶ 37.  Accordingly, the LSAC provides

what he calls "massive compensation packages" to its executives.  *Id.* at ¶ 39.  And the LSAC

uses its profits to pay grants to member law schools, some of which have ranged from $50,000 to

over $100,000 in recent years.[2]  *Id.* at ¶ 43.  Mr. Risner calls these payments "kickbacks."  *Id.*

Among the 28 non-LSAC member schools (non-ABA approved law schools), only one school

uses the LSAC's platform.  *Id.* at ¶ 62.

### C.  Application processing in other education sectors

In other education sectors, there are two predominate models for application processing:

(1) a centralized model, where applicants can apply to many schools through a single service;

and (2) a decentralized model, where schools host their own applications, developing software

internally or engaging an outside vendor.  *Id.* at ¶¶ 47-48.  In both models, schools allegedly

compete with each other on the total price of their application fees.  *Id.*

The undergraduate Common Application is an example of a centralized model, offering

"most of the same features as does LSAC," including applicant-facing and school-facing

elements.  *Id.* at ¶ 49.  And like the LSAC, "the Common Application is a membership

organization controlled by the schools who use the application."  *Id.* at ¶ 50.  The Common

Application does not charge applicants any fees, and instead charges member schools a flat fee

per year.  *Id.* at ¶ 51.  Common Application schools then decide whether to pass the costs on to

their applicants.  *Id.* at ¶ 52.

Graduate business schools are an example of a decentralized model.  *Id.* at ¶ 56.  The

---

[2] The complaint includes a list of 28 schools that allegedly received grants in varying amounts between 2020 and 2023, though it is not clear how schools are chosen or how the amounts are determined.  DI 1 at ¶ 43.

business schools themselves charge and collect the application fees and administer their own application software. *Id.* at ¶ 56. The total fee an applicant will pay varies by school, but can be as low as $30. *Id.* at ¶ 57. Graduate business schools engage outside vendors to provide application platforms: Georgia Tech, for example, engages an outside vendor and uses "the same application software for its business school as it does for all other graduate programs." *Id.* at ¶¶ 58, 60. Georgia Tech charges a $95 application fee. *Id.*

## II.    The LSAC's motion to dismiss

In the summer of 2022, Linvel Risner paid for a CAS subscription from the LSAC and applied to seven law schools. *Id.* at ¶ 78. In total, Mr. Risner paid $510 to the LSAC — $195 upfront, and $315 in application fees. *Id.* at ¶¶ 78-79. He was not permitted to apply by other means. *Id.* at ¶ 80. Now, Mr. Risner brings three claims on behalf of a putative nationwide class of similarly situated individuals, beginning four years prior to the filing of the complaint. *Id.* at ¶¶ 82-83. Count I alleges a horizontal restraint of trade in the J.D. education market in violation of Sherman Act Section 1. *Id.* at ¶¶ 95-114. According to the complaint, the J.D. education market is defined as "the 197 Member Law Schools and other law schools in the United States," who are "direct competitors . . . for applicants to law school." *Id.* at ¶¶ 69-70. Count II, also brought under Section 1, alleges a horizontal restraint of trade in the law school application platform market. *Id.* at ¶¶ 115-38. Mr. Risner defines the law school application platform market as "the market for a platform to handle applications to U.S. law schools," which "includes the LSAC Law School Application Platform and the other application platforms used by the small number of U.S. law schools (less than 15%) that do not use the LSAC Law School Application Platform." *Id.* at ¶ 73. Count III alleges that the LSAC has monopolized the law

school application platform market in violation of Sherman Act Section 2. *Id.* at ¶¶ 139-52.

The LSAC seeks dismissal of all Mr. Risner's claims. DI 22-1. Beginning with the Section 1 claims, the LSAC argues that Mr. Risner does not adequately allege concerted action. *Id.* at 4-13. And even if he could, the LSAC says that any alleged agreement is not an unreasonable restraint of trade in violation of the Sherman Act because the rule of reason applies, Mr. Risner's relevant markets are implausibly alleged and, at any rate, that the complaint does not allege competitive harm in either of the alleged markets. *Id.* at 13-20. The motion then turns to Mr. Risner's monopolization claim, challenging Mr. Risner's allegations of monopoly power and exclusive conduct. *Id.* at 18-22. The LSAC concludes by arguing that regardless of the adequacy of Mr. Risner's complaint, he lacks antitrust standing. *Id.* at 23-25.

Mr. Risner disagrees. DI 24. He argues that the LSAC engaged in concerted action by setting fees at the same price for each of its member schools, which control it. *Id.* at 2. And the restraint of trade he alleges does not require an assessment of its reasonableness because it is subject to the *per se* rule. *Id.* at 11-13. But even if the rule of reason applies, Mr. Risner maintains that he has adequately alleged a rule of reason claim, and that both of his relevant markets are plausible because he defines their "outer boundaries." *Id.* at 13-17. As for his monopoly claim, Mr. Risner claims to offer both direct and indirect evidence of the LSAC's monopoly power and exclusionary conduct, including the structure of its application platform, exclusive agreements with the law schools, and kickbacks paid to them. *Id.* at 17-20. Last, Mr. Risner argues that he has antitrust standing because he purchased directly from the LSAC. *Id.* at 24.

III.    **Standard of Review**

As with any other motion to dismiss, "we accept as true the factual allegations in the complaint, and draw all reasonable inferences in plaintiff's favor." *Host Int'l, Inc. v. MarketPlace, PHL, LLC*, 32 F.4th 242, 248 (3d Cir. 2022) (quoting *Bell Atl. v. Twombly*, 550 U.S. 544, 570 (2007) (citation modified)).  But "we are not compelled to accept unsupported conclusions and unwarranted inferences." *Id.*  Instead of following "an attenuated chain of assumptions," we rely on "judicial experience and common sense." *Id*.  And "while it is inappropriate to apply *Twombly*'s plausibility standard with extra bite in antitrust and other complex cases . . . we need not accept as true a legal conclusion couched as a factual allegation." *Id.*  With that in mind, Mr. Risner must plead facts that make each element of his case "plausible on its face" in order to survive the LSAC's motion to dismiss.  *Id*.; *Wheeler v. Wheeler*, 639 F. App'x 147, 149 (3d Cir. 2016) ("To state such a 'plausible' claim, a plaintiff must plead sufficient facts to permit a reasonable expectation that discovery will reveal evidence establishing each element of the relevant cause of action[.]").

IV.    **Discussion**

Mr. Risner has two things going for him: he alleges concerted action, and he has antitrust standing.  The rest presents an uphill battle.  For starters, neither of Mr. Risner's markets — the J.D. education market nor the law school application software market — is plausibly alleged, dooming his Section 1 claims under the rule of reason.  Even assuming the law school application platform market is plausibly alleged, though, the complaint describes a two-sided transaction platform for which Mr. Risner has not alleged anticompetitive harm as a whole.  And Mr. Risner's Section 2 claim falls short because he does not allege direct evidence of the LSAC's market power, and he cannot offer indirect evidence of said market power because the

7

law school application software market is implausible as pled. As such, we dismiss all three of Mr. Risner's claims without prejudice.

### A. Mr. Risner's Sherman Act Section 1 claims must be dismissed

Under Section 1 of the Sherman Act, "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." *In re Insurance Brokerage Antitrust Litig.*, 618 F.3d 300, 314 (3d Cir. 2010) (quoting 15 U.S.C. § 1) (citation modified). That language "imposes two essential requirements" on Mr. Risner. *Id.* at 314-15. First, Mr. Risner must show an agreement — that is, "some form of concerted action" which evinces "a unity of purpose or a common design and understanding or a meeting of minds or a conscious commitment to a common scheme." *Id*. (citation modified). Second, Mr. Risner must show that the agreement was an unreasonable restraint of trade. *Id.*

Meeting the requirements of a Section 1 claim is rarely as simple as the brevity of its elements might suggest, however. *Am. Needle, Inc. v. National Football League*, 560 U.S. 183, 189 (explaining that "even though, 'read literally,' § 1 would address 'the entire body of private contract,' that is not what the statute means.") (quoting *National Soc. of Professional Engineers v. United States*, 435 U.S. 679, 688 (1978)). Looking to Mr. Risner's well-pled, non-conclusory allegations, we conclude that Mr. Risner plausibly alleges concerted action. But Mr. Risner's markets are implausible as alleged, and even if plausible, Mr. Risner does not allege sufficient harm across the law school application software market to save that claim, so we dismiss both of his Section 1 claims.

### 1. *The complaint plausibly alleges concerted action*

Concerted action is "the hallmark of a Section 1 claim." *Insurance* Brokerage, 618 F.3d

8

at 315 (citation modified).  It may be shown by either direct evidence, circumstantial evidence, or both, and "should be analyzed as a whole, rather than compartmentalized." *Big Apple BMW, Inc. v. BMW of North America, Inc.*, 974 F.3d 1358, 1364 (3d Cir. 1992) (citation modified). Direct evidence is "explicit and requires no inferences[.]" *In re Baby Food Antitrust Litigation*, 166 F.3d 112, 118 (3d Cir. 1999).  Circumstantial evidence, on the other hand, requires an antitrust plaintiff to allege some "parallel conduct" bolstered by facts which "tend to rule out the possibility that the defendants were acting independently," colloquially referred to as "plus factors."  *Insurance Brokerage*, 618 F.3d at 321-22.  While not exhaustive, common plus factors include evidence: (1) of a motive to enter a price fixing conspiracy; (2) that the defendant acted against its own interests; and (3) of a traditional conspiracy.  *Id.*

The concerted action inquiry "does not turn simply on whether the parties involved are legally distinct entities." *Am. Needle*, 560 U.S. at 191.  Rather, courts have "eschewed such formalistic distinctions in favor of a functional consideration of how the parties involved in the alleged anticompetitive conduct actually operate."  *Id.*; *see also Copperweld*, 467 U.S. at 160 (the Sherman Act is "aimed at substance rather than form.").  As such, the Supreme Court has "repeatedly" accommodated theories under Section 1 where a "legally single entity . . . was controlled by a group of competitors and served, in essence, as a vehicle for ongoing concerted activity."  *Id.*  In analyzing whether Mr. Risner adequately alleges concerted action, then, our focus is not on formalities.

The LSAC argues that both of Mr. Risner's Section 1 claims must be dismissed because he has not alleged concerted action.  DI 22-1 at 4.  Rather, the LSAC says the conduct Mr. Risner challenges (1) is unilateral price setting, and (2) does not plausibly allege a horizontal

9

conspiracy among the law schools. *Id.* at 4-13. Mr. Risner responds that the complaint alleges

both direct and indirect evidence of conspiracy. DI 24 at 4. We take the LSAC's arguments in

turn and conclude that Mr. Risner plausibly alleges concerted action.

a.    The challenged conduct is concerted action

Quoting the complaint, the LSAC argues that the conduct Mr. Risner challenges is

unilateral price setting and not concerted action because Mr. Risner alleges that the LSAC "sets

the price it charges for the Credential Assembly Service subscription reports." DI 22-1 at 4

(quoting DI 1 at ¶ 27) (citation modified). But that is an incomplete picture of the relevant

allegations. Before that, the complaint alleges that the LSAC sets its prices "at the direction of

the Member Law Schools that control it." DI 1 at ¶ 27. The LSAC says that this allegation

makes no difference because (1) it is conclusory; (2) a single entity cannot conspire with itself;

and (3) a presumption of independent action applies here. DI 22-1 at 5-8. We disagree.

Isolated, Mr. Risner's allegation that the LSAC sets its prices at the direction of the

member law schools may seem conclusory. *See* DI 1 at ¶ 27. But there is more to Mr. Risner's

alleged conspiracy. *In re Processed Eggs Products Antitrust Litigation*, 821 F. Supp. 709, 718

(E.D. Pa. 2011) (Pratter, J.) (allegations of conspiracy "are not to be judged by dismembering it

and viewing its separate parts, but only by looking at it as a whole.") (quoting *Continental Ore*

*Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) (citation modified)). Relevant

here, Mr. Risner alleges that the law schools: created the LSAC through "law school deans who

wanted to make legal education accessible and equitable," DI 1 at ¶ 17 (citation modified); elect

the LSAC's Board of Trustees, who "manage or direct LSAC's business and affairs," *id.* at ¶ 18;

exercise control over the LSAC by electing the Board of Trustees, with each law school having a

10

vote for Board of Trustees members, *id.* at ¶ 100; receive kickbacks from the LSAC as part of their participation in the conspiracy, *id.* at ¶¶ 42, 103; and receive LSAC Unite for free. *Id.* at ¶ 44. We appreciate that a complaint must provide "more than mere repetitive generic reference to 'Defendants' tacked on to a conclusory verb form to connect an individual defendant to an actual agreement in an antitrust conspiracy," but Mr. Risner's allegations go further than that. *Processed Eggs*, 821 F. Supp. at 720. They describe who controls the LSAC (the "Member Law Schools"), how (by electing the LSAC's Board of Trustees), and why (to receive kickbacks and a free, centralized product through which they receive applications).

We are also unconvinced that concerted action is lacking because "[a] single entity cannot conspire with itself." DI 22-1 at 5. As the Supreme Court has explained:

> Because the inquiry is one of competitive reality, it is not determinative that two parties to an alleged § 1 violation are legally distinct entities. Nor, however, is it determinative that two legally distinct entities have organized themselves under a single umbrella or into a structured joint venture. The question is whether the agreement joins together independent centers of decisionmaking.

*Am. Needle*, 560 U.S. at 196 (citation modified); *see also Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 1007 (3d Cir. 1994) ("The actions of a group of competitors taken in one name present the same potential evils as do the actions of a group of competitors who have not created a formal organization within which to operate."). Nonetheless, the LSAC argues that under the Supreme Court's decision in *American Needle*, we should presume that it acted independently because "[t]he Complaint contains no allegations that any Member Law School had or acted on any 'interests separate from' those of LSAC itself in purportedly directing LSAC to set fees" and that Mr. Risner "does not allege, as he must, that any Member Law School is an actual or potential competitor of LSAC." DI 22-1 at 6 (citing *American Needle*, 560 U.S. at 197, 200).

11

That is not what *American Needle* requires.

In *American Needle*, an apparel vendor alleged that all 32 of the National Football League's teams violated the Sherman Act by jointly forming National Football League Properties (NFLP), an entity meant to develop and license each teams' intellectual property to produce items like hats and jerseys. 560 U.S. at 187. The teams and the NFLP argued that the NFLP was a "single entity" such that the vendor could not show concerted action. *Id.* at 197-99. The Supreme Court rejected this argument, explaining that "it is not dispositive that the teams have organized and own a legally separate entity that centralizes the management of their intellectual property. An ongoing § 1 violation cannot evade § 1 scrutiny simply by giving the ongoing violation a name and label." *Id.* at 197. Were it otherwise, "every agreement and combination in restraint of trade could be so labeled." *Id.* Accordingly, the Court concluded that the teams' formation of the NFLP constituted concerted action: "The NFL teams do not possess either the unitary decisionmaking quality or the single aggregation of economic power characteristic of independent action. Each team is a substantial, independently owned, and independently managed business." *Id.* Thus, "decisions by NFLP regarding the teams' separately owned intellectual property constitue[d] concerted action." *Id.* at 200. Same here.[3]

The LSAC also attempts to distinguish *American Needle* on its facts, but the parallels are

---

[3] The Third Circuit authority the LSAC says "controls here" precedes *American Needle* and is distinct. DI 22-1 at 8. For example, *Weiss v. York Hosp.*, 745 F.2d 786, 817 (3d Cir. 1984) and *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1135 (3d Cir. 1995) concerned alleged conspiracies by a "single entity" for Section 1 purposes. In those cases, the Third Circuit found that a hospital and its employees (*Weiss*) and a steel company and its 99.92% owned railroad (*Siegel*) were single economic entities incapable of conspiring. The LSAC, on the other hand, is allegedly controlled by the law schools, which are competitors with independent economic interests. DI 1 at ¶¶ 15, 20.

clear.  DI 22-1 at 7.  Like the NFLP, Mr. Risner alleges that the LSAC was created by competitors — the member law schools.  DI 1 at ¶ 14, 17.  And like the NFL teams, while the law schools may have "common interests" in maximizing applications to law school or streamlining the law school application process, they "remain separately controlled, potential competitors with economic interests that are distinct from [the LSAC's] financial well-being." *Am. Needle*, 560 U.S. at 198, 201.  That the interests of the law schools and the LSAC are aligned regarding the provision of the LSAC's application software does not meaningfully alter the analysis.  After all, "illegal restraints often are in the common interests of the parties to the restraint, at the expense of those who are not parties." *Id.* at 198.  It would make little sense to dismiss a Section 1 claim for lack of concerted action merely because competitors have found some common interest between them on which they may or may not compete.

It may well be the case, as LSAC posits, that centralized software simplifies the application process for both schools and applicants and therefore creates procompetitive efficiencies.  DI 22-1 at 7; *Twombly*, 550 U.S. at 556 ("of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that 'recovery is very remote and unlikely.'").  But our concern at this step is the presence of concerted action, not whether it is justified.  *Am. Needle*, 560 U.S. at 199 ("The justification for cooperation is not relevant to whether that cooperation is concerted or independent action."); *Copperweld*, 467 U.S. at 769 ("Of course, such mergings of resources may well lead to efficiencies that benefit consumers, but their anticompetitive potential is sufficient to warrant scrutiny even in the absence of incipient monopoly.").  Similarly, a discussion of whether the law schools are plausibly alleged to be competitors in the law school application platform market is

better reserved for an analysis of market definition, which we reach below.  *See* Section IV.A.3, *infra*; *Am. Needle,* 560 U.S. at 199 (explaining that "teams that need to cooperate are not trapped by antitrust law," but that "the conduct at issue in this case is still concerted activity under the Sherman Act that is subject to § 1 analysis.").

Whether it is division rivals who play on Sundays or law schools hunting for the best students, we think that a group of competitors' creation of an entity to do their bidding — in a way materially related the operation and financial success of their respective businesses — is the type of action subject to Section 1.  The complaint plausibly alleges concerted action.

b.  The complaint plausibly alleges an agreement among the law schools

According to the LSAC, "[e]ven assuming LSAC's pricing decisions *could* amount to concerted action, Plaintiff has pled no facts raising a plausible inference that they are, in fact, the product of an agreement among the law schools."  DI 22-1 at 8 (emphasis in original).  Put differently, the LSAC urges us to conclude that the complaint pleads at most a "rimless" hub and spoke conspiracy.  *Insurance Brokerage*, 618 F.3d at 370 ("a plaintiff must show not simply that the defendants all engaged in similar wrongdoing, but that they *agreed to undertake* concerted action in restraint of trade.") (emphasis added); *Howard Hess Dental Lab'ys Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 256 (3d Cir. 2010) (dismissing claim for hub and spoke conspiracy for lack of a "rim" and refusing to assess allegations on "rimless" conspiracy because such a conspiracy was not alleged).  We disagree for many of the same reasons discussed above under the heading of concerted action.

i.  The complaint does not identify a rule or policy constituting direct evidence of a horizontal agreement between the law schools

First, the LSAC argues that Mr. Risner's allegations do not allege any direct evidence of

an agreement among the law schools, and "furnish no clue as to which of the Member Law Schools. . . supposedly agreed, or when and where the illicit agreement took place[.]"  DI 22-1 at 9 (citing *Twombly*, 550 U.S. at 565 n.10) (citation modified).[4]  Although not entirely clear, Mr. Risner seems to suggest that his allegations of concerted action — that the law schools created LSAC, which sets supracompetitive prices at their direction and control — should be considered direct evidence of an agreement at this stage.  DI 24 at 5-8.  More specifically, Mr. Risner relies on the Second Circuit's decision in *Relevent Sports, LLC v. U.S. Soccer Fed'n, Inc.*, which held that if "the plaintiff adequately alleges that the policy or rule is the agreement itself, then it need not allege any further agreement."  61 F.4th 299, 308 (2d Cir. 2023) (emphasis in original); DI 24 at 6.  Mr. Risner identifies two courts in this district that have applied the *Relevent Sports* decision.  *Id.* at 6; *Muhammad v. NAR*, 2025 WL 2171143, at *11 (E.D. Pa. July 31, 2025) (Leeson, J.); *Davis v. Hanna Holdings, Inc.*, 787 F. Supp. 3d 42 (E.D. Pa. 2025) (Beetlestone, C.J.); *Davis v. Hanna Holdings, Inc.*, _ F. Supp. 3d _, 2026 WL 654145 (E.D. Pa. 2026).[5]

We note at the outset that absent explicit direction from the Third Circuit adopting the Second Circuit's view in *Relevent Sports*, that decision is not binding.  *See Aguilar v. Vitamin Shoppe, Inc.*, 2018 WL 1960444, at *7 (D.N.J. April 25, 2018) ("Second Circuit decisions do not bind district courts in the Third Circuit.").  Understanding *Relevent Sports* for the useful

---

[4] The footnote from *Twombly* quoted by the LSAC concerned whether the allegations of the complaint would provide a defendant with sufficient notice under Rule 8, noting that "a defendant seeking to respond to plaintiffs' conclusory allegations in the § 1 context would have little idea where to begin."  *Twombly*, 550 U.S. at 565 n.10.  The LSAC cannot claim such a lack of notice here.

[5] We refer to Judge Beetlestone's opinions in *Davis v. Hanna Holdings* as "*Davis I*" and "*Davis II*" respectively.

guidance it provides, however, we are unpersuaded by Mr. Risner's argument. In both *Muhammad* and *Davis*, the rule or policy that was said to constitute the anticompetitive agreement among the parties was "specifically alleged." *Muhammad*, 2025 WL 2171143, at *14; *Davis II*, 2026 WL 654145, at *14 (defendant allegedly had a policy "explicitly requiring its agents 'to comply with any real estate transaction standards adopted by NAR.'"). Mr. Risner does not specifically allege any such rule or policy.

To that end, in *Davis I*, Chief Judge Beetlestone aptly rejected the plaintiff's attempt to shoehorn his allegations into *Relevent Sports*: "[u]ltimately, though, at the motion to dismiss stage, it is the allegations in the operative complaint that set the terms of the analysis—not the parties' arguments in their briefs or at oral argument." *Davis I*, 787 F. Supp. 3d at 59. So too here. *Howard Hess*, 602 F.3d at 257 ("To the extent the Plaintiffs are recasting their allegations in an effort to circumvent a motion to dismiss, we must reject that approach.").

Mr. Risner says that he alleges a policy within the purview of *Relevent Sports* because "he challenges the Council's policy of charging the same CAS Fees for every school." DI 24 at 7. But that is *post hoc* argument; the complaint does not identify any rule or policy, in form or substance, governing the relationship between the law schools and the LSAC. Rather, the complaint describes the LSAC as a "conduit for, participant in, facilitator of, and beneficiary of an agreement to restrict trade between Member Law Schools." DI 1 at ¶ 113. And the law schools purportedly enter "*de facto* exclusive agreements" with LSAC, *id.* ¶ 146, which are not equivalent to the explicit rules imposed on members of the associations in *Muhammad* and *Davis*. A plaintiff cannot hitch his wagon to *Relevent Sports* simply by labeling any conduct a

"rule or policy."[6]

>     ii.    The alleged conduct amounts to circumstantial evidence of a
>            horizontal agreement

Second, the LSAC argues that Mr. Risner fails to show circumstantial evidence of an agreement among the law schools, lacking the required allegations of parallel conduct and plus factors. DI 22-1 at 9-12. Mr. Risner disagrees again: the law schools have engaged in parallel conduct because they all require law students to apply through the LSAC, and the complaint alleges a motive to enter a conspiracy, actions contrary to the law schools' own interests, and the improbability that each school would make the same decision in the absence of an agreement. DI 24 at 8-10. We start with parallel conduct and then consider Mr. Risner's alleged plus factors. We conclude that he meets his burden at this stage.

To plausibly allege an agreement by circumstantial evidence, the allegedly parallel conduct "must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Lifewatch Services Inc. v. Highmark Inc.*, 902 F.3d 323, 333 (3d Cir. 2018) (quoting *Twombly*, 550 U.S. at 557) (citation modified). The LSAC argues that complaint does not identify when any of the schools began to use its application platform, so Mr. Risner comes up short of parallel conduct. DI 22-1 at 9-10. In turn, Mr. Risner argues that temporal proximity among the law schools is not necessary because "it is elementary that an unlawful conspiracy may be and often is formed without

---

[6] It is worth noting that in *American Needle* the teams did not dispute the existence of an agreement. Rather, the dispute was confined to whether they were capable of conspiring under the law: "[i]n their answer to the complaint, the defendants averred that the teams, the NFL, and NFLP were incapable of conspiring within the meaning of § 1." *Am. Needle*, 560 U.S. at 187-88. Accordingly, the utility of *American Needle* is necessarily limited when assessing the existence of a "rim" agreement.

simultaneous action or agreement on the part of the conspirators." DI 24 at 8 (quoting *Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 227 (1939) (citation modified)). The boundaries of such a temporal link in an antitrust conspiracy is one of several disputed issues of law currently before a panel of the Third Circuit in *Cornish-Adebiyi, et al v. Caesars Entertainment Inc, et al*, No. 24-3006, DI 50, 77, 110. Because we conclude that Mr. Risner's Section 1 claim must be dismissed on other grounds, however, we assume (without deciding) that Mr. Risner has plausibly alleged parallel conduct between the member law schools.

Next we consider Mr. Risner's alleged plus factors. The complaint does not fairly suggest that the law schools have acted contrary to their own interests by engaging in the alleged conduct. "[A]llegations of conspiracy are deficient if there are 'obvious alternative explanations' for the facts alleged." *Insurance Brokerage*, 618 F.3d at 322-23 (quoting *Twombly*, 550 U.S. at 567). As the complaint itself acknowledges — and Mr. Risner's opposition brief does not challenge — a centralized application model permits an applicant to "apply to many schools through a central application service." DI 1 at ¶ 48; DI 24 at 10. And "each Member Law School . . . competes with each other to woo applicants to apply to, and ultimately attend, its institution." *Id.* at ¶ 20. It would therefore be rational for self-interested, competing law schools to decide to use a centralized application service to maximize the number of applications each receives. *See Kerwin v. Casino*, 802 F. App'x 723, 726 (3d Cir. 2020) (plaintiff's own allegations made clear that independent self-interest was an obvious alternative explanation for defendant casinos' parallel behavior).

Mr. Risner tries to avoid this obstacle by suggesting that he does not challenge the benefits of a centralized application software. DI 24 at 10. Rather, he says the schools have

18

"acted contrary to their own interests by charging set prices rather than undercutting each other to attract more applicants and revenue." *Id.*  This is puzzling because as the complaint explains, "[w]hile some Member Law Schools do not charge their own application fees, Member Law School application fees generally range from $50 to $105." DI 1 at ¶ 30.  According to the complaint, then, the law schools can and do undercut each other on application price.  In that sense, law schools get the best of both worlds by going through the LSAC: they can compete with each other on their own application prices while receiving the LSAC's application platform at no cost.  *Id*. at ¶ 33.  Facially, that is not contrary to the interests of a law school engaged in competition for applicants.

We are persuaded, however, that the complaint plausibly alleges a motive to conspire among the law schools.  "Evidence of a motive to conspire means that the market is conducive to price fixing." *In re Confectionary Antitrust Litig.*, 801 F.3d 383, 398 (3d Cir. 2015).  A market may be conducive to price fixing where it is highly concentrated, there are high barriers to entry, or declining prices or profits make collusion attractive.  *See In re Blood Reagents Antitrust Litig.*, 266 F. Supp. 3d 750, 772 (E.D. Pa. 2017).  Typical examples of entry barriers are "economies of scale, high initial investment, capital market imperfections, risk, low prices, scarce inputs or customers, product reputation and promotion, and government constraints."  P. Areeda & H. Hovekamp, *Antitrust Law*, ¶ 421 (5th ed. 2021) (Areeda & Hovenkamp).  Without citing to supporting authority, Mr. Risner's opposition brief suggests three ways that he has plausibly alleged a motive to conspire: (1) the stability of not having to make independent, market-based decisions about fees for an application platform; (2) the receipt of kickbacks; and (3) the free provision of the application platform to law schools.  DI 24 at 9.  These proffered reasons speak

19

merely to the potential benefits of entering into a conspiracy with other law schools; they say nothing of market concentration, barriers to entry, or declining prices.

The complaint adds a little more. It alleges that the "LSAC has constructed illegitimate and insurmountable barriers to entry for competitors," including "using the revenue from the price-fixed Applicant Platform fee to provide its service in the Law School Application Platform Market for free to law schools." DI 1 at ¶ 144. Potential competitors are also unable to "feasibly sell alternative application platforms" to the member law schools, according to the complaint, because none "could feasibly, or legally, provide a competing platform to Member Law Schools at no cost while providing kickbacks to schools using price-fixed fees extracted from applicants, as LSAC does."[7] *Id.* at ¶ 145. In this way, Mr. Risner adequately pleads high barriers to entry, and suggests that the law school application software market is conducive to price fixing. Areeda & Hovenkamp, ¶ 421f; *see also United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 195-96 (3d Cir. 2005) (defendant supplier's access to and "power over" dealers through exclusive agreements was a barrier to entry).[8] The fact that a market is conducive to collusion alone, however, "does not create a reasonable inference of concerted action[.]" *Confectionary Antitrust Litig.*, 801 F.3d at 398; *Insurance Brokerage*, 618 F.3d at 322 ("care must be taken with the first two types of evidence, each of which may indicate simply that . . . market behavior is interdependent and characterized by conscious parallelism."); Areeda & Hovenkamp at ¶ 421

---

[7] Mr. Risner also alleges the LSAC enters into *de facto* exclusive agreements with the law schools. DI 1 at ¶ 146. This allegation is conclusory and does not meaningfully advance our analysis here.

[8] We recognize that even construed as true, Mr. Risner's entry barrier allegations do not create the overwhelming impression of opportunistic collusion among the law schools. But "entry barrier proof . . . is less elaborate in the case of joint ventures posing a significant collusion threat." Areeda & Hovenkamp at ¶ 420b.

("Entry barriers may reflect entirely proper conduct and may result from efficiency.").  More than this is needed.

Significantly, the complaint's allegations imply a traditional conspiracy — "the most important plus factor in cases like this one." *Confectionary Antitrust Litigation*, 801 F.3d at 398; *Insurance Brokerage*, 618 F.3d at 321-22.  That plus factor "looks for 'proof that the defendants got together and exchanged assurances of common action or otherwise adopted a common plan even though no meetings, conversations, or exchanged documents are shown.'" *Confectionary Antitrust Litig.*, 801 F.3d at 398.  Mr. Risner does not offer direct evidence of meetings, conversations, or exchanged documents between the law schools at this stage.  But he does allege that the LSAC was created and is controlled by the law schools, which elect the LSAC's Board of Trustees (for which all ABA-approved law schools have a vote) and receive kickbacks for their participation.  DI 1 at ¶¶ 14, 17-18, 42-44, 100-103.  These allegations plainly imply a traditional conspiracy, rendering it plausible that at some point the law schools "got together . . . adopted a common plan," and continue to implement that plan. *Confectionary Antitrust Litigation*, 801 F.3d at 398.

Mr. Risner plausibly alleges the horizontal and vertical aspects of a hub-and-spoke conspiracy.  As he tells it, the law schools engaged in concerted action by creating the LSAC and electing a body of individuals to control its operations.  That brings us to Mr. Risner's next hurdle: he must also plausibly allege an unreasonable restraint of trade in a plausibly defined market.  That one, he does not clear.

### 2.   *The alleged restraints will be analyzed under the rule of reason*

Courts apply one of three tests to assess the reasonableness of an alleged restraint of

trade: the rule of reason, the *per se* rule, or the quick look analysis. *Winn-Dixie Stores, Inc. v. Eastern Mushroom Marketing Cooperative, Inc.*, 89 F.4th 430, 438-39 (3d Cir. 2023). These three tests can be appropriately understood as falling along a spectrum: on one end is the rule of reason, which requires "careful scrutiny," and on the other is the *per se* rule, under which courts will forego an assessment of one or more (and in some instances all) factors related to a restraint's reasonableness. *Id*. at 435; Areeda & Hovenkamp at ¶ 1510. Somewhere in between lies the quick look analysis, which has been described as a test of "I know it when I see it." *Winn-Dixie Stores*, 89 F.4th at 435, 439 (citation modified).

Which of these three tests applies in an antitrust case generally depends on judicial experience with the type of restraint at issue. As such, application of the *per se* or quick look tests require a degree of familiarity:

> Recognizing the inherent limits on a court's ability to master an entire industry—and aware that there are often hard-to-see efficiencies attendant to complex business arrangements—we take special care not to deploy these condemnatory tools until we have amassed 'considerable experience with the type of restraint at issue' and 'can predict with confidence that it would be invalidated in all or almost all instances.'

*Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 89 (2021); *Winn-Dixie*, 89 F.4th at 439. By Mr. Risner's account, application of the *per se* rule is as easy as ABC: the law schools are competitors, and the actions of the LSAC constitute concerted action, so the LSAC's price setting is *per se* illegal horizontal price fixing. DI 24 at 11-12. That is an unwarranted oversimplification. *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 9 (1979) ("Literalness is overly simplistic and often overbroad. When two partners set the price of their goods or services they are literally 'price fixing,' but they are not *per se* in violation of the Sherman Act.").

"When 'restraints on competition are essential if the product is to be available at all,' *per se* rules of illegality are inapplicable, and instead the restraint must be judged according to the flexible Rule of Reason." *Am. Needle*, 560 U.S. at 203 (citation modified).  Mr. Risner argues that in the absence of pricing decisions by the LSAC, the law schools would independently set the price for application platforms, so the LSAC's fixed fees are "not a necessary, appropriate, or procompetitive aspect of law school applications."  DI 24 at 12 (citing DI 1 at ¶ 111) (citation modified).  This argument is undermined by Mr. Risner's own admission that a centralized application system provides the convenience of applying to multiple schools, all in one place.  DI 1 at ¶¶ 48-51.  And as the complaint explains, the LSAC's application software is meant to simplify "the law school application process for both candidates and law schools . . . saving [students] time and effort."  *Id.* at ¶ 23.  Indeed, the complaint acknowledges the LSAC's stated purpose of making "legal education accessible and equitable."  *Id.* at ¶ 17.

Regardless of whether the alleged restraint is necessary to make centralized application processing available, however, its admitted benefits are the type that would justify the application of the rule of reason.  *United States v. Brown Univ. in Providence in State of R.I.*, 5 F.3d 658, 672 (3d Cir. 1993) (holding that "when bona fide, non-profit professional associations adopt a restraint which they claim is motivated by public service or ethical norms . . . economic harm to consumers may be viewed as less predictable and certain.").  Taking care not to employ the "condemnatory tools" of the *per se* and quick look tests without the requisite predictability of the restraint alleged, *Alston*, 594 U.S. at 89, "it is proper to entertain and weigh procompetitive justifications proffered in defense of an alleged restraint before declaring it to be unreasonable."

*Brown Univ.*, 5 F.3d at 672.[9]  The complaint's conspiracy allegations support this result because they present a mix of vertical and horizontal components such that an eyeball test will not suffice.  *Winn-Dixie*, 89 F.4th at 430 (applying the rule of reason because "the interplay between the vertical and horizontal components of Appellees' scheme muddies the theoretical economic conclusions that a court might draw, in turn negating our ability to label it as 'obviously anticompetitive.'").  The rule of reason controls here.

### 3.  *Neither of the alleged markets can sustain Mr. Risner's claims*

Under the rule of reason, Mr. Risner "bears the heavy initial burden of proving" that the LSAC's alleged restraint "has a substantial anticompetitive effect that harms consumers in the relevant market."  *Winn-Dixie*, 89 F.4th at 438 (quoting *Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018) (*Amex*) (citation modified).  However, "courts usually cannot properly apply the rule of reason without an accurate definition of the relevant market," so we start there.  *Amex*, 585 U.S. at 542-543; *Elad v. Nat'l Collegiate Athletic Ass'n*, 160 F.4th 407, 414 (3d Cir. 2025) ("Because courts must engage in a robust market analysis, a precisely defined relevant market is essential.").

A relevant market is "the area of effective competition," the "outer boundaries" of which are illustrated by "significant substitution in consumption or production."  *Lifewatch*, 902 F.3d at 337 (quoting *Amex*, 585 U.S. at 543) (citation modified).  A relevant market's boundaries are also clarified by a consideration of the cross-elasticity of demand between two products that are

---

[9] As the Third Circuit explained in *Brown*, this does not "necessarily mean that commercially motivated conduct of such organizations should be immune from *per se* treatment."  5 F.3d at 672.  But where, as in *Brown*, the alleged restraint "was the product of a concern for the public interest," particularly "equality of educational access and opportunity," the rule of reason is appropriate to get to the bottom of the nature of the challenged restraint.  *Id.*

usually substitutes for one another, "in which a price change for one product affects the price of the other." *Id.* (quoting *Mylan Pharm. Inc. v. Warner Chilcott Pub. Ltd. Co.*, 838 F.3d 421, 425-36 (3d Cir. 2016) (citation modified)). "Ultimately the relevant market must 'both correspond to the commercial realities of the industry and be economically significant.'" *Id.* (quoting *Brown Shoe Co v. United States*, 370 U.S. 294, 336-37 (1962)).

More often than not, "proper market definition can be determined only after a factual inquiry into the commercial realities faced by consumers" and is therefore not usually suited for disposition on a motion to dismiss. *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997). But it is not a "*per se* prohibition against dismissal of antitrust claims for failure to plead a relevant market." *Id.* "Where a plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand . . . the relevant market is legally insufficient and a motion to dismiss may be granted." *Id.* So, to avoid dismissal, Mr. Risner must sensibly allege the interchangeability and cross-elasticity of demand for products in his markets. The LSAC argues that both markets are insufficiently stated in the complaint — the J.D. education market and the law school application platform market. DI 22-1 at 15-16, 18. Mr. Risner responds that he has carried his burden at this stage by defining their outer boundaries. DI 24 at 15-17. As alleged, neither market can sustain Mr. Risner's claims.

   a.   The J.D. education market

Mr. Risner defines the J.D. education market as "the 197 Member Law Schools and other law schools in the United States," who are "direct competitors . . . for applicants to law school." *Id.* at ¶¶ 69-70. LSAC argues this market is implausible because "[t]here are no facts suggesting

that all law schools are reasonably interchangeable with one another" and therefore the complaint fails to explain why they are within the same product market. DI 22-1 at 15-16. Mr. Risner says that "other educational programs like business and medical schools are not acceptable substitutes because they do not confer J.D. degrees." DI 24 at 15 (citing DI 1 at ¶¶ 68-70). And the LSAC's argument about distinctions among law schools is misplaced, according to Mr. Risner, because all law schools accept applications for a J.D.-conferring program. *Id.* at 16.

Given the allegations in the complaint, we credit with Mr. Risner's first argument that there is a lack of substitutability between J.D. programs and other educational programs like business and medical schools. DI 1 at ¶ 77; *Queen City Pizza*, 124 F.3d at 436. But we disagree with Mr. Risner that the J.D. education market is plausibly alleged because all law schools share a "relevant attribute" of accepting applications for a J.D.-conferring program. DI 24 at 16. This argument does not confront the defect the LSAC identifies — that the complaint does not account for interchangeability or cross-elasticity of demand among law schools. Yes, all law schools in the United States confer J.D. degrees. But that alone does not suffice to define the market, just as the product offered by top-tier Division I football programs does not automatically equate with that of lower-tier Division I football programs. *Rock v. Nat'l Collegiate Athletic Ass'n*, 928 F. Supp. 2d 1010, 1021-1022 (S.D. Ind. 2013) ("NCAA schools offering top-tier Division I football programs may be comparable substitutes, but it is implausible to suggests that lower-tier Division I football schools offer the same high level of in-kind benefits . . . that Plaintiffs allege are present at all NCAA schools across their market.").

The Supreme Court's decision in *Alston* does not salvage Mr. Risner's proposed market

26

definition.  594 U.S. at 81.  Mr. Risner contends that in *Alston*, the Supreme Court "implicitly approved" of a market "for athletic services in men's and women's Division I basketball and FBS football, wherein each class members participates in his or her sport-specific market."  DI 24 at 16 (quoting *Alston*, 594 U.S. at 81) (citation modified).  That is incorrect because, as the LSAC points out, the Supreme Court did not evaluate the district court's market definition in *Alston* as the parties did not challenge the district court's definition of the relevant market there. DI 25 at 6-7; *Alston*, 594 U.S. at 86 (explaining that "[t]he parties do not challenge the district court's definition of the relevant market" and "this suit involves admitted horizontal price fixing in a market where the defendants exercise monopoly control."); *see also Elad*, 160 F.4th at 416-17 & n. 13 (holding that the district court failed to define the relevant market by relying on expert testimony based on the Supreme Court's decision in *Alston* and noting that market definition was not in issue there).  As such, Mr. Risner does not adequately define his proposed market "with reference to the rule of reasonable interchangeability and cross-elasticity of demand," which in turn warrants dismissal of his Section 1 claim under the J.D. education market.  *Queen City Pizza*, 124 F.3d at 436.

Mr. Risner's alternative submarkets seem to acknowledge a difference in the "in-kind benefits" that different institutions of varying rank, rigor, and prestige might offer.  *Id.*; DI 1 at ¶ 71.  He alleges that the J.D. education market "includes submarkets in which certain law schools compete with other certain law schools for applicants with comparable GPA, test scores, and other admissions criteria as may be determined by the LSAC's own application data."  DI 1 at ¶ 71.  But the complaint does not frame these purported submarkets any better than the J.D. education market generally.  There could be relevant submarkets, but the complaint gives no

27

indication (i) which law schools allegedly compete with each other and in which submarkets they allegedly do so, (ii) how many submarkets there are or (iii) the reasons — substitutability, cross-elasticity of demand, or a lack thereof — which would account for the submarkets.  We are left to speculate as to the outer boundaries of the alleged submarkets.  *Lifewatch*, 902 F.3d at 337.  This too warrants dismissal.  *Queen City Pizza*, 124 F.3d at 436.

We entirely agree with courts that have cautioned against dismissing based on an ill-defined relevant market.  *Id.*; *Lifewatch*, 902 F.3d at 337.  But the alleged market in this case is said to comprise well over 200 law schools.  DI 1 at ¶¶ 69, 142.  The value of a "precisely defined market" is highest in such cases.  *Elad*, 160 F.4th at 414.  And while the complaint need only allow for identification of the "outer boundaries" of a market (rather than a precise definition), we are at a loss to do that without speculating.  That we cannot do.[10]  Absent clarity from the complaint, we dismiss Count I under the J.D. education market without prejudice.

b.   The law school application software market

The second alleged market — to which both of Mr. Risner's remaining claims apply — is that for law school application software.  DI 1 at ¶¶ 73-76.  Mr. Risner defines it as "the market for a platform to handle applications to U.S. law schools," which comprises "the LSAC Law School Application Platform and the other application platforms used by the small number of U.S. law schools (less than 15%) that do not use the LSAC Law School Application Platform."  *Id.* at ¶ 73.  Like the J.D. education market, the LSAC says that the law school application software market is implausible for failure to include allegations related to the product's

---

[10] *See Insurance Brokerage*, 618 F.3d at 370 (explaining that "RICO cases, *like antitrust cases*, are big cases and the defendant should not be put to the expense of big-case discovery on the basis of a threadbare claim.") (citation modified).

28

interchangeability or cross-elasticity of demand.  DI 22-1 at 18.  We agree.

As he does for the J.D. education market, Mr. Risner alleges that medical schools, business schools, and other schools are inadequate substitutes for law schools.  DI 1 at ¶ 77.  We take that allegation to mean that application platforms for other schools are inadequate substitutes for law school application platforms.  However, other allegations of the complaint undermine this position.  Mr. Risner alleges that "law school admissions do not pose any unique technical requirements that could not be addressed by experienced vendors" that provide application platforms for business and other professional schools, and "would be competitive forces in the relevant market" if not foreclosed by the LSAC.  DI 1 at ¶¶ 60-61.  In addition, the complaint uses Georgia Tech as an example of a school that uses the same application software for all graduate programs.  *Id.* at ¶ 58.

Again, Mr. Risner attempts to correct this deficiency by telling us something different than what the complaint actually alleges.  This time, he argues that his "alleged market encompasses *any* platform that could support law school applications."  DI 24 at 17 (emphasis added).  But that just does not square with the allegations that other application platforms are inadequate substitutes.  And the complaint's description of what the market includes — LSAC's platform and those used by "the small number of U.S. law schools" that use something else — clearly does not extend to any platform that could support law school applications.  DI 1 at ¶ 73.  In this way, the allegations of the complaint suggest that the proposed market "clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in [his] favor."  *Queen City*, 124 F.3d at 436.  Such inconsistent pleading warrants dismissal.  Areeda & Hovenkamp at ¶ 270 (explaining that contradictory pleading regarding market

29

definition "may be fatal[.]"); *See Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063-1064 (9th Cir.2001) (holding that plaintiff failed to define relevant market where proposed geographic and product markets limited to women's soccer program in Los Angeles was undermined by allegation that plaintiff was nationally recruited); *Choh v. Brown University*, 753 F. Supp. 3d 117, 133-34 (D. Conn. Oct. 2024) (granting motion to dismiss for failure to define the relevant market where the alleged market did "not include other colleges and universities that compete with the University Defendants[.]").[11]  The law school application platform market is implausibly alleged, so we dismiss count II without prejudice.

4. *Even if plausibly defined, the law school application platform market is two-sided*

Setting aside our analysis above, and assuming that Mr. Risner has plausibly defined the law school application platform market, we conclude that the platform market is two-sided.  A two-sided platform "is one that facilitates activities involving at least two interdependent groups of users."  Areeda & Hovenkamp at ¶ 565d.  The "manager" of the two-sided market — in this case the LSAC — "maximizes its profits by assessing the right price level and also coordinating the correct 'participation level' between the two sides."  *Id.* (using Uber as an example because it "must set driver prices that are sufficiently high to attract sufficient drivers, but not so high as to repel prospective riders.").  One version of a two-sided platform is a "transaction platform," the "key feature" of which is that "they cannot make a sale to one side of the platform without

---

[11] The Second Circuit recently affirmed the district court's decision in *Choh*, agreeing that the plaintiffs failed to plead a relevant market because the complaint's "[c]onclusory assertions . . . contradict[ed] well-pleaded facts in the complaint" indicating substitutability with schools outside the market as alleged and did "not include a plausible explanation as to why these markets should be limited to exclude possible substitutes." *Choh v. Brown University*, 2026 WL 905018, at *3 (2d Cir. April 2, 2026) (citation modified).

simultaneously making a sale to the other." *Amex*, 585 U.S. at 535 (citation modified). As such, the value of a two-sided platform to one group may also be influenced by participation on the other side of the platform, referred to as "indirect network effects." *Id.* For example, a credit card is more valuable to cardholders if more merchants accept it, and vice versa. *Id.* In light of such interdependencies, a two-sided platform may charge one side at "below-cost (or even negative) price." *Id.* at 536. In other words, a two-sided platform may entail the manager of the platform operating at a loss on one side to reap benefits on the other. *Id.*

The most widely known example involving a two-sided transaction platform is the Supreme Court's decision in *Amex*. 585 U.S. at 529. There, the United States sued American Express, alleging that "antisteering provisions" in its agreements with merchants violated Section 1 by imposing higher fees. *Id.* at 539. On appeal, the issue was whether the plaintiffs met their burden of proving that Amex's antisteering provisions had an anticompetitive effect in the relevant market. *Id.* at 542. The Court concluded that the credit card market was a single, two-sided transaction platform necessitating an analysis of anticompetitive effects on the platform as a whole: "[b]ecause they cannot make a sale unless both sides of the platform simultaneously agree to use their services, two-sided transaction platforms exhibit more pronounced indirect network effects and interconnected pricing and demand." *Id.* at 543-547. The plaintiffs' exclusive focus on the anticompetitive effects on merchants — one side of the two-sided platform — was insufficient to carry their evidentiary burden. *Id.* at 547-48.

The LSAC advocates for *Amex*'s application here. It argues that, like in *Amex*, the LSAC cannot make a sale to one side of the platform without simultaneously doing so on the other side. DI 22-1 at 19. As a result, the LSAC reasons, the complaint is fatally nearsighted, focusing only

on higher prices to applicants. *Id.* In response, Mr. Risner asks us to reserve the issue because he has alleged supracompetitive pricing in the market as a whole. DI 24 at 14 n. 4. We think it sounder to conclude that Mr. Risner has pled a two-sided transaction platform for which he has not alleged anticompetitive harm to the market as a whole.

According to the complaint, the Council's software contains "offerings to both applicants and Member Law Schools" comprising "both applicant-facing and Member Law School-facing elements." DI 1 at ¶ 22. Prospective students pay for the software, while the law schools receive it for free, memorialized in agreements with LSAC that renew annually. *Id.* at ¶¶ 23-25, 33, 146. Indeed, the complaint expressly refers to the two sides of the platform: "LSAC has constructed illegitimate and insurmountable barriers to entry for competitors by structuring LSAC's . . . Platform in such a way that competitors have no feasible way to access potential customers *on either side* of the platform." *Id.* at ¶ 144 (emphasis added). The LSAC acts as a "middleman," requiring applicants to "pay $45 *each time* LSAC sends a Credential Assembly Service report to a Member Law School, which occurs *each time* an applicant applies to a school." *Id*. at ¶¶ 1, 26 (emphasis added).

Thus, we agree with The LSAC that the complaint frames the law school application platform market as a two-sided transaction platform. The LSAC's platform certainly exhibits indirect network effects because students can apply to "many schools through a central application service." *Id.* at ¶¶ 48-49. If applicants could apply to only a handful of schools through the LSAC, the value of its product would be greatly diminished. Moreover, the LSAC cannot make a "sale" on one side (the applicant-facing side) without also doing so on the other (the law-school-facing side) — the paradigmatic feature of a transaction platform. *Id*. at ¶ 26;

32

*Amex*, 585 U.S. at 535 (citation modified).  The sufficiency of Mr. Risner's allegations therefore turns on whether he has plausibly alleged anticompetitive harms in the law school application software market as a whole, not just on the applicant-facing side of the platform.  *Id.* at 547-48; Areeda & Hovenkamp at ¶ 565d ("In all events, it is essential that observations of price changes not be limited to a single side of the market. Where relevant, effects on the other side of the platform must be addressed no matter what the methodology for assessing power.  A price increase on one side may reflect a consumer benefit or cost increase on the other side.").

The complaint does not allege anticompetitive harm on both sides of the platform.  The complaint alleges that the "LSAC has constructed illegitimate and insurmountable barriers to entry for competitors by structuring LSAC's Law School Application Platform in such a way that competitors have no feasible way to access potential customers on either side of the platform." DI 1 at ¶ 144.  That seems to suggest that higher barriers to entry have plagued both sides of the law school application platform market.  But the complaint continues: "These barriers include using the revenue from the price-fixed Application Platform fee to provide its service in the Law School Application Platform Market for free to law schools." *Id.*  As *Amex* teaches, "[t]he optimal price might require charging the side with more elastic demand at below-cost (or even negative price)."  585 U.S. at 536-37.  Accordingly, the Court there noted that credit card networks "might well *lose* money on the cardholder side by offering rewards such as cash back, airline miles, or gift cards." *Id.* at 537 (emphasis in original).  So too, here: the mere fact that LSAC offers its product to the law schools for free does not show anticompetitive

33

effect.[12]

Moreover, we will not place dispositive weight on Mr. Risner's conclusory allegation that the LSAC enters exclusive agreements with the law schools. *Host Int'l*, 32 F.4th at 248 (3d Cir. 2022). Mr. Risner points to our decision denying Equifax's motion to dismiss in *Greystone Mortg., Inc. v. Equifax Workforce Sols. LLC*, 2025 WL 540021, at *4 (E.D. Pa. Feb. 18, 2025), but the situation there was different.[13] There, the complaint alleged both multi-year exclusive deals, *de facto* exclusive deals, and identified the percentage of the market foreclosed by the allegedly anticompetitive conduct. *Id.* Not so here. For instance, Mr. Risner's opposition brief posits that "the Council offers incentives for loyalty" by sharing profits with the schools "to induce exclusivity." DI 24 at 22. But that is not what the complaint says. Rather, it alleges that the LSAC offers kickbacks in the form of grants, DI 1 at ¶ 43 — with no insight into how the LSAC determines which schools receive them — and then separately makes a conclusory allegation that the LSAC enters into exclusive agreements with the member law schools. *Id.* at

---

[12] This analysis applies with equal force to Mr. Risner's allegation that "[n]o competitor could feasibly, or legally, provide a competing platform to Member Law Schools at no cost and while providing kickbacks to schools using price-fixed fees extracted from applicants, as LSAC does." DI 1 at ¶ 145. His example of the common application contradicts this: "the Common Application does not charge applicants any fees for its application platform. Instead, the Common Application charges member schools[.]" *Id.* at ¶ 51. Such an approach is consistent with a two-sided transaction platform, reflecting a decision by the Common Application to pass the costs on to the side it sees as having more elastic demand. *Amex*, 585 U.S. at 536-37.

[13] Any reliance on our decision not to apply *Amex* to the motion to dismiss in *Greystone* also misses the mark. There, the allegations of the complaint explained that the product the defendants sought to treat as part of a two-sided market was actually a different product altogether. *Greystone*, 2025 WL 540012 at *2-3. Nor does the *Davis I* decision help. There, Chief Judge Beetlestone distinguished *Amex* on its facts — the defendant could earn a commission by operating on only one side of the market. 787 F. Supp. 3d at 64. Neither situation applies here. Mr. Risner acknowledges — and in fact, treats — the alleged market as two-sided. DI 1 at ¶¶ 22-25, 144.

¶ 146. Mr. Risner supposes that the grants are used as a mechanism to induce the loyalty of the law schools, but the complaint provides no basis for that suggestion. As explained above, we will not permit to Mr. Risner to "recast" his allegations to avoid dismissal. *Howard Hess*, 602 F.3d at 257. If Mr. Risner wants to rethink his allegations, he must do so through an amended complaint.

Boiled down, the complaint's alleged harm is supracompetitive prices imposed on the applicant side of the law school application software market. DI 1 at ¶ 148 ("The lack of any feasible competition has enabled LSAC to charge fees for the Application Platform that are far above those that could be charged in a competitive market[.]"). But "[e]vidence of a price increase on one side of a two-sided transaction platform cannot by itself demonstrate an anticompetitive exercise of market power." *Amex*, 585 U.S. at 547. We understand that an "insistence of precision can become a costly rule of nonliability to the extent it produces too many false negatives." Areeda & Hovenkamp at ¶ 565d(1). We do not intend to impose one here. And that concern does not absolve an antitrust plaintiff of the need to adequately allege anticompetitive harm in a relevant, plausibly defined market. *Queen City Pizza*, 124 F.3d at 436. Because Mr. Risner does not do so here, we dismiss count II without prejudice.

## B.  Mr. Risner does not plausibly state a monopolization claim

We dismiss count III for monopolization because the law school application platform market is implausible as alleged. *See Section* IV.A.3.b., *supra*. Assuming that the law school application platform market were adequately pled, however, we further conclude that Mr. Risner does not plausibly allege a monopolization claim for reasons closely linked to his Section 1 claim. A monopolization claim under Section 2 of the Sherman Act requires that the plaintiff

35

plausibly allege "two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power." *In re Lipitor Antitrust Litig.*, 855 F.3d 126, 147 (3d Cir. 2017) (citing *LePage's Inc. v. 3M*, 324 F.3d 141, 146 (3d Cir. 2003)). Monopoly power may be shown through direct or indirect evidence. *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 (3d Cir. 2007). Mr. Risner does not plausibly allege monopoly power.

       1.    *Mr. Risner does not plausibly allege direct evidence of monopoly power*

First we must determine the appropriate test for direct evidence of monopoly power. The LSAC argues that the test is a conjunctive one, requiring an antitrust plaintiff to plead both supracompetitive pricing and reduced output. DI 22-1 at 21 (citing *Broadcom*, 501 F.3d at 306, *BanxCorp v. Bankrate, Inc.*, 847 F. App'x 116, 120 (3d Cir. 2021)). Mr. Risner, on the other hand, says that the test is disjunctive, such that he may plead supracompetitive pricing *or* reduced output. DI 24 at 18 (citing *Mylan*, 838 F.3d at 434). Mr. Risner's position is unsupported by the authority he relies on: "to support a claim that a defendant set supracompetitive prices through direct evidence a plaintiff often must provide an analysis of the defendant's costs, showing *both* that the defendant had an abnormally high price-cost margin *and* that the defendant restricted output." *Mylan*, 838 F.3d at 434 (citation modified) (emphasis added). This makes sense because "[m]arket power is the ability raise price profitably by restricting output," so these elements go hand-in-hand. Areeda & Hovenkamp at ¶ 501; *see also id.* at ¶ 503a (explaining the Lerner Index, which measures market power with relation to the effect of price and output on each other). The LSAC's authority substantiates this conclusion. *BanxCorp*, 847 F. App'x at 120 (holding that evidence of increased prices alone was insufficient

and explaining that "[e]ven assuming the prices were supracompetitive, BanxCorp admits Bankrate did not restrict output during the challenged period—it increased it."); *Broadcom*, 501 F.3d at 307 ([t]he existence of monopoly power may be proven through direct evidence of supracompetitive prices *and* restricted output.") (emphasis added).[14]  The test is conjunctive.

Mr. Risner alleges increased prices: a $215 upfront fee and $45 per application fee which, according to Mr. Risner, "can be only a few dollars per application" and is significantly higher than that charged to applicants by the Common Application.  DI 1 at ¶¶ 2-3, 24, 51; Areeda & Hovenkamp at ¶ 503 ("For the firm with some market power, its profit-maximizing price exceeds marginal revenue and therefore exceeds marginal cost as well.").  But Mr. Risner does not allege reduced output.  He purports to do so by arguing that "the Council also restricts the output of additional platforms competing to process applications to law school."  DI 24 at 19. This is alleged exclusionary conduct repackaged as restricted output.  *See id.* at ¶ 651d (cautioning that "our concern about monopoly and the opportunities of rivals must not be allowed to obscure the objective of antitrust law, which seeks to protect the process of competition on the merits and the economic results associated with workable competition" and noting that higher output "is welcomed by the Sherman Act" and not considered exclusionary.); *see also California Dental Ass'n v. F.T.C.*, 526 U.S. 756, 776 (1999) (noting, where Federal Trade Commission alleged that professional association of local dental societies restricted dental

---

[14] Mr. Risner relies on *Amex* to suggest that the test should be disjunctive.  DI 24 at 18. But *Amex* does not help Mr. Risner, because at best it highlights why a lack of plausibly alleged restricted output warrants dismissal here: "[w]here . . . output is expanding at the same time prices are increasing, rising prices are equally consistent with growing product demand."  585 U.S. at 549 (quoting *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 237) (1993)).

advertising, the "relevant output" was "presumably not information or advertising, but dental services themselves.").

As the LSAC points out, Mr. Risner alleges that "[l]aw school applicants . . . have increased every year since the 2023 cycle, with the 2025 cycle seeing more than a 23% increase in applicants." DI 1 at ¶ 149. This, of course, is the opposite of reduced output. *BanxCorp*, 847 F. App'x at 120 (holding, where defendant's customers "nearly tripled within less than three years," that the defendant did not restrict ouput) (citation modified); *Amex*, 585 U.S. at 549 (holding there was "no such evidence" that output was restricted because "[t]he output of credit-card transactions grew dramatically from 2008 to 2013, increasing 30%."). Mr. Risner does not plausibly allege market power by direct evidence.

### 2. *Mr. Risner does not plausibly allege indirect evidence of monopoly power*

To show market power by indirect evidence, a plaintiff must plausibly allege that (1) the defendant had market power in the relevant market, and (2) there were barriers to entry into the relevant market. *Mylan*, 838 F.3d at 435. Indirect evidence of monopoly power also requires that the plaintiff plausibly define the relevant market. *Id.* For the reasons explained above, Mr. Risner does not plausibly define the law school application platform market. *See Section* IV.A.3.b., *supra.* So, Mr. Risner is likewise unable to show monopoly power by indirect evidence. *BanxCorp*, 847 F. App'x at 120 (failure to define the relevant market "doom[ed] any attempts to prove monopolization circumstantially."); *Queen City Pizza*, 124 F.3d at 437-43 (dismissing monopolization claim, attempted monopolization claim, and related Section 1 claim for failure to define relevant market). As such, Count III for monopolization is dismissed without prejudice.

### C. Mr. Risner has antitrust standing

As a backstop, the LSAC argues that Mr. Risner lacks antitrust standing because his theory is "too speculative and attenuated." DI 22-1 at 23-25. Mr. Risner's response is straightforward: he has antitrust standing because he was a direct customer of the LSAC. DI 24 at 23-25. We agree with Mr. Risner and conclude that he has standing.

"While the name echoes the familiar formulation of Article III, the judicially imposed requirement of antitrust standing is far more limiting." *Host Int'l*, 32 F.4th at 249 (citing *Gulfstream II Assocs., Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 425, 429 (3d Cir. 1993)). Five factors help guide the analysis:

> (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages.

*Id.* (citation modified). The third factor — the directness of the injury — has been described as "all-important" and "the focal point by which the remainder of the [] factors are guided," so we start there. *In re Modafinil Antitrust Litig.*, 837 F.3d 238, 263-64 (3d Cir. 2016) (citation modified).

Mr. Risner alleges that he was directly injured by the LSAC's allegedly anticompetitive conduct. Specifically, he says that he paid a supracompetitive price for its product as a result of the LSAC's "unlawful conduct" — $195 for the subscription and $315 in report fees. DI 1 at ¶¶ 78-81. That is enough at this stage. *In re Processed Egg Products Antitrust Litig.*, 881 F.3d 262, 274-75 (3d Cir. 2018). This scenario is distinct from one in which a purchaser seeks to

39

recover for prices set by a party other than the defendant. *Id.* (distinguishing *Mid-W Paper Prods. Co. v. Con'l Grp., Inc.*, 596 F.2d 573 (3d Cir. 1999)); *In re Modafinil*, 837 F.3d at 264-65 (same and explaining that where "the anticompetitive conduct is price-fixing, the only customers who will have antitrust standing are the direct customers of the conspiracy members.").

With the third factor in Mr. Risner's favor, the rest logically follow. The causal connection between the allegedly anticompetitive prices and Mr. Risner's having to pay those prices to apply to law school is quite clear; protecting consumers is of paramount importance under the antitrust laws; the LSAC does not (and cannot) identify a more direct victim of the alleged violation; and there is no risk of duplicative recovery. *Processed Egg Products*, 881 F.3d at 275-76 (walking through factors and concluding that direct purchasers had antitrust standing). Mr. Risner has standing to sue, so our dismissal of his claims is without prejudice.

V.    **Conclusion**

Mr. Risner's complaint is not without its merits, but the LSAC's arguments required a close examination that revealed facial legal deficiencies. The time to cure those deficiencies is in an amended complaint, not in briefing. We must grant the LSAC's motion and dismiss without prejudice because the complaint: alleges implausible markets; inadequately states harms across the law school application software market as a whole; and, taken as a whole, does not point to direct or indirect evidence of the LSAC's market power. Mr. Risner has 14 days to file an amended complaint addressing the deficiencies identified in this memorandum, if the facts allow.