**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| Linvel James Risner, on behalf of himself and those similarly situated, | Case No.  25-cv-4461 |
| Plaintiff, | **FIRST AMENDED COMPLAINT -- CLASS ACTION** |
| v. | |
| Law School Admission Council, Inc., | |
| Defendant. | |

Plaintiff Linvel James Risner, on behalf of himself and all those similarly situated, brings this action against Defendant Law School Admission Council, Inc., for violations of the Sherman Antitrust Act.

Plaintiff, on behalf of himself and all others similarly situated, demands a trial by jury on all counts for which a right to trial by jury is allowed and, in support of this First Amended Complaint, alleges as follows:

## NATURE OF THE ACTION

1.      In 2025, more than 60,000 aspiring law students submitted more than 500,000 applications to law schools. Most paid application fees to schools that cost up to $105 per school. Those application fees varied per school, and schools could choose what fee to charge an applicant or whether to waive fees to woo applicants.

2.      To even submit their applications, applicants first had to pay uniform fixed fees to LSAC, a middleman established and controlled by the law schools. These fees covered the LSAC application processing platform used by nearly all law schools. LSAC has adopted and implemented a policy of fixing those processing fees paid by applicants for every ABA-approved law school: a $215 upfront fee, plus $45 per

1

application—thereby imposing a price floor for the cost to apply to all member law schools. It also adopted and implemented a policy of fixing the fees paid by its member law schools at $0. LSAC, which does little more than transmit basic application information to law schools, collects an average of nearly $500 in fees from each applicant, totaling more than $30 million annually.

3. LSAC charges such high fees because the law schools that control it demand the revenue from LSAC's fees to provide the member law schools with direct payments and numerous free and subsidized services.

4. To grow and protect the pool for these payments and services, the LSAC member law schools, through LSAC, mandate that all LSAC members exclusively use LSAC's Law School Application Platform to process electronic applications. As evidence, three LSAC trustees—who also were deans of member law schools—issued a report to the full board of trustees that recommended denying full membership to three schools that accept the Law School Admission Test (an LSAC product). The trustees concluded that those schools could not be members because they do not use LSAC's Application Platform and "thus do not contribute significantly to the revenue needed to support LSAC's services to members." Those schools have not been granted membership.

5. The astronomical sum LSAC and its member schools receive from these fees is untethered to any actual costs or the value of LSAC's Law School Application Platform in a competitive market. Application costs for modern electronic applications can be only a few dollars per application, so low that costs may not even

2

be passed on to applicants. Indeed, the undergraduate Common Application, which offers a very similar application platform to LSAC, does not charge applicants a penny for its application platform. Instead, undergraduate schools accepting the Common Application charge (and often decide not to charge) a comprehensive application fee that includes the minimal application platform costs. Graduate business schools similarly incorporate the minimal application platform costs into competitive, school-specific application fees. Without LSAC's unlawful price fixing and monopolization of law school application platforms, law school applicants would not pay the mammoth, standalone LSAC platform fees.

6.    LSAC—an ostensible not-for-profit organization purportedly committed to making legal education "equitable and accessible" for all—has been wildly enriched by LSAC's anticompetitive conduct, as have LSAC's executives. In its most recent 501(c)(3) nonprofit filings for FY 2023, LSAC reported nearly $250 million in net assets—mostly securities investments. LSAC's then-CEO made more than $1 million in FY 2023. And LSAC reported compensating five other executives more than $400,000 in the same year.

7.    LSAC has violated federal antitrust law and gouged law school applicants attempting to follow their dreams. Injunctive relief, treble damages, and other remedies are appropriate to rectify LSAC's wrongdoing.

## **VENUE AND JURISDICTION**

8.    Plaintiff's claims arise under Sections 1, 2, and 3 of the Sherman Antitrust Act (15 U.S.C. § 1, *et seq.*). Plaintiff seeks damages under Section 4 of the

Clayton Act (15 U.S.C. § 15), as well as injunctive relief under Section 16 of the Clayton Act (15 U.S.C. § 26).

9.    This Court has subject-matter jurisdiction over Plaintiff's claims under 15 U.S.C. § 15 (because they arise from injuries Plaintiff suffered by reason of conduct forbidden in the antitrust laws); 28 U.S.C. § 1331 (because they arise under the laws of the United States); and 28 U.S.C. § 1337(a) (because they arise under an Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies).

10.    This Court has personal jurisdiction over LSAC because it has its principal place of business in this District in Newtown, Pennsylvania.

11.    LSAC engaged in conduct inside the United States that caused direct, substantial, and reasonably foreseeable and intended anticompetitive effects upon interstate commerce within the United States.  LSAC's activities were within the flow of interstate commerce and were intended to, and did, have a substantial effect on interstate commerce of the United States. LSAC's platform is sold in the flow of interstate commerce.

12.    Venue is proper in this District pursuant to § 12 of the Clayton Act, codified at 15 U.S.C. § 22, and 28 U.S.C. § 1391(b)–(d), because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, a substantial portion of the affected interstate trade and commerce has been carried out in this District, and LSAC resides in this District.

## PARTIES

13.     Plaintiff Linvel James Risner is a citizen of Georgia domiciled in Georgia. He is above 18 years of age.

14.     Defendant Law School Admission Council, Inc. ("LSAC") is a Delaware corporation with its principal place of business in Newtown, Pennsylvania. LSAC is recognized as a not-for-profit membership corporation under 26 U.S.C. § 501(c)(3).

15.     LSAC's membership includes all 197 ABA-approved law schools in the United States ("Member Law Schools").[1]

## FACTUAL BACKGROUND

**The Law School Admission Council**

16.     LSAC was created and is operated, maintained, and controlled by its Member Law Schools.

17.     The Member Law Schools are direct competitors for law school applicants. They generally operate as independent decision makers except when they collude through LSAC.

18.     LSAC's three express purposes, according to its bylaws, are: "(a) To construct, administer and report scores for tests for admission to law school; (b) To conduct educational research; and (c) To provide services to law schools and the educational community."[2]

---

[1] Several Canadian law schools also are LSAC members, but those schools are not at issue in this First Amended Complaint.

[2] *See Law School Admission Council Certificate of Incorporation & Bylaws*, *available at* https://www.lsac.org/docs/default-source/publications-(lsac-resources)/cert-of-inc-and-bylaws.pdf.

19.    LSAC states that it was "created by law school deans who wanted to make legal education accessible and equitable."[3]

20.    The Member Law Schools elect LSAC's Board of Trustees, who manage or direct LSAC's business and affairs. As of May 2026, every member of LSAC's Board of Trustees works for a Member Law School or for LSAC itself.[4]

**LSAC's Law School Application Platform**

21.    Every application cycle, more than 60,000 people apply to law school. An application cycle generally begins in the summer or fall of the year before matriculation. For instance, the 2027 application cycle will begin in summer or fall 2026 and run through summer 2027 for matriculation in the fall of 2027.

22.    While applicants compete with other applicants for acceptance, each Member Law School also competes with each other to woo applicants to apply to, and ultimately attend, its institution.

23.    Every Member Law School requires applicants to submit applications electronically through LSAC. No Member Law School permits applicants to apply using any other electronic processing method.

24.    The Member Law Schools directed LSAC to develop a suite of software to process electronic applications. The software comprises both applicant-facing and Member Law School-facing elements. This First Amended Complaint collectively

---

[3] *See LSAC Resources for Law School Deans*, LSAC, *available at* https://www.lsac.org/sites/default/files/media/2026-deans-resources.pdf.
[4] *See Board of Trustees*, LSAC, *available at* https://www.lsac.org/about/board-of-trustees/bios.

refers to LSAC's offerings to both applicants and Member Law Schools, including the application processing components and other features, as LSAC's "Law School Application Platform."

25.    The Member Law Schools first requested creation of the predecessor to the Law School Application Platform in 1970.[5] Each application cycle, they reaffirm their use of the Law School Application Platform and thus recommit to their agreements with each other, through LSAC, to fix prices and exclude LSAC's competitors.

26.    LSAC has acknowledged that the Member Law Schools control the development and functions of the Law School Application Platform. In 2022, Susan Krinsky, Executive Vice President for Operations and Chief of Staff (and Interim President and CEO from July 1, 2024 – June 30, 2025) was asked in a Law.com article about a feature of the Law School Application Platform that automatically released LSAT scores to law schools.[6] She responded: "We are currently responding to what the ABA has asked us to do and what our schools want. . . . Currently, our member schools have told us they want to see all scores. **We are a membership organization giving them what they want.**"[7]

---

[5] *See Law Test Delay*, The Harvard Crimson (Apr. 4, 1980), *available at* https://www.thecrimson.com/article/1980/4/4/law-test-delay-pthe-eight-week-delay/.
[6] Christine Charnosky, *Ahead of the Curve: The Law School Admissions Process is Built Around LSATs—So Where Does the GRE Fit In?*, Law.com (Feb. 7, 2022), *available at* https://www.law.com/2022/02/07/ahead-of-the-curve-the-law-school-admissions-process-is-built-around-lsats-so-where-does-the-gre-fit-in/?slreturn=20260429190925.
[7] *Id.* (emphasis added).

27.     On the applicant side, LSAC offers its platform under an umbrella called "Credential Assembly Service." According to LSAC's website:

> LSAC's Credential Assembly Service (CAS) simplifies the law school application process for both candidates and law schools. With CAS, your transcripts, letters of recommendation, and any other documents required for each of your law school applications only need to be sent one time to LSAC. All ABA-approved law school applications are available electronically through your CAS account as well, saving you time and effort. LSAC combines your documents with your LSAT score and forwards a full report to all the schools you apply to.[8]

28.     Importantly, the cost for applicants to apply to law school has two components, both of which are charged through the Law School Application Platform and collected by LSAC: (1) Credential Assembly Service fees and (2) school-specific application fees. The school-specific fees are set by the school in the Law School Application Platform. LSAC collects the fees and transmits them to the school to which the applicant applies.

29.     For the 2026 application cycle, LSAC's stated policy, available on its website, is to charge applicants two types of fees for its Credential Assembly Service: a $215 mandatory subscription fee and a $45 per report fee. The one-time subscription fee covers "Electronic application processing for all ABA-approved law schools," which all are Member Law Schools.[9] LSAC also states that "CAS Reports cost $45 each. You will need to purchase a CAS report for each law school to which

---

[8] *Credential Assembly Service (CAS)*, LSAC, *available at* https://www.lsac.org/applying-law-school/jd-application-process/credential-assembly-service-cas.
[9] *Id.*

you are applying."[10] The CAS fees thus are the same for every Member Law School per LSAC's written policies.

30. Consistent with this policy, since the 2022 application cycle, LSAC has charged at least $195 for its subscription fee and $45 per report. While a few applicants receive waivers for Credential Assembly Service fees, including based on financial need, the vast majority of applicants must pay these fees. LSAC's policy, as stated on its website, is to charge the same fees for each Member Law School.

31. The LSAC Board of Trustees decides and directs LSAC's pricing policies, including by voting on the policies.[11] The Board of Trustees thus decides the policy to set the same Credential Assembly Service fees for each Member Law School.

32. The current $215 subscription fee is mandatory to apply to almost every law school and is active for five years. According to LSAC, the subscription fee includes:

- "Transcript summarization (as well as authentication and evaluation of academic records for internationally educated JD applicants, if applicable).

---

[10] *Credential Assembly Service (CAS) Reports*, LSAC, *available at* https://www.lsac.org/applying-law-school/jd-application-process/credential-assembly-service-cas/credential-assembly.

[11] *See* Daniel O. Bernstine, *Finding the New Normal*, LSAC Report at 3 (Dec. 2011), *available at* https://web.archive.org/web/20120504085004/https://www.lsac.org/LSACResources/Publications/PDFs/December2011_LSRDEC.pdf (noting that the "Board of Trustees voted earlier this month to raise our fees by amounts that are larger than inflation."); Brian Tamanaha, *LSAC Responds to Balkinization Post* (Apr. 24, 2012), *available at* https://balkin.blogspot.com/2012/04/lsac-responds-to-balkinization-post.html. (quoting email from chair of LSAC Board of Trustees noting that the Board scrutinizes fees and attempts to "adjust its prices").

- Creation of your CAS Report (Note: CAS Reports cost $45 each. You will need to purchase a CAS Report for each law school to which you are applying.).

- Letter of recommendation processing.

- Electronic application processing for all ABA-approved law schools and some non-ABA-approved schools."[12]

33.     As noted above, applicants must pay $45 each time LSAC sends a Credential Assembly Service report to a Member Law School, which occurs each time an applicant applies to a school. The $45 flat fee does not vary based on the school to which an applicant applies. And the few member schools that permit applications by paper may still require applicants to pay for LSAC's Law School Application Platform.[13]

34.     LSAC, at the direction of the Member Law Schools that control it, sets the price it charges for the Credential Assembly Service subscription and reports. There is no variation in pricing based on the schools an applicant applies to. The prices are fixed for every Member Law School and thus impose a uniform price floor to apply to every Member Law School.

35.     The prices also do not vary based on application requirements. For instance, some schools do not require applicants to submit LSAT score reports and

---

[12] *Credential Assembly Service (CAS) Reports*, LSAC, *available at* https://www.lsac.org/applying-law-school/jd-application-process/credential-assembly-service-cas/credential-assembly.

[13] *See J.D. Application Requirements*, Fordham Law School, *available at* https://www.fordham.edu/school-of-law/admissions/jd-admissions/apply-to-fordham-law/application-requirements/ (noting that Fordham offers paper applications but that "Every applicant must also register for the Credential Assembly Service (CAS)" and submit transcripts through CAS).

require no or few letters of recommendation. The Credential Assembly Service fees are the same for applications to those schools as for applications to schools that require LSAT score reports and more letters of recommendation.

36.   Since at least the 2006 application cycle, LSAC has charged applicants Credential Assembly Service subscription and report fees. The chart below compiles those fees, the total number of applicants and applications, and the anticipated resulting revenue for all completed application cycles since 2006:[14]

| Year | Total Applicants | % Change from Previous | Total Applications | % Change from Previous | CAS Subscription Fee | % Change from Previous | CAS Report Fees | % Change from Previous | Anticipated Revenue* | % Change from Previous |
|------|------|------|------|------|------|------|------|------|------|------|
| 2006 | 88,662 | N/A | 530,433 | N/A | $106.00 | N/A | $12 | N/A | $15,763,368 | N/A |
| 2007 | 84,021 | -5.23% | 517,110 | -2.51% | $109.00 | 2.83% | $12 | 0.00% | $15,363,609 | -2.54% |
| 2008 | 83,371 | -0.77% | 532,580 | 2.99% | $113.00 | 3.67% | $12 | 0.00% | $15,811,883 | 2.92% |
| 2009 | 86,576 | 3.84% | 565,656 | 6.21% | $117.00 | 3.54% | $12 | 0.00% | $16,917,264 | 6.99% |
| 2010 | 87,916 | 1.55% | 604,313 | 6.83% | $124.00 | 5.98% | $12 | 0.00% | $18,153,340 | 7.31% |
| 2011 | 78,478 | -10.74% | 535,505 | -11.39% | $124.00 | 0.00% | $16 | 33.33% | $18,299,352 | 0.80% |
| 2012 | 67,897 | -13.48% | 468,128 | -12.58% | $155.00 | 25.00% | $21 | 31.25% | $20,354,723 | 11.23% |
| 2013 | 59,602 | -12.22% | 385,032 | -17.75% | $155.00 | 0.00% | $21 | 0.00% | $17,323,982 | -14.89% |
| 2014 | 55,808 | -6.37% | 354,368 | -7.96% | $160.00 | 3.23% | $25 | 19.05% | $17,788,480 | 2.68% |
| 2015 | 54,433 | -2.46% | 339,426 | -4.22% | $165.00 | 3.13% | $28 | 12.00% | $18,485,373 | 3.92% |
| 2016 | 54,897 | 0.85% | 345,666 | 1.84% | $170.00 | 3.03% | $30 | 7.14% | $19,702,470 | 6.58% |
| 2017 | 55,521 | 1.14% | 351,937 | 1.81% | $175.00 | 2.94% | $30 | 0.00% | $20,274,285 | 2.90% |

[14] The application data is sourced from LSAC's application data, *available at* https://report.lsac.org/View.aspx?Report=AdmissionTrendsApplicantsAdmitApps. For the 2021 application cycle, LSAC's website reports the percent change from previous for applicants and applications as 12.1% and 26.2%, respectively. According to the data, the percent changes should be 14.2% and 26.6%, respectively.

The historical Credential Assembly Service fees were compiled using archives of LSAC.org from the Wayback Machine, *available at* https://web.archive.org/. The Credential Assembly Service was previously known as the Law School Data Assembly Service ("LSDAS"), so this data includes subscription and report fees for LSDAS.

| Year | Total Applicants | % Change from Previous | Total Applications | % Change from Previous | CAS Subscription Fee | % Change from Previous | CAS Report Fees | % Change from Previous | Anticipated Revenue* | % Change from Previous |
|---|---|---|---|---|---|---|---|---|---|---|
| 2018 | 59,908 | 7.90% | 382,896 | 8.80% | $185.00 | 5.71% | $35 | 16.67% | $24,484,340 | 20.77% |
| 2019 | 61,648 | 2.90% | 377,333 | -1.45% | $195.00 | 5.41% | $45 | 28.57% | $29,001,345 | 18.45% |
| 2020 | 62,090 | 0.72% | 378,407 | 0.28% | $195.00 | 0.00% | $45 | 0.00% | $29,135,865 | 0.46% |
| 2021 | 70,893 | 14.18% | 479,151 | 26.62% | $195.00 | 0.00% | $45 | 0.00% | $35,385,930 | 21.45% |
| 2022 | 62,507 | -11.83% | 428,718 | -10.53% | $195.00 | 0.00% | $45 | 0.00% | $31,481,175 | -11.03% |
| 2023 | 61,319 | -1.90% | 415,992 | -2.97% | $195.00 | 0.00% | $45 | 0.00% | $30,676,845 | -2.55% |
| 2024 | 64,779 | 5.64% | 427,732 | 2.82% | $200.00 | 2.56% | $45 | 0.00% | $32,203,740 | 4.98% |
| 2025 | 76,480 | 18.06% | 523,085 | 22.29% | $207.00 | 3.50% | $45 | 0.00% | $39,370,185 | 22.25% |

\* Anticipated revenue is estimated based on the total applicants and applications and the imposed fees. It does not account for fee waivers.

37. Fees are set before an application cycle begins and maintained throughout the cycle. Accordingly, fees are set based on a review of previous application cycles and a projection of the upcoming cycle(s).

38. Applicants also must pay school-specific application fees (or receive a waiver) to most Member Law Schools to which they apply. While some Member Law Schools do not charge their own application fees, Member Law School application fees generally range from $50 to $105.

39. Applicant fees paid to Member Law Schools do not cover the costs of an electronic application platform. Indeed, as LSAC states on its website, the fees LSAC charges applicants cover "Electronic application processing for all ABA-approved law schools and some non-ABA-approved schools."

40. As a result, a single application to a Member Law School with a $90 application fee costs an applicant $340 total. If a second Member Law School also had

a $90 application fee, that application would cost $135 total ($90 application fee + $45 Credential Assembly Service Report).

41.     Unlike applicants, law schools do not pay for the Application Platform. The Member Law Schools directed LSAC to provide LSAC's Law School Application Platform to the schools at no cost. The back-end software the schools use, which LSAC recently rebranded as "LSAC Unite," enables them to review and process applications submitted through LSAC, as well as manage enrollment. LSAC describes LSAC Unite as "a customer relationship and enrollment management platform that enables law schools to build, nurture, and manage the pipeline of prospective students."[15]

42.     During the application cycle, LSAC provides schools with daily, market-wide application reports showing application volume and demographic trends. LSAC also offers an "Applications page within the report [that] also shows how other law schools are performing in terms of year-over-year application volumes."[16]

43.     LSAC has entered into written agreements with each Member Law School confirming that the Member Law Schools do not pay LSAC for LSAC's Law School Application Platform, and LSAC elsewhere has confirmed in writing that it generally provides LSAC Unite to Member Law Schools free of charge.

44.     Applicants' Credential Assembly Service fees thus are the sole fees paid by anyone for LSAC's Law School Application Platform.

---

[15] *See LSAC Resources for Law School Deans*, LSAC *available at* https://www.lsac.org/sites/default/files/media/2026-deans-resources.pdf.
[16] *See Data Sources*, LSAC, *available at* https://www.lsac.org/general/deans-handbook/rankings/content/#/lessons/9PNaVYnPo5nNMvU3Rfk2VdJ3v1QjNece.

45.     The Member Law Schools' direction to LSAC to formulate its Law School Application Platform in this way removed the ability for Member Law Schools to be independent decision makers because they would otherwise have to determine whether and how much to charge applicants for processing.

46.     LSAC's revenue is far higher than the costs of LSAC's Law School Application Platform and far higher than any prices it could charge if the market were competitive.

**LSAC Policies Challenged in this Case**

47.     This case challenges separate but related written policies imposed by Member Law Schools through LSAC and annually adopted by Member Law Schools through their use of the Law School Application Platform. First, LSAC sets the exact same price for application processing for every single Member Law School (the "Pricing Policy"). Second, LSAC requires all Member Law Schools to use its price-fixed Law School Application Platform (the "Exclusivity and Use Policy").

48.     Each written policy may also be inferred by circumstantial evidence of the parallel conduct of the Member Law Schools and, among other plus factors, the Member Law Schools' motive to conspire and evidence of a traditional conspiracy.

Policy #1—The Pricing Policy: LSAC Sets the Same Price for Application Processing for Every Member Law School.

49.     As a requirement of the Law School Application Platform that LSAC requires all Member Law Schools to use, LSAC mandates that all applicants must pay the same Credential Assembly Service fees regardless of the school to which they

14

apply. The First Amended Complaint refers to this portion of the Pricing Policy as the "Applicant Pricing Policy."

50.    As a corollary, and as confirmed by LSAC's written agreements with Member Law Schools, LSAC's policy is not to charge law schools for their use of the Law School Application Platform. The First Amended Complaint refers to this portion of the Pricing Policy as the "Law School Pricing Policy."

51.    Neither aspect of the Pricing Policy is a necessary or competitively beneficial feature of a centralized application platform. As evidence, LSAC has built the Law School Application Platform to allow Member Law Schools to independently set and collect their own application fees within the platform itsel—or collect no fee at all. It thus is not essential to the existence of the Law School Application Platform that all Credential Assembly Service fees be set for applicants to pay the same supracompetitive prices.

52.    Moreover, as explained further below, centralized application platforms for undergraduate admissions do not impose fixed application processing fees on applicants and do not impose a price floor. Accordingly, charging applicants a fixed price for all schools and imposing a price floor has no bearing on the existence of a centralized application platform because centralized application platforms exist without such price fixing.

53.    LSAC's Pricing Policy charging applicants a fixed price for the Law School Application Platform does not result from notions of concern for the public interest, which would be addressed by developing a centralized application platform

15

without price-fixed fees. Instead, LSAC's Pricing Policy results from a desire by its Member Law Schools to increase profits to provide the Member Law Schools services and funding.

54.    As LSAC has acknowledged, the features of the Law School Application Platform reflect LSAC "giving [Member Law Schools] what they want." Member Law Schools' assent to and ratification of this fixed pricing structure further confirm their uniform adoption of this LSAC policy.

Policy #2—The Exclusivity and Use Policy: Member Law Schools Must Exclusively Use the Law School Application Platform.

55.    As a condition of full voting membership, LSAC mandates that all Member Law Schools require their applicants to exclusively use LSAC's Law School Application Platform for electronic applications.

56.    This Exclusivity and Use Policy exists to increase revenue for LSAC to then be redistributed to Member Law Schools.

57.    Evidencing the Exclusivity and Use Policy and its purpose, in 2019, a working group comprising three members of the Board of Trustees, who also were deans of Member Law Schools, issued a written report to the full Board of Trustees regarding applications of three law schools outside of North America for full LSAC membership (the "2019 Working Group Report"). The 2019 Working Group Report recommended rejecting full LSAC membership, explaining:

> The working group believes that admitting these schools to regular membership is not advisable. While these schools use the LSAT (or a localized version), **they do not require their applicants to use LSAC's other admission products and thus do not contribute significantly to the revenue needed to support LSAC's services to members**. For this reason, the

16

> working group is concerned about **how well the interest of these schools aligns with those of existing members**.[17]

58.    The 2019 Working Group Report instead recommended an "affiliate" membership that would not provide full voting rights or other benefits of LSAC Membership, including the services provided from the Law School Application Platform's revenue. As of the filing of this First Amended Complaint, the three law schools are not full LSAC members.

59.    This publicly available information is evidence that only law schools that require use of LSAC's Law School Application Platform may be full Member Law Schools because only such law schools generate "significant revenue" for LSAC. Law schools that do not require exclusive use do not have interests "aligned with those of existing members."

60.    The not-so-veiled implication of the Exclusivity and Use Policy is that any Member Law School that does not require exclusive use of LSAC's Law School Application Platform risks being stripped of its LSAC membership and denied corresponding benefits because it is reducing "the revenue needed to support LSAC's services to members."

61.    As indicated by the 2019 Working Group Report, an explicit and significant reason for the Exclusivity and Use Policy is that revenue from the Law School Application Platform is critical to fund services for the Member Law Schools,

---

[17] Report from Working Group on Int'l Membership Applications (May 31, 2019), *available at* https://www.lsac.org/system/files/inline-files/working-group-on-intl-membership-report_0.pdf. (emphasis added).

as the Credential Assembly Service fees represent approximately 30% of LSAC's total annual revenue, as confirmed by public tax filings.

62.    In a 2016 letter to Member Law School deans regarding admissions data, LSAC highlighted the services it provides to Member Law Schools. It explained: "LSAC remains committed to providing accurate and reliable law school admission data and to supporting legal education in other ways, many free of charge or with significant subsides to our members."[18] The letter then attached a list of more than 80 such services.[19]

63.    LSAC still provides many of these services and has since developed additional services for Member Law Schools, paid for by applicants' fees. As explained above, those services are explicitly tied to revenue from Credential Assembly Service fees.

## LSAC's Enrichment at the Expense of Applicants

64.    The scheme by which the Member Law Schools and LSAC have eliminated significant and feasible competition on both the applicant and law-school side of its platform has proven incredibly lucrative for LSAC. According to its public tax filings, LSAC *collected $93 million in Credential Assembly Service fees* over just the last three reported years ($32,194,549 in FY 2023, $30,003,215 in FY 2022 and $31,335,192 in FY 2021).

---

[18] *See* Susan L. Krinsky, Letter to Member Law School Deans (Aug. 2, 2016), *available at* https://pdfserver.amlaw.com/ca/LSACMatriculantServiceDeans.pdf.
[19] *Id.*

65.    Based on those same public tax filings, in FY 2023, the Credential Assembly Service fee revenue represented approximately 29% of LSAC's total revenue. In FY 2022, the Credential Assembly Service fee revenue represented approximately 31% of LSAC's total program service revenue.

66.    LSAC reported $238 million in total net assets at the end of FY 2023. A significant portion of those assets stem from the exorbitant and fixed fees that LSAC charges applicants.

67.    LSAC spends some of the fees it collects on massive compensation packages for executives. LSAC reported the following compensation in FY 2023:

    a.    Chief Executive Officer (until 6/30/24): $1,001,251

    b.    Chief Financial Officer: $539,231

    c.    Chief Strategy Officer: $470,650

    d.    Interim-President/CEO (from 7/1/24): $502,582

    e.    Chief Information Officer (until 3/13/24): $414,782

    f.    General Counsel and Corporate Secretary: $408,409

These compensation packages are higher than compensation packages for most law school deans.

68.    LSAC also reported paying $1.37 million on travel in FY 2023 and $3.97 million in FY 2022.

**Benefits to Member Law Schools from their Scheme with LSAC**

69.    To incentivize Member Law Schools to quash competition between themselves on application price and quality, they receive substantial benefits from their price-fixing agreement through LSAC.

70.    First, as explained above, LSAC uses the profits from its price-fixed application fees to provide numerous free and subsidized "services" to Member Law Schools. The 2019 Working Group Report recognized that this is a critical benefit of the Credential Assembly Service fees because the "revenue [is] needed to support LSAC's services to members."[20] LSAC has identified more than 80 such services it provides to members, "many free of charge or with significant subsides to our members."[21]

71.    These "services" explicitly provided from LSAC's Credential Assembly Service fee revenue include several categories of "grants" to Member Law Schools.[22] From FY 2013–2023, LSAC paid more than $6.5 million in grants to Member Law Schools, with 27 law schools receiving more than $100,000 during that period. And many individual payments are substantial. For instance, from FY 2020–2023, LSAC made the following direct payments to law schools of at least $50,000:

| Fiscal Year | School | Amount |
|---|---|---|
| 2023 | Seattle University | $50,000 |
| 2023 | North Carolina Central University | $64,332 |
| 2023 | Boston University | $100,000 |
| 2023 | Pennsylvania State University | $125,000 |

---

[20] *See* Susan L. Krinsky, Letter to Member Law School Deans (Aug. 2, 2016), *available at* https://pdfserver.amlaw.com/ca/LSACMatriculantServiceDeans.pdf.
[21] *See id.*
[22] *See id.* at 2 (listing five categories of "grants").

20

| Fiscal Year | School | Amount |
|---|---|---|
| 2023 | University of Denver | $70,404 |
| 2023 | Indiana University | $338,408 |
| 2022 | University of Memphis | $81,554 |
| 2022 | Seattle University | $103,971 |
| 2022 | Tulane University | $89,177 |
| 2022 | University of Puerto Rico | $94,125 |
| 2022 | University of Oregon | $94,125 |
| 2022 | Boston University | $114,000 |
| 2021 | University of Memphis | $69,000 |
| 2021 | University of Oregon | $63,617 |
| 2021 | University of Puerto Rico | $85,171 |
| 2021 | Seattle University | $60,000 |
| 2021 | Tulane University | $60,000 |
| 2021 | North Carolina Central University | $60,000 |
| 2021 | Boston University | $60,000 |
| 2020 | Duke University | $50,000 |
| 2020 | St. John's University | $102,026 |
| 2020 | University of Memphis | $50,000 |
| 2020 | University of Texas | $57,500 |
| 2020 | University of Akron | $108,058 |
| 2020 | University of Alabama | $96,000 |
| 2020 | University of Houston | $108,837 |
| 2020 | University of Oregon | $96,847 |
| 2020 | University of Puerto Rico | $90,334 |

72.     Second, Member Law Schools use LSAC to create a rainy day fund that Member Law Schools can tap in case of emergency. In 2012, the Chair of the LSAC Board of Trustees stated: "When the recession hit, the LSAC [] increased its direct subsidies to schools to help them weather the storm[.]"[23] LSAC thus provides Member Law Schools with valuable financial security, which in fact is funded by applicants.

---

[23] Brian Tamanaha, *LSAC Responds to Balkinization Post* (Apr. 24, 2012), *available at* https://balkin.blogspot.com/2012/04/lsac-responds-to-balkinization-post.html.

73. Third, Member Law Schools receive stability and are insulated from competition. They do not have to concern themselves with market pressures to change their Application Platform based on what other law schools use. Nor do they have to determine whether to fully compete on price with other law schools for application platforms, such as by charging applicants much less or fully absorbing the cost of such platforms.

74. Fourth, Member Law Schools receive the LSAC Unite platform at no cost. Because Member Law Schools otherwise would have to develop or purchase an application review, applicant relationship, and enrollment management platform, this is a valuable incentive to Member Law Schools.

75. These incentives provided to Member Law Schools cannot be matched by any competitor in the market for application platforms because a competitor would not have the profits from mandated price fixing to provide these incentives.

**Comparative Competitive Markets for Application Processing**

76. Robust competition exists for secure application platforms in other sectors, confirming that LSAC and its Member Law Schools have unlawfully restrained competition and created and maintained a monopoly with LSAC's Law School Application Platform.

77. Competitive markets for application platforms encourage competition on price because the costs for application platforms are borne by the schools that choose to use certain platforms. The schools then compete with each other as independent market participants on the price of their total application fees—

22

including whether to pass along processing costs to applicants. This competitive market differs sharply from the restrained, monopolistic market established by LSAC and its Member Law Schools where (1) schools bear no application platform costs and thus do not compete with each other regarding whether to charge application platform fees and (2) the prices paid by applicants are fixed with feasible, significant competition barred by the schools and LSAC.

78.    Market competition has resulted in at least two models for higher-education application processing: (1) a centralized model where applicants apply to many schools through a central application service and (2) a decentralized model where schools are responsible for hosting their own applications. Both models can be operated competitively, significantly lowering costs and increasing choice for applicants, as compared to the uncompetitive model for Member Law Schools, which fixes the prices for part of the application fee resulting in a price floor.

### *Centralized Application Processing*

79.    Undergraduate schools utilize several centralized application platforms, which are not required to be exclusively used and do not charge fixed fees for applications.

80.    The Common Application operates as a centralized application service very similar to LSAC. Common Application applicants can apply directly through the Common Application's website. The Common Application offers most of the same features as does LSAC, including soliciting and accepting letters of recommendation, compiling and reporting background demographic information and GPA, and other

general processing features. It also offers a backend platform for undergraduate admissions offices to review applications.

81.    Notably, like LSAC, the Common Application is a membership organization controlled by the schools who use the application. Unlike LSAC, the Common Application and its members have not fixed prices for application platform fees.

82.    Unlike LSAC, the Common Application does not charge applicants any fees for its application platform. Instead, the Common Application charges member schools a $2,500 flat fee per year, a $3.76–$4.80 fee per application (depending on the platform a school uses), and a $2.00 payment processing fee if a school requires an application fee.[24]

83.    A price floor does not exist to apply to schools using the Common Application. Individual schools determine the fee that they will charge applicants, or whether to charge any fee. More than 500 Common Application schools charge no application fee.[25] Thus, an applicant applying to one of these schools would incur no application costs. Those Common Application schools have made competitive decisions not to pass application costs to applicants, presumably with the goal of increasing applications.

---

[24] *See Pricing & Fees*, Common App, *available at* https://membersupport.commonapp.org/s/pricing (Note: since the filing of the original complaint, this page has moved behind a login screen.). The Common Application also charges a one-time implementation fee for new member schools.
[25] *See Explore Colleges*, Common App, *available at* https://www.commonapp.org/explore.

84.     While the Common Application is the most widely used centralized application platform for undergraduate schools, several other centralized application platforms exist and compete against the Common Application. The Coalition Application offers a similar platform for approximately 123 institutions.[26] Similarly, QuestBridge offers a centralized application platform for applicants from households earning less than $65,000 annually and with minimal assets.[27] None of these centralized applications impose a price floor on applicants.

85.     None of these application platforms require exclusive use of their platform. Indeed, schools often accept applications from multiple platforms—Yale, for instance, accepts applications from all three.[28]

86.     Such competition and benefits do not occur in the price-fixed, monopolistic market established by LSAC and its Member Law Schools. Applicants must bear the fixed costs of the application platform regardless of the school to which they apply, setting a price floor to apply to any Member Law School. And as illustrated by the fees charged to undergraduate schools by the undergraduate centralized application platforms, LSAC's fees charged to law school applicants dwarf what a centralized application service could charge in a competitive market where schools and the centralized service have not insulated themselves from competition.

---

[26] *See App Receiving Colleges*, SCOIR, *available at* https://www.scoir.com/apply-colleges.

[27] *See National College Match*, QuestBridge, *available at* https://www.questbridge.org/apply-to-college/programs/national-college-match.

[28] *Apply to Yale as a First-Year Student*, Yale University, *available at* https://admissions.yale.edu/apply.

87.    The Common Application and similar competitive centralized application systems underscore that a centralized system does not require fixing prices. LSAC could offer a centralized application platform that encourages competition and does not set a price floor to apply to law school. It has chosen instead to restrict and prevent competition at applicants' expense.

*Decentralized Application Processing*

88.    Other schools and programs have adopted a decentralized model where the school builds or contracts with a vendor to host its own application instance. In particular, many graduate schools do not rely on centralized membership organizations to provide an application service. The costs to applicants of a decentralized model are also very low compared to LSAC's fees.

89.    For example, graduate business schools each have their own applications and associated fees. And like law school applications, business school applications collect pertinent documents, including test scores, GPA data, and other applicant information. Unlike law schools, however, the business schools themselves charge and collect all fees. The price paid by business school applicants to business schools incorporates both the application platform software (like that paid to LSAC by applicants) and the institution-specific costs of applying (like that paid to the individual schools by would be law students). Business schools thus compete with each other on price for the all-in cost to a business school applicant.

26

90.     By way of example, the application fees at private business schools historically considered some of the best schools in the country can reach $250–$275.[29] But application fees to less historically prestigious or lower-ranked schools can be significantly lower, as low as $30 per application.[30] This competition in price to woo applicants to a school is the hallmark of a healthy, open market.

91.     Business schools can engage in this application-fee competition because the actual per-applicant costs for their decentralized application software are very low. For instance, Georgia Tech uses the same application software for its business school as it does for all other graduate programs. That software is provided by an outside vendor. Georgia Tech pays that vendor a few dollars per application. With that low cost, it charges a $95 all-in application fee.

92.     In contrast, as noted above, a student applying to one law school pays LSAC $260 solely for LSAC's Law School Application Platform, more than a 10,000% markup on the per-application cost. And to reiterate, this fee is only for LSAC's Law School Application Platform. A law school applicant still must pay any school-specific application fee set and charged by each law school.

---

[29] *See 2025-2026 Application Guide*, University of Pennsylvania Wharton School, *available at* https://mba.wharton.upenn.edu/application-guide; *Application Process*, Harvard Business School, *available at* https://www.hbs.edu/mba/admissions/application-process.

[30] *Apply to MBA*, University of Florida Warrington College of Business, *available at* https://warrington.ufl.edu/mba/apply/.

93. Multiple outside vendors provide application platforms for business schools, other graduate and professional schools, and undergraduate programs. Those include Salesforce, Oracle, Technolutions, Liaison, and others.

94. Because law school admissions do not pose any unique technical requirements that could not be addressed by experienced vendors, these vendors very likely would be competitive forces in the relevant market if not substantially foreclosed by LSAC and its Member Schools. Such competition would drive down the price of LSAC's Law School Application Platform and incentivize increases in its quality. However, LSAC and its Member Schools have substantially foreclosed access to that market with their agreements that prohibit price competition on a major part of the application fee.

95. Competitive alternatives would be present if not foreclosed by the price-fixing agreement and LSAC's leverage of its profits from the price fixing. Indeed, out of 28 active law schools that are not LSAC members, as identified on LSAC's website,[31] only one uses LSAC's Law School Application Platform. The remainder host their applications on their own websites, using either vendors or processing software that they developed themselves. In this situation, applicants do not pay LSAC, but rather the school or vendor. The extremely low adoption rate outside of the Member Law Schools demonstrates that LSAC's Law School Application Platform

---

[31] *See Other Law Schools*, LSAC, *available at* https://www.lsac.org/choosing-law-school/find-law-school/other-law-schools.

did not obtain its dominance, and does not maintain its dominance, by having a superior product.

**Harm to Both Sides of the Platform Markets and to the Markets as a Whole.**

96.    LSAC's conduct has allowed it to charge supracompetitive prices that have raised the costs to applicants by such a substantial degree that the harm to applicants strongly outweighs any benefits that LSAC may assert its price-fixing and exclusion of competitors provides to applicants or schools. Accordingly, LSAC's conduct harms the relevant Platform Markets, defined *infra*, as a whole. Moreover, LSAC's express requirements that Member Law Schools use its platform in order to enjoy full voting membership benefits and its free and subsidized services provided from the profits of the Law School Application Platform restrict the law schools' freedom to accept electronic applications a different way and restrict competitors from potentially entering the markets on the law school side of the platform.

97.    First, LSAC has increased its fees for its Law School Application Platform far beyond the rate of inflation. For the 2006 application cycle, LSAC charged a $106 subscription fee which included "law school report preparation, letter of recommendation and transcript processing, and access to electronic applications for all ABA-approved law schools."[32] LSAC also charged a $12 per report fee. For the 2011 application cycle, LSAC charged a $124 subscription fee for the Credential

---

[32] *See 2005-2006 LSAT/LSDAS Fees*, LSAC, *available at* https://web.archive.org/web/20051023213131/http://www.lsac.org/LSAC.asp?url=/lsac/lsdas-fees.asp.

Assembly Service and a $12 per report fee. The charts below illustrate the increase in fees to the 2026 application cycle, in nominal and real dollars.

| Fees in Nominal Dollars | | | | | |
|---|---|---|---|---|---|
| | **2026** | **2011** | **Percent Increase from 2011 to 2026** | **2006** | **Percent Increase from 2006 to 2026** |
| **Subscription Fee** | $215 | $124 | 73% | $106 | 103% |
| **Report Fee** | $45 | $16 | 181% | $12 | 275% |
| **Fees for One Application** | $260 | $140 | 86% | $118 | 120% |
| **Fees for Ten Applications** | $665 | $284 | 134% | $226 | 194% |

| Fees in Real Dollars[33] | | | | | |
|---|---|---|---|---|---|
| | **2026** | **2011 Fees (adjusted for inflation)** | **Percent Increase from 2011 to 2026** | **2006 fees (adjusted for inflation)** | **Percent Increase from 2006 to 2026** |
| **Subscription Fee** | $215 | $187.82 | 14% | $179.13 | 20% |
| **Report Fee** | $45 | $24.23 | 86% | $20.28 | 122% |
| **Fees for One Application** | $260 | $212.05 | 23% | $199.41 | 30% |
| **Fees for Ten Applications** | $665 | $436.22 | 52% | $381.92 | 74% |

98.     These increases far outpace overall inflation, as measured by the Consumer Price Index. According to the Bureau of Labor Statistics' CPI Inflation Calculator, inflation between July 2005 (right before the 2006 application cycle

---

[33] 2006 and 2011 cycle fees are adjusted for inflation to March 2026 using the Bureau of Labor Statistics' *CPI Inflation Calculator* for comparison between March 2026 and July 2005 and 2010 (the months just before the application cycles began), *available at* https://www.bls.gov/data/inflation_calculator.htm.

began) and July 2025 (right before the 2026 application cycle began) was approximately 65%.[34]

99.    The prices even further outpace inflation for software systems, as measured by the Producer Price Index for Software Publishers.[35] Between June 2006 (the earliest date available through the PPI website) and July 2025, software publisher-observed inflation was only 11.34%, meaning that the cost for software significantly *decreased* in real dollars from 2006 to 2026. This makes sense because of the advances in software development and computing power that have made it more economical to produce and operate software.

100.    Put differently, software is cheaper to produce in real dollars than it was in 2006. Yet LSAC charges a 2026 applicant to ten schools approximately 75% more in real dollars (almost $300 more) than it would have charged the same applicant in 2006.

101.    LSAC has acknowledged that its price increases have outpaced inflation. In the December 2011 LSAC newsletter, then LSAC President Daniel Bernstine explained that LSAC was raising Credential Assembly Service Fees above the cost of inflation in conjunction with decreased application volume.[36] According to Bernstine,

---

[34] *See CPI Inflation Calculator*, Bur. Lab. Stats., *available at* https://www.bls.gov/data/inflation_calculator.htm.

[35] *See Producer Price Index by Industry: Software Publishers: Software Publishing, Except Games*, Bur. Lab. Stats., *available at* https://fred.stlouisfed.org/series/PCU5112105112105.

[36] Daniel O. Bernstine, *Finding the New Normal*, LSAC Report (Dec. 2011), *available at* https://web.archive.org/web/20120504085004/https://www.lsac.org/LSACResources/Publications/PDFs/December2011_LSRDEC.pdf.

the high applicant volume created massive revenue streams based solely on the volume, which LSAC used to fund services to law schools, including by "reduc[ing] the cost to law schools of participating in many of our programs, including the Annual Meeting, Forums, and workshops." Bernstine then explained that LSAC's "mode of doing business probably was sustainable in an environment of record-level candidate volumes. Today, with successive double-digit volume declines and significant operating deficits, it is sustainable no longer." After a vote of the Board of Trustees, LSAC thus raised its prices to prevent LSAC's revenue from further declining.

102.    These price increases underscore that the significant harms to applicants outweigh any benefit to the other side of the platform, causing anticompetitive harm to the relevant markets as a whole.

103.    Moreover, the supracompetitive prices cannot be explained by some hidden cost associated with operating a centralized application platform. To illustrate, LSAC collects significantly more revenue than it would under the Common Application's competitive pricing structure. As noted above, the Common Application charges schools, at most, $4.80 per application and a $2,500 flat fee per school per year. Applying the Common Application's pricing structure to the LSAC's law school application numbers (approximately 500,000 applications to 197 schools), LSAC would receive approximately $2.9 million in revenue. LSAC collected 10 times more in Credential Assembly Service Fees in each of the last three reported tax years.

104.    The simplest explanation for these harms is the correct one: LSAC and its Member Law Schools use their unique control of the platform to charge applicants

32

excessive and supracompetitive fees that could not be borne in a competitive market, which LSAC pockets to be used for the schools' collective and individual benefit.

105.   Second, LSAC has explicitly restrained competition on the school side of the markets. As explained above, LSAC requires its Member Law Schools to use LSAC's Law School Application Platform and thus has prevented competitors from being able to compete for Member Law Schools' business. LSAC's Member Law Schools also have fixed prices that they will pay on the school side of the market to prevent meaningful competition.

106.   LSAC further excludes potential competitors by redistributing its supracompetitive profits from the Law School Application Platform to Member Law Schools in the form of free or subsidized services, including grants and direct subsidies. Having built up these services and funds with applicants' fees, schools would be irrational to abandon the services and payments they receive as a benefit of their LSAC membership and in exchange for requiring applicants to use LSAC's Law School Application Platform.

## **RELEVANT MARKETS**

107.   LSAC's conduct is unlawful in several markets or submarkets. These markets and submarkets are alleged separately, as well as in the alternative to each other. As such, an allegation as to a characteristic of one alleged market should not be construed against a separate alleged market.

108.   The markets may be grouped into two categories: Application Markets and Platform Markets. The first alleged markets in each category are the broadest.

The successive markets are narrower standalone markets or, alternatively, submarkets of the broadest market alleged.

109.    The Application Markets or submarkets relate to the sale and purchase of law school applications: (1) the market for applications to law schools (the "Law School Application Market"); (2) the markets, or alternately submarkets, for applications to law schools for four separate tiers based on selectivity (the "Law School Selectivity Markets"); and (3) the markets, or alternatively submarkets, for applications to four separate tiers of law school based on perceived program quality (the "Law School Application Ranking Tier Markets").

110.    The Platform Markets or submarkets relate to the sale and purchase of application processing platforms: (4) the market for an electronic platform to handle applications to higher education programs (the "Higher Education Application Platform Market") and (5) the submarket for a centralized electronic platform to handle applications to law school (the "Law School Centralized Application Platform Submarket").

111.    The geographic scope of all markets is the United States, including its territories and the District of Columbia. LSAC is involved in the markets throughout the United States, including in the District of Columbia. The markets do not include applications to non-U.S. law schools, which typically will not allow for graduates to be admitted to practice law in the U.S.

112. The data necessary to determine the precise scope of the markets will be available in discovery, and Plaintiff reserves the right to amend or add any market definition as discovery proceeds.

113. Regardless of the applicable market, LSAC fixes prices and excludes competitors uniformly across all markets.

**Application Markets**

114. For each of the Application Markets, the schools are direct competitors with each other for applicants to apply to law school. Each school usually operates as an independent decision maker, one exception being when they collude through LSAC.

115. The product or service offered in each Application Market is a law school application to an ABA-approved law school, which provides the ability to be considered for admission to an ABA-approved institution the confers a juris doctor degree.

116. The product is not admission to, matriculation to, or education from a law school because not all applicants will be admitted to or matriculate to a law school. Indeed, at the most selective law schools in the country, more than 90% of applicants will be rejected.

117. None of the markets relate to applications to law schools not approved by the ABA. Applicants and the industry recognize the quality of ABA-approved law schools as different from the quality of law schools not approved by the ABA. Attendance at a law school not approved by the ABA is less likely to lead to favorable

35

career outcomes than attendance at an ABA-approved law school and limits admissibility to most state bars for the practice of law. This is underscored by the fact that LSAC requires ABA approval for a law school to be eligible for membership.[37]

118.    None of the Application Markets relate to schools other than law schools, such as undergraduate schools or other graduate programs. Because law school is the only available option to receive a J.D. degree and become a lawyer in nearly every state in the country, medical school, business schools, undergraduate or masters legal programs, or other schools are not acceptable substitutes for law schools.

119.    The Application Markets are one-sided markets because the product at issue is the law school application for which law schools set a price floor. In the Application Markets, the law schools, through LSAC, sell applications to law school, and the applicants consume those products and services by paying a fee to submit applications for consideration.

120.    The Application Markets also are one-sided because the services provided by the Law School Application Platform for the Application Market are different for applicants and for schools. The services that the law schools receive from LSAC's Law School Application Platform to analyze and act on the applications have more and different features than the simple transmission and processing services that applicants receive. Furthermore, the law schools and applicants do not simultaneously choose to use the services provided by LSAC. A law school decides

---

[37] *See Law School Admission Council Certificate of Incorporation & Bylaws* at 4, *available at* https://www.lsac.org/docs/default-source/publications-(lsac-resources)/cert-of-inc-and-bylaws.pdf.

once per year whether to use LSAC's application-processing service, and LSAC then provides services to that law school regardless of how many applications that law school receives.

121. Alternatively, if the Application Markets are a two-sided market because of the fixed payment structure unlawfully imposed by LSAC and the Member Law Schools, LSAC has caused harm to the markets as a whole and on both sides of the markets for the same reasons as alleged for the Platform Markets, namely that the supracompetitive pricing harm to applicants outweighs any potential benefit to schools and that competition has been restrained on the school side of the markets by the exclusivity rule.

### 1. The Law School Application Market

122. The Law School Application Market includes all ABA-approved law schools in the United States, including its territories and the District of Columbia.

123. All ABA-approved law schools participate in the Law School Application Market because all law schools process and receive applications regardless of the qualifications of a law school applicant. Put differently, the applicants with the highest chance of admission to a particular school and the applicants with the lowest chance of admission still pay the same application fees to the schools and the same Credential Assembly Service fees to LSAC.

124. There are no prohibitions on applications for less qualified applicants. In fact, law schools often encourage applicants to apply regardless of their statistical qualifications (e.g. LSAT or GRE score and undergraduate GPA), promising a holistic review of all applications.

125.    Applicants often apply to, and thus pay fees for, schools for which they have varying likelihood of admission, including schools to which they are likely to be admitted (safety schools), schools that they have a decent chance of getting into (target schools), and schools to which they are unlikely to, but may be admitted (reach schools). Advisors encourage students to apply to a mix of reach, target, and safety schools.[38]

126.    Indeed, application fees from unadmitted applicants are a significant source of revenue for law schools. For instance, for the 2025 application cycle, Yale Law School had the lowest acceptance rate of all law schools. Yale admitted 226 applicants out of 5,562 total applications (approximately 4%). It charged $85 for its school-specific application fee.[39] Even assuming Yale granted fee waivers to 10% of its applicants, Yale would have received more than $400,000 in application fees and LSAC would have received more than $200,000 in CAS report fees from rejected Yale applicants in the 2025 application cycle.

127.    Similarly, fees for unsuccessful applications represent the vast majority of LSAC's revenue from Credential Assembly Service fees. According to data from the 2025 application cycle, approximately 26% of all applications were accepted.[40]

---

[38] *See Reach, Target, & Safety Schools*, 7Sage LSAT, *available at* https://7sage.com/lessons/admissions/introduction-to-law-school-admissions/how-many-law-schools.

[39] *See 2025 1L JD Applicant/First-Year Class Data*, Am. Bar Assoc., *available at* https://www.americanbar.org/content/dam/aba/administrative/legal_education_and_admissions_to_the_bar/statistics/2025/2025-fall-jd-applicant-and-enrollee-class-data.xlsx.

[40] *Id.*

Approximately 74% of LSAC's Credential Assembly Service fee revenue thus resulted from rejected applications. As explained above, this revenue was repurposed for the benefit of all schools to provide grants and subsidized and free services.

128. Accordingly, applications to all law schools are reasonably interchangeable for one another because a purchase of an application provides the same result regardless of the school applied to: an admissions decision from a law school.

129. Because of this reasonable interchangeability, an increase in the cost to apply to one or more law schools, coupled with a stable cost to apply to one or more different law schools, would increase applications to schools that did not increase prices.

130. The inverse also is true. A decrease in the cost to apply to one or more law schools, coupled with a stable cost to apply to one or more different law schools, would decrease applications to schools that did not decrease prices.

131. This cross-elasticity of demand has been observed for undergraduate applications. In November 2020, the Common Application observed an 8% year-over-year decrease in overall applications.[41] However, 22 schools eliminated their application fees (including all processing fees) for first-year international students and saw application volume increase by nearly 29%. At the same time, several institutions introduced fees for this same group of applicants and experienced a

---

[41] *See Applications are Decreasing*, Inside Higher Ed, *available at* https://www.insidehighered.com/admissions/article/2020/11/16/college-applications-are-decreasing.

nearly 12% decline. These same economic features apply equally for law school applications.

132.    LSAC produces non-public "Common Applicant reports" for Member Law Schools analyzing applicants to a school that applied to other "peers and competitors."[42] Accordingly, LSAC possesses nonpublic data with which interchangeability and cross-elasticity of demand can be confirmed through discovery.

### 2. Law School Selectivity Markets

133.    The Law School Selectivity Markets constitute four markets, or alternatively submarkets of the Law School Application Market, comprising competing law schools with comparable selectivity rates. Members of each Law School Selectivity Market compete with other law schools in the market for applications.

134.    According to ABA application data from the 2025 application cycle, the acceptance rates for ABA-approved law schools range from 4% to 67%.[43] The data also shows that, in general, more selective law schools have entering classes with higher statistical qualifications.

---

[42] *See Data Sources*, LSAC, *available at* https://www.lsac.org/general/deans-handbook/rankings/content/#/lessons/9PNaVYnPo5nNMvU3Rfk2VdJ3v1QjNece.
[43] *See ABA Law School Data: JD Applicant and Enrollee Data, Fall 2025*, Am. Bar. Assoc., *available at* https://www.americanbar.org/content/dam/aba/administrative/legal_education_and_admissions_to_the_bar/statistics/2025/2025-fall-jd-applicant-and-enrollee-class-data.xlsx.

135. Generally, applicants and the legal industry regard law schools with lower acceptance rates to be of higher quality than law schools with higher acceptance rates.

136. LSAC itself recognizes these distinctions between law schools based on and separates law schools into "Law School Selectivity Quartiles" for data analysis based on an LSAC-created "law school selectivity index score."[44] As LSAC explains:

> [W]e use each law school's annual admission rate, median LSAT score of admitted students, and median UGPA of admitted students to create a law school selectivity index score. The top 25% of law schools by selectivity, considered "highly selective," in a given year are in the first quartile (Q1); the next 25% of schools by selectivity are in the second quartile (Q2); and so on.

137. Accordingly, four separate quartile markets, or in the alternative four quartile submarkets of the Law School Application Markets, exist for law schools based on comparable selectivity. These markets can be delineated based on the overall acceptance rate throughout the class period. A list of the schools in each quartile market and their overall acceptance rates, based on application data from the 2022–2025 application cycles, is attached as Exhibit A.[45]

138. LSAC, an industry group of competing law schools, recognizes these markets or submarkets based on the common characteristics of the law schools in

---

[44] *The Composition of the First-Year Law School Class and Enrollment 2021–2025 Trends*, LSAC, *available at* https://www.lsac.org/sites/default/files/research/2026-Composition-Report.pdf.

[45] The few ABA-approved schools for which acceptance rate data was not available for all years of the class period have been excluded from this list. Data in discovery will determine the specific market for those schools.

41

each Law School Selectivity Market. Based on LSAC's knowledge of and experience with law school applications, LSAC has determined that the selectivity characteristics of law schools are predominate factors that warrant categorizing them together. Moreover, applicants recognize law schools of similar selectivity as distinct from law schools of different selectivity and thus often apply to schools with similar selectivity rates. As a result, law schools in one Law School Selectivity Market have different applicant pools than law schools in a different Law School Selectivity Market.

139.    Law schools in each Law School Selectivity Market thus are reasonably interchangeable for others in the same Law School Selectivity Market because applicants view them to offer similar qualities in education and future career prospects. Put differently, applicants to schools in a specific Law School Selectivity Market are reasonably likely to apply to other schools in the same Law School Selectivity Market even if their chances of admission differ between schools in the same market because applicants apply to reach, target, and safety schools. For these same reasons, applicants in a specific Law School Selectivity Market also are less likely to apply to other schools in a different Law School Selectivity Market.

140.    This is evidenced by LSAC analyzing entering class data using the Law School Selectivity quartiles because LSAC understands that applicants to schools within one quartile also consider and may apply to other schools within that quartile.

141.    Because of this reasonable interchangeability, cross-elasticity of demand also exists within each Law School Selectivity Market. An increase in the

cost to apply to one or more law schools within each market, coupled with a stable cost to apply to one or more different law schools within the market, would increase applications to schools that did not increase prices.

142.   The inverse also is true. A decrease in the cost to apply to one or more law schools within a market, coupled with a stable cost to apply to one or more different law schools within the market, would decrease applications to schools that did not decrease prices.

143.   This cross-elasticity of demand has been observed for undergraduate applications. In November 2020, the Common Application observed an 8% year-over-year decrease in overall applications.[46] However, 22 schools eliminated their application fees (including all processing fees) for first-year international students and saw application volume increase by nearly 29%. At the same time, several institutions introduced fees for this same group of applicants and experienced a nearly 12% decline. These same economic features apply equally for law school applications.

144.   LSAC produces non-public "Common Applicant reports" for Member Law Schools analyzing applicants to a school that applied to other "peers and competitors."[47]   Accordingly,   LSAC   possesses   nonpublic   data   with   which

---

[46] *See Applications are Decreasing*, Inside Higher Ed, *available at https://www.insidehighered.com/admissions/article/2020/11/16/college-applications-are-decreasing.*
[47] *See Data Sources*, LSAC, *available at* https://www.lsac.org/general/deans-handbook/rankings/content/#/lessons/9PNaVYnPo5nNMvU3Rfk2VdJ3v1QjNece.

interchangeability and cross-elasticity of demand can be confirmed through discovery.

### 3. Law School Ranking Tier Markets

145.    The Law School Ranking Tier Markets constitute four markets comprising competing law schools with comparable rankings such as by the U.S. News and World Report, which are third-party assessments of perceived quality. Members of each Law School Ranking Tier Market compete with other law schools in the market for applications.

146.    In the alternative, the Law School Application Market includes submarkets based on the perceived program quality of each law school, as measured by third-party rankings such as the U.S. News and World Report.[48] Discovery will determine the most authoritative third-party ranking system for the Law School Ranking Tier Markets.

147.    For the purposes of this First Amended Complaint, the market is defined by the 2026 U.S. News and World Report rankings, which "serve as a structured framework for evaluating program quality."[49] The U.S. News and World Report law school rankings are the most widely recognized rankings of law schools and are used by schools, applicants, and the general public to compare the quality of law schools. Indeed, LSAC itself devotes an entire section of its "Deans' Handbook" to the U.S.

---

[48] *See 2026 Best Law Schools*, U.S. News & World Rpt., *available at* https://www.usnews.com/best-graduate-schools/top-law-schools/law-rankings.
[49] *See Methodology: 2026 Best Law Schools Rankings*, U.S. News & World Rpt., *available at* https://www.usnews.com/education/best-graduate-schools/articles/law-schools-methodology.

News and World Report rankings, underscoring the rankings' importance for law schools.[50]

148.   The Law School Ranking Tier Markets comprise the following:

- **Tier 1**: Schools ranked 1–50

- **Tier 2**: Schools ranked 51 – 100

- **Tier 3:** Schools ranked 101 – 150

- **Tier 4:** Schools ranked 150+

149.   The U.S. News and World Report has published law school rankings for decades, and its law school rankings are the most recognized and influential in the industry. U.S. News and World Report asserts that its rankings result from rigorous analyses of metrics like incoming class qualifications, outcomes, and market surveys, including surveys of academics, lawyers and judges.[51]

150.   For the same reasons as with the Law School Selectivity Markets, applications to schools within each Law School Ranking Tier Market are reasonably interchangeable with each other and reflect cross-elasticity of demand. Applicants in each Law School Ranking Tier Market are reasonably likely to also apply to other schools within the same Law School Ranking Tier Market because applicants apply to reach, target, and safety schools. For these same reasons, applicants in a specific

---

[50] *Rankings Methodology for U.S. News & World Report*, LSAC, *available at* https://www.lsac.org/general/deans-handbook/rankings/content/#/lessons/G0O7v-UE3DC7bL0xGVm1QjFJBZELP1tw
[51] *See Methodology: 2026 Best Law Schools Rankings*, U.S. News & World Rpt., *available at* https://www.usnews.com/education/best-graduate-schools/articles/law-schools-methodology.

Law School Ranking Tier Market also are less likely to apply to other schools in a different Law School Ranking Tier Market.

151. Dividing the rankings into four tiers is appropriate based on how applicants and the industry group and assess the quality of law schools. As discussed above, LSAC analyzes law schools in "Selectivity Quartiles" and thus recognizes the utility of quartile groupings for law school quality.

152. LSAC produces non-public "Common Applicant reports" for Member Law Schools analyzing applicants to a school that applied to other "peers and competitors."[52] Accordingly, LSAC possesses nonpublic data with which interchangeability and cross-elasticity of demand can be confirmed through discovery.

**Platform Markets**

153. For each of the Platform Markets, LSAC competes with other developers of application platforms for adoption and use of electronic higher education admission application platforms.

154. The product at issue in each of the Platform Markets is an electronic higher education application platform.

155. For each of the Platform Markets, Member Law Schools compete with each other as buyers of electronic higher education application platforms.

---

[52] *See Data Sources*, LSAC, *available at* https://www.lsac.org/general/deans-handbook/rankings/content/#/lessons/9PNaVYnPo5nNMvU3Rfk2VdJ3v1QjNece.

156.   None of the Platform Markets relate to application platforms outside of admission to higher education, such as job application or financial aid platforms. Application platforms for higher education admissions have unique requirements such as the ability to transmit and aggregate educational records and permit review of applications for admission to a higher education program by an admissions office.

157.   Each Platform Market is, at least in part, a restrained two-sided market. In a typical two-sided market, an intermediary manages the exchange between two parties (e.g., a credit card company managing transactions between consumers and merchants). However, in this market, the intermediary is a product of concerted actions by the schools on one side of the market so that the incentive structures present in the typical two-sided market do not fully apply.

### *4. Higher Education Application Platform Market.*

158.   The Higher Education Application Platform Market is the market for any electronic application platform used to process applications to U.S. higher education programs. This market includes law schools and other professional schools, graduate schools, and undergraduate schools.

159.   LSAC competes in the Higher Education Application Platform Market because it offers for sale the Law School Application Platform for use in law school admissions.

160.   Other competitors in the Higher Education Application Platform Market include external vendors like the Common Application, the Coalition Application, QuestBridge, Salesforce, Oracle, Technolutions, Liaison, and others.

Each develops and provides a higher education application platform used in higher education admissions. Some schools also are actual and potential competitors in the Higher Education Application Platform Market because schools can and do develop their own systems and collect application processing fees from those systems.

161. In a competitive market, the higher education platforms offered in this market are reasonably interchangeable for each other. They perform technically similar functions, including soliciting and accepting letters of recommendation, compiling and reporting background demographic information and GPA, and other general processing features. They also offer higher education programs the ability to review applications.

162. Moreover, the same platform often can be implemented both for individual programs and at scale as a centralized higher education platform. For instance, Technolutions provides its admissions application with licenses for each program,[53] and it advertises its partnerships with individual schools.[54] But it also holds the contract to provide the application system for the entire State University of New York system.[55]

163. In a competitive market, higher education programs can, and do, use multiple platforms, as evidenced by the undergraduate schools that accept

---

[53] *Pricing & Licensing*, Technolutions, *available at* https://technolutions.com/licensing.

[54] *Admissions*, Technolutions, *available at* https://technolutions.com/admissions.

[55] *SUNY Contracts Search*, SUNY, *available at* https://www.suny.edu/business/contractsearch/details.cfm?it_con_id=329#results.

applications through multiple platforms. Such schools typically have "no preference" for the application platform that an applicant uses.[56]

164. Moreover, higher education programs often issue RFPs for higher education application platforms. Several of the programs also can, and do, change platforms based on preferences such as platform features, qualities, or price. To illustrate, in a discussion post on Salesforce's website, a higher education consultant working for Enrollment Rx discussed transitions from Technolutions' "Slate" platform to Salesforce and noted that the company "was recently asked to replace Slate with our Salesforce-based solution at two different universities."[57] Similarly, a 2023 blog post from Enrollment Rx highlighted "Three Reasons why Higher Education Should Move to Salesforce for Admissions."[58]

165. For these reasons, electronic higher education application platforms are reasonably interchangeable with each other.

166. Also for these reasons, application platforms used to process applications to law school are reasonably interchangeable with other higher education application platforms that could be used to process applications to law

---

[56] *See, e.g., Apply*, Harvard College, *available at* https://college.harvard.edu/admissions/apply (noting that Harvard has "no preference" as to the platform used between the Common Application or Coalition Application).

[57] Lawrence, Levy, *Moving From Slate to Salesforce?*, Salesforce, (Apr. 13, 2023), *available at* https://trailhead.salesforce.com/trailblazer-community/feed/0D54S00000PeGC6SAN.

[58] *Three Reasons Higher Education Should Move to Salesforce for Admissions*, Enrollment Rx (April 6, 2023), *available at* https://www.enrollmentrx.com/salesforce-for-admissions-reasons/.

school if discovery shows that the network effects of a centralized law school application platform do not restrict cross-elasticity of demand with non-centralized application platforms that are not used for law school applications. These network effects are discussed further for the Law School Centralized Application Platform Submarket. Discovery of law school and applicant behavior will determine the full scope of the market.

167.    Higher education application platforms also exhibit cross-elasticity of demand because an increase in the price of one platform increases the demand for another. For instance, when selecting a vendor to implement a higher education platform, higher education programs often evaluate platforms and award contracts to the lowest bidder.[59]

### 5. Law School Centralized Application Platform Submarket

168.    The Law School Centralized Application Platform Submarket is a distinct submarket of the Higher Education Application Platform Market for any centralized electronic application platform that is used to process applications to multiple U.S. law schools or could promptly develop widespread use among law schools to provide network effects. Potential competitors in this submarket include those that offer other higher education application platforms with these technical

---

[59] *See, e.g., Request for Proposal: Customer Relationship Management System*, Illinois Procurement Bulletin, *available at* https://www.procure.stateuniv.state.il.us/viewNotice.cfm?mName=findNotice&i=GSU&p=D1906TMS (awarding bid to Technolutions over two competing vendors and noting "The lowest cost firm earning the most evaluation points is the most responsive and responsible firm recommended for the award.").

capabilities. However, no actual competitor currently exists in this submarket because of LSAC's exclusionary conduct.

169. Schools and applicants recognize the Law School Centralized Application Platform Submarket as a distinct and unique market or submarket. Indeed, LSAC's very existence—and its inclusion of law schools and exclusion of other programs—is a recognition by law schools, the industry, and the public that application to law school is distinct from application to other higher education programs.

170. Moreover, a significant majority of law schools, which select the platform(s) through which they will accept applications, have exhibited a preference for a centralized platform rather than decentralized platforms, as evidenced by their initial request in the 1970s to centralize application processing through the Credential Assembly Service predecessor and their continued direction to LSAC to develop, operate, and maintain such a platform.

171. Network effects limit reasonable interchangeability and cross-elasticity of demand to centralized platforms in use by law schools. For instance, on the school side of the platform, schools would not wish to join a centralized platform that does not have access to a sufficiently large applicant pool of potential law students, which in turn can only be accomplished with a sufficiently large pool of schools to apply. Moreover, schools value applicant data and insights about applications market-wide and to competing schools, such as LSAC's Common Applicant reports and daily

application and demographics data, that would not be available in a platform without a sufficient number of schools or applicants.

172. These network effects are mirrored on the applicant side of the platform. Applicants do not have a choice to use platforms because schools dictate the platforms that they will accept. And, in any event, applicants would not use a platform without a sufficiently large pool of law schools to apply to.

173. Accordingly, in the face of a small but significant and non-transitory increase in price of a centralized application platform for law school applications, a large majority of schools would not switch to a non-centralized application platform for law school applications. Similarly, neither schools nor applicants would switch to an alternative platform without a network of law schools and law school applicants or the capability to promptly build such a network of law schools and law school applicants. Cross-elasticity of demand thus only exists between platforms with such networks or the capability to promptly build such networks.

174. Indeed, this has been proven by LSAC's price increases that did not result in any law schools or applicants switching to a different platform.

175. The fact that competitors do not currently exist is not evidence that competitors do not and could not exist. As alleged above, multiple centralized application platforms compete for undergraduate applications. However, the network effects necessary for a centralized application for law school applications cannot possibly be achieved because of the Exclusivity and Use Policy implemented by LSAC and the Member Law Schools.

## CLASS REPRESENTATIVE ALLEGATIONS

176.    Plaintiff paid for a Credential Assembly Service subscription and for seven Credential Assembly Service Reports in the 2023 application cycle, which began in Summer 2022 for matriculation in Fall 2023. He paid LSAC $195 for the subscription in October 2022 and $315 for the report fees in January and February 2023.

177.    The fees were paid directly to LSAC for use of its application platform to apply to law schools in the United States.

178.    Specifically, Plaintiff paid LSAC fees to apply to law school at George Mason University, the University of Florida, Florida State University, the University of Alabama, George Washington University, Wake Forest University, and Washington & Lee University.

179.    Based on acceptance rates from available data during the class period, George Mason University, the University of Florida, Florida State University, the University of Alabama, George Washington University, and Wake Forest University are in Law School Selectivity Market – Tier 1. Washington & Lee University is in Law School Selectivity Market – Tier 2.

180.    Based on the 2026 U.S. News & World Report Rankings, all of the law schools are in Law School Ranking Market – Tier 1.

181.    Plaintiff was not permitted to apply by other means.

182.    LSAC's unlawful conduct allowed LSAC to overcharge Plaintiff for his Credential Assembly Service fees.

183.    Plaintiff has not enrolled in law school. He intends to retake the Law School Admission Test and reapply to law school based upon his LSAT results.

## CLASS ACTION ALLEGATIONS

184.    Plaintiff brings claims, *infra*, on behalf of similarly situated persons against Defendant under Fed. R. Civ. P. 23(a) and 23(b)(3) and seeks certification of the class defined as follows: All individuals in the United States, including its territories and the District of Columbia, who paid Application Platform fees to LSAC.

185.    The class period begins four years before the filing of this lawsuit.

186.    Plaintiff reserves the right to amend these definitions as discovery proceeds and to conform to the evidence.

187.    Excluded from the Class are Defendant, its agents, representatives, and employees; any judge to whom this action is assigned; and any member of that judge's staff and immediate family.

188.    While the exact number of the Nationwide Class is unknown at this time, Plaintiff submits that LSAC's publicly available data shows that 60,000 applicants have applied to Member Law Schools each application cycle since 2021.

189.    Because the number of potential Class Members is so numerous, individual joinder of these members is impracticable.

190.    Plaintiff further alleges the Class Members will be ascertainable through discovery, including, but not limited to, Defendant's electronic records and databases, third-party discovery, and discovery concerning the identity of people who paid LSAC's fees for the Law School Application Platform.

191.   There are common questions of law and/or fact shared by Plaintiff and each Class Member. The common questions of law and/or fact include, but are not limited to, the following:

a.   whether LSAC entered into or facilitated an agreement which restrained competition;

b.   whether the agreement is unlawful;

c.   whether LSAC maintains a monopoly;

d.   whether LSAC uses unlawful means to maintain its monopoly;

e.   whether LSAC's conduct injured consumers; and

f.   the appropriate nature of class-wide injunctive or other equitable relief.

192.   Certification of the Class under Fed. R. Civ. P. 23(a) and 23(b)(3) is appropriate as to the members of the putative class in that common questions predominate over any individual questions and a class action is superior for the fair and efficient adjudication of this controversy. All Class Members were subject to the same conduct by LSAC, as such conduct is LSAC's standard business practice to be applied consistently nationwide.

193.   A class action will cause an orderly and expeditious administration of claims by the members of the Class, will foster economies of time, effort, and expenses, and will ensure uniformity of decisions.

194.   Plaintiff's claims are typical of the claims of the Class pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) since they are based on and arise out of identical facts constituting the wrongful conduct of Defendant.

55

195.    Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of other class members, and he will fairly and adequately protect their interests. Additionally, Plaintiff is cognizant of his responsibility as a class representative, and he has retained experienced counsel fully capable of, and intent upon, vigorously pursuing the action. Plaintiff's counsel has extensive experience in class action litigation.

196.    The Class Members have suffered the same or similar injury as the Plaintiff, including actual damages.

## COUNT I
## HORIZONTAL RESTRAINTS OF TRADE
## IN THE APPLICATION MARKETS
## IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT,
## 15 U.S.C. § 1

197.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth in paragraphs 1–196 as if fully set forth herein.

198.    This claim is brought by Plaintiff individually and on behalf of the Class.

199.    Plaintiff does not assert a claim related to the Law School Selectivity Tiers 3 and 4 Markets or Law School Ranking Tiers 2, 3, and 4 Markets, which do not include law schools to which Plaintiff applied.

200.    The competing Member Law Schools that use LSAC's Law School Application Platform—which are the vast majority of law schools in the Application Markets—have used LSAC as a smokescreen cover to fix a price floor to apply to law school: a $215 fee for the Credential Assembly Service subscription and a $45 fee per Credential Assembly Service report—in violation of Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1).

201.    Member Law Schools cannot compete on price for the fixed fees that make up the rigid price floor. They only can compete on price on any amount above the price-fixed floor.

**Concerted Action**

202.    Member Law Schools set this price floor through LSAC to ensure that they would collectively receive revenue to pay for perks that LSAC provides back to its members, often for free or with significant subsidies. The more than 80 services provided to the Member Law Schools from supracompetitive fees include programs, workshops, meetings, software, data analysis and reporting, publications, and direct payments to the Member Law Schools.

203.    Member Law Schools have enforced this agreement through two explicit LSAC policies, both of which Plaintiff challenges. First, as a condition of full membership, Member Law Schools must exclusively use LSAC's Law School Application Platform. Second, LSAC fixes the price for Credential Assembly Service fees to be the same for every law school.

204.    These Member Law Schools control LSAC, and through that control they have been able to fix the price of these fees to be the same regardless of school.

205.    The Member Law Schools made this agreement through LSAC, which they formed and maintain with a stated purpose in its bylaws to "provide services to law schools[.]" LSAC Bylaws ¶ 3.

206.    The Member Law Schools exercise control over LSAC through, e.g., their election of the Board of Trustees, which manages LSAC's "business and affairs." LSAC Bylaws ¶ 3. Each Member Law School has a vote for the Board of Trustees

members. As of May 2026, every Trustee is employed by an LSAC Member Law School or LSAC itself.

207. The Member Law Schools direct the development, operation, and implementation of the LSAC Law School Application Platform through their operation of LSAC. Indeed, LSAC has stated as to its development and operation of the Law School Application Platform that it is "a membership organization giving them what they want."

208. Through their control of LSAC, the Member Law Schools have used LSAC to facilitate concerted action between Member Law Schools to fix the price of the subscription and report fees, which nearly every Member Law School requires applicants to pay.

209. LSAC is a separate legal entity from the Member Law Schools. LSAC has facilitated and conspired along with the Member Law Schools to fix the price of these fees for its Law School Application Platform. LSAC benefits from the supracompetitive profits it earns from the price-fixed fees, using that to build up more than $250 million in net assets, pay its executives lavishly for a nonprofit, and kickback money to the Member Law Schools.

210. The Member Law Schools each know that LSAC collects fixed fees for its Law School Application Platform from applicants. Indeed, many Member Law Schools discuss LSAC's collection of these fees on their websites.

211. The two challenged written policies are direct evidence of concerted action by the Member Law Schools. The Pricing Policy is publicly posted to LSAC's

website every application cycle. The Exclusivity and Use Policy is written and reflected in LSAC internal documents, including the 2019 Working Group Report. At the very least it is reasonable to infer an implicit agreement from the parallel conduct that every Member Law School uses LSAC for its Law School Application Platform and nearly all refuse to accept applications in any other manner. This parallel conduct occurs every year when Member Law Schools adopt the Law School Application Platform for each application cycle.. These Member Law Schools' agreements with LSAC and refusal to accept applications in any other manner is not independently determined parallel conduct because of the Member Law Schools' membership in and control of LSAC.

212.    LSAC also serves as the "hub" in a "hub-and-spoke" restraint of trade involving LSAC and the Member Law Schools as "spokes."

213.    LSAC entered into agreements with each Member Law School under which Member Law Schools agreed to exclusively use LSAC's Law School Application Platform. In exchange, the Member Law Schools agreed that LSAC could charge applicants a fixed and uniform price for Law School Application Platform fees for every Member Law School.

214.    Member Law Schools entered into a "rim" agreement with each other when they elected representatives of the Member Law Schools to serve on LSAC's Board of Trustees and direct LSAC's business affairs. The Member Law Schools' concerted conduct included fixing the price for Law School Application Platform fees.

59

**Unreasonable Restraint of Trade**

215.    The Member Law Schools' horizontal agreement with each other and through LSAC to fix a price floor (the subscription and report fees) for law school applications constitutes a *per se* violation of the Sherman Act. The fixing of the price floor is not a necessary, appropriate, or procompetitive, aspect of a centralized law school application platform. Indeed, several centralized application platforms do not charge applicants any fees that are for every school and thus do not set a price floor for any associated application fees. Moreover, the Law School Application Platform permits individual law schools to set their own prices for application fees to the schools, to be paid to the schools themselves.

216.    This conduct also is a *per se* violation because the purpose of the price fixing is not for the public benefit or another positive aim. Instead, LSAC's stated purpose is to collectively increase revenue far beyond what could be collected in a competitive market, which the Member Law have directed LSAC to redistribute to the Member Law Schools as free or subsidized services and direct payments.

217.    The Member Law Schools' agreement also could be condemned under the "quick look" standard because the anticompetitive character of the alleged price-fixing scheme to raise revenue for services collectively provided to competitors is obvious to an observer "with even a rudimentary understanding of economics."[60] The anticompetitive character is exacerbated by LSAC's Exclusivity and Use Policy requiring law schools exclusively use the Law School Application Platform to exclude

---

[60]    *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999).

competitors. Any pro-competitive justifications of a centralized application platform have no bearing on the pricing scheme and the policies challenged here because centralized application platforms can and do exist without the price floor LSAC and Member Law Schools have set. Moreover, centralized application platforms can and do co-exist with competitors and do not require that the schools exclusively use one platform.

218. Given the lack of procompetitive benefits or justification, the price fixing is also necessarily a violation of the Sherman Act according to the Rule of Reason.

219. There are no procompetitive benefits of the Member Law Schools' agreement, by and through LSAC, to fix prices for the subscription and report fees, nor was there a legitimate or sufficient business justification. Any ostensible procompetitive benefit was pretextual or could have been achieved by less restrictive means.

220. LSAC unlawfully restrained trade in each of the Application Markets.

221. The Application Markets are one-sided markets involving schools and applicants. The supracompetitive prices caused by LSAC's price-fixing of competitors harmed applicants.

222. Alternatively, if the Application Markets are two-sided markets, the unlawful restraint harmed the Application Markets as a whole because there was harm on both sides of the two-sided markets: applicants paid supracompetitive prices and potential competitors were excluded from responding to the supracompetitive prices. Moreover, any minimal procompetitive benefit on the school side of the market

is strongly outweighed by the anticompetitive harm of supracompetitive fees to applicants.

**Damages, Antitrust Standing, and Jurisdiction**

223. The Member Law Schools' agreement, through and with LSAC, intentionally, directly and proximately caused the overcharging of Plaintiff and Class Members to apply to law school. The Law School Application Platform fees that LSAC charged far exceed both the actual costs of processing applications and the fees that would be charged in a competitive market. Plaintiff thus seeks damages in an amount to be proven at trial under Section 4 of the Clayton Act (15 U.S.C. § 15), on behalf of himself and the Nationwide Class.

224. The restrained trade affects interstate commerce for several reasons, including because applicants in states across the country who apply to law schools across the country were overcharged by LSAC for Law School Application Platform fees.

225. LSAC, as conduit for, participant in, facilitator of, and beneficiary of an agreement to restrict trade between Member Law Schools, is liable for the damages resulting from such agreement, including the overpayments by applicants to LSAC for its Law School Application Platform fees.

226. Plaintiff's and Class Members' injuries are of the type the antitrust laws were designed to prevent because the injuries are higher costs and limited quality from an agreed restriction on competition. These injuries flow directly from that which makes Defendant's conduct unlawful: the agreed restriction on competition. Plaintiff is suing, on behalf of Class Members, to recover for injuries that he and the

Class Members personally suffered, most notably the supracompetitive Law School Application Platform fees that he and Class Members paid to LSAC, which would have been lower or nonexistent absent the Member Law Schools' unlawful conduct through LSAC.

## COUNT II
## HORIZONTAL RESTRAINTS OF TRADE IN THE PLATFORM MARKETS, IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1

227.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth in paragraphs 1– 196 as if fully set forth herein.

228.    This claim is brought by Plaintiff individually and on behalf of the Class.

229.    LSAC entered into, engaged in, and facilitated unlawful concerted action with and between the Member Law Schools, which unreasonably restrained trade in the Platform Markets. The challenged conduct includes concerted action (1) as a buyers' cartel agreeing through the Law School Pricing Policy to reduce the price every Member Law School paid to $0 and (2) by excluding LSAC's competitors in the Platform Markets through the Exclusivity and Use Policy in violation of Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1).

230.    The pricing and exclusivity policies were entered into by horizontal competitors with each other and with and through LSAC, the organization that they created, control, and operate.

**Concerted Action**

231.    LSAC is operated by competing Member Law Schools, which exercise control over LSAC through, e.g., their election of the Board of Trustees, which

63

manages LSAC's "business and affairs." LSAC Bylaws ¶ 3. Each Member Law School has a vote for the Board of Trustees members. As of May 2026, every Trustee is employed by an LSAC Member Law School or LSAC itself.

232.    The Member Law Schools direct the development, operation, and implementation of the LSAC Law School Application Platform through their operation of LSAC. Indeed, LSAC has stated as to its development and operation of the Law School Application Platform that it is "a membership organization giving them what they want."

233.    LSAC facilitated the Law School Pricing Policy agreement by and amongst Member Law Schools to set the price that each Member Law School would pay for the Law School Application Platform at $0. This agreement is reflected in LSAC's written Pricing Policy. It further is reflected in LSAC's written contracts with Member Law Schools confirming that each school pays $0 for use of the Law School Application Platform. Plaintiff challenges LSAC's written Pricing Policy of not charging Member Law Schools for the Law School Application Platform.

234.    LSAC also facilitated the Exclusivity and Use Policy agreement by and amongst Member Law Schools to exclude competition and set supracompetitive prices in the Platform Markets. This agreement is reflected in LSAC's written Exclusivity and Use Policy, which Plaintiff also challenges.

235.    As a condition of full membership, Member Law Schools must exclusively use LSAC's Law School Application Platform. LSAC's exclusivity requirement prevents any feasible competition with LSAC for LSAC's school

64

customers, the Member Law Schools that control LSAC. No Member Law School could use another platform without risking losing voting membership in LSAC, as well as promised benefits and services. Member Law Schools thus are incentivized to remain exclusive and increase LSAC's supracompetitive profits for redistribution.

236.   Because the Member Law Schools and LSAC have restrained competition, LSAC can set prices for applicants at a supracompetitive level. These supracompetitive fees are paid by applicants, and they have been increased far above the rate of inflation.

237.   The purpose of these agreements was to minimize the costs to Member Law Schools and maximize the profits due to LSAC, which are redistributed to Member Law Schools as free or subsidized services and direct payments.

238.   The challenged policies are direct evidence of concerted action by the Member Law Schools. At the very least it is reasonable to infer an implicit agreement from the parallel conduct that every Member Law School uses LSAC for its Law School Application Platform and nearly all refuse to accept applications in any other manner. This parallel conduct occurs every year when Member Law Schools adopt the Law School Application Platform for each application cycle. These Member Law Schools' agreements with LSAC and refusal to accept applications in any other manner is not independently determined parallel conduct because of the Member Law Schools' membership in and control of LSAC.

239.   LSAC also serves as the "hub" in a "hub-and-spoke" restraint of trade involving LSAC and the Member Law Schools as "spokes."

240.    LSAC entered into agreements with each Member Law School under which Member Law Schools agreed to exclusively use LSAC's Law School Application Platform. In exchange, the Member Law Schools agreed that LSAC could charge applicants a fixed and uniform price for Law School Application Platform fees for every Member Law School.

241.    Member Law Schools entered into a "rim" agreement with each other when they established, joined, and maintained LSAC as a 501(c)(3) membership organization.

242.    Member Law Schools further entered into a "rim" agreement with each other when they elected representatives of the Member Law Schools to serve on LSAC's Board of Trustees and direct LSAC's business affairs.

**Unreasonable Restraints of Trade**

Buyer Price Fixing (Law School Pricing Policy)

243.    The Member Law Schools, through LSAC and its policies, explicitly agreed to (1) limit the price they would pay for an application platform to $0 and (2) limit purchases of application platforms other than LSAC's Law School Application Platform.

244.    These agreements harmed competition on both sides of the Platform Markets and for the Platform Markets as a whole. Member Law Schools' buyer-side price-fixing agreement through the Law School Pricing Policy was made in conjunction with their agreement in the Applicant Pricing Policy to charge applicants fixed and supracompetitive prices. Potential competitors to LSAC also were excluded

from the school side of the market because of the Member Law Schools' price-fixing agreement.

245.   The Member Law Schools' price-fixing agreement fails under the rule of reason.  There are no procompetitive benefits of the Member Law Schools' agreement, by and through LSAC, to fix the $0 price that they paid for the Law School Application Platform, allowing LSAC to charge applicants supracompetitive and fixed prices and excluding potential competitors, nor was there a legitimate or sufficient business justification. Any ostensible procompetitive benefit was pretextual or could have been achieved by less restrictive means.

Exclusion of LSAC Competitors (Exclusivity and Use Policy)

246.   The Member Law Schools, through LSAC and its policies, explicitly agreed through the Exclusivity and Use Policy to exclude any competitors of LSAC, the organization that they control and operate, to redistribute revenue to themselves.

247.   LSAC's and the Member Law Schools' exclusion of competition should be condemned under the "quick look" standard because the anticompetitive character of a policy excluding competition to raise supracompetitive revenue for services collectively provided to competitors is obvious to an observer "with even a rudimentary understanding of economics."[61] Any pro-competitive justifications of a centralized application platform have no bearing on the policy and scheme challenged here because centralized application platforms can and do co-exist with competitors and do not require that the schools exclusively use one platform.

---

[61] *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999).

248. The Exclusivity and Use Policy is not a typical arms-length, vertical exclusive agreement that may have procompetitive benefits. The Exclusivity and Use Policy was executed by Member Law Schools as horizontal competitors to exclude competition for LSAC, the organization that they created and control, with the intent of increasing revenue for LSAC and thus for themselves. With competition excluded, LSAC could charge supracompetitive, fixed prices to increase revenue to be redistributed to the horizontal competitor Member Law Schools.

249. Given the lack of procompetitive benefits or justification, the exclusion of competition is also necessarily a violation of the Sherman Act according to the Rule of Reason.

250. There are no procompetitive benefits of the Member Law Schools' agreement, by and through LSAC, to exclude competitors for the Law School Application Platform, allowing LSAC to charge supracompetitive and fixed prices, nor was there a legitimate or sufficient business justification. Any ostensible procompetitive benefit was pretextual or could have been achieved by less restrictive means.

251. LSAC unlawfully restrained trade in each of the Platform Markets.

252. If unrestrained, the Platform Markets are two-sided markets connecting schools and applicants. However, because the Member Law Schools control and operate LSAC, the Law School Application Platform does not feature the same incentive structures seen in typical two-sided markets.

253. The unlawful restraint harmed the markets as a whole because there was harm on both sides of the two-sided markets: applicants paid supracompetitive prices and potential competitors were excluded from responding to the supracompetitive prices. Moreover, any minimal procompetitive benefit on the school side of the markets is strongly outweighed by the anticompetitive harm of supracompetitive fees to applicants.

**Damages, Antitrust Standing, and Jurisdiction**

254. The Member Law Schools' agreement, by and through LSAC, intentionally, directly and proximately caused the overcharging of Plaintiff and Class Members. The Law School Application Platform fees that LSAC charged far exceed both the actual costs of processing applications and the fees that would be charged in a competitive market. Plaintiff thus seeks damages in an amount to be proven at trial under Section 4 of the Clayton Act (15 U.S.C. § 15), on behalf of himself and the Nationwide Class.

255. The restrained trade affects interstate commerce for several reasons, including because applicants in states across the country who apply to law schools across the country were overcharged by LSAC for Law School Application Platform fees.

256. LSAC, as conduit for, participant in, facilitator of, and beneficiary of an agreement to restrict trade between Member Law Schools, is liable for the damages resulting from such agreement, including the overpayments by applicants to LSAC for the Law School Application Platform fee.

69

257.    Plaintiff's and Class Members' injuries are of the type the antitrust laws were designed to prevent, and flow from that which makes Defendant's conduct unlawful. Plaintiff is suing, on behalf of Class Members, to recover for injuries that he and the Class Members personally suffered, most notably the supracompetitive Law School Application Platform fees that he and Class Members paid to LSAC, which would have been lower or nonexistent absent LSAC's unlawful conduct.

**COUNT III**
**MONOPOLIZATION AND CONSPIRACY TO MONOPOLIZE**
**VIOLATIONS OF SECTION 2 OF THE SHERMAN ACT,**
**15 U.S.C. § 2**

258.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth in paragraphs 1– 196 as if fully set forth herein.

259.    This claim is brought against LSAC by Plaintiff individually and on behalf of the Class.

260.    LSAC has willfully acquired and maintained a monopoly over the Law School Centralized Application Platform Submarket. LSAC also has facilitated its Member Law Schools' conspiracy to monopolize the Law School Centralized Application Platform Submarket.

**Monopoly Power – Direct Evidence**

261.    LSAC imposed increased and supracompetitive prices for its Law School Application Platform with reduced output, establishing direct evidence of monopoly power.

262.    Between the 2010 and 2015 application cycles, LSAC saw a dramatic drop in applications:

| Year | Total Applicants | % Change from Previous | Total Applications | % Change from Previous | CAS Subscription Fee | % Change from Previous | CAS Report Fees | % Change from Previous | Anticipated Revenue* | % Change from Previous |
|---|---|---|---|---|---|---|---|---|---|---|
| 2010 | 87,916 | 1.55% | 604,313 | 6.83% | $124.00 | 5.98% | $12 | 0.00% | $18,153,340 | 7.31% |
| 2011 | 78,478 | -10.74% | 535,505 | -11.39% | $124.00 | 0.00% | $16 | 33.33% | $18,299,352 | 0.80% |
| 2012 | 67,897 | -13.48% | 468,128 | -12.58% | $155.00 | 25.00% | $21 | 31.25% | $20,354,723 | 11.23% |
| 2013 | 59,602 | -12.22% | 385,032 | -17.75% | $155.00 | 0.00% | $21 | 0.00% | $17,323,982 | -14.89% |
| 2014 | 55,808 | -6.37% | 354,368 | -7.96% | $160.00 | 3.23% | $25 | 19.05% | $17,788,480 | 2.68% |
| 2015 | 54,433 | -2.46% | 339,426 | -4.22% | $165.00 | 3.13% | $28 | 12.00% | $18,485,373 | 3.92% |
| 2016 | 54,897 | 0.85% | 345,666 | 1.84% | $170.00 | 3.03% | $30 | 7.14% | $19,702,470 | 6.58% |

\* Anticipated revenue is estimated based on the total applicants and applications and the imposed fees. It does not account for fee waivers.

263. In the 2011 application cycle, the total number of applications was down 11.4% from the previous cycle. As LSAC's then-president acknowledged, this decrease in output was an existential threat to LSAC's business model.

264. To attempt to maintain the same level of revenue, LSAC initiated a massive price increase for the 2012 application cycle in the face of decreased output. LSAC increased the price of the Credential Assembly Service subscription fee by 25% and the report fee by 31.25%.

265. LSAC's then-president explained these increases as an effort to raise prices in light of reduced output and thus, at a minimum, to sustain LSAC's total revenue and profits. He explained: "the mode of doing business probably was sustainable in an environment of record-level candidate volumes. Today, with successive double-digit volume declines and significant operating deficits, it is sustainable no longer."

266. Application volume fell by 12% for the 2012 application cycle, but LSAC's price increase paid off. Because of the massive price increase for the 2012

cycle, LSAC actually increased its expected Credential Assembly Service revenue from 2011 by 11.2%, even with a reduction in output.

267.  Applications continued to decline. In the 2013 application cycle, total applications were down 17.75%. As a result, for the 2014 cycle, LSAC raised the subscription fee by 3.23% and the report fee by 19.05%.

268.  In the 2014 cycle, applications declined by 7.96%, prompting LSAC to again raise the subscription fee by 3.13% and the report fee by 12% for the 2015 cycle.

269.  LSAC's strategy was extremely successful. Application volume decreased significantly for five cycles in a row from 2011 to 2015, a 43.83% decrease in output from the 2010 to 2015 cycles. Yet LSAC's anticipated revenue only decreased in one year, and it never fell below the revenue from the 2009 cycle. Remarkably, LSAC's anticipated revenue for the 2015 cycle was 1.8% higher than in the 2010 cycle.

270.   LSAC's strategy would not be possible without monopoly power. In any competitive market, if a firm attempted to raise prices with reduced output, a competitor would enter the market to compete and undercut the firm. Instead, LSAC's ability to maintain its profits and revenue with increased prices and reduced output is direct evidence of monopoly power.

271.  LSAC has maintained this monopoly power throughout the class period, including through its and its Member Law Schools' reaffirmation of its supracompetitive pricing and other monopolistic conduct. Indeed, no Member Law

School has defected from LSAC's Law School Application Platform. LSAC thus maintains its supracompetitive prices based on its monopoly power.

272. Because Plaintiff pleads direct evidence of LSAC's monopoly power, no market analysis is necessary.

## Monopoly Power – Indirect Evidence

273. LSAC acquired and maintained a market share in the Law School Centralized Application Platform Submarket of at least 85%, which forecloses that substantial share of the submarket from the many potential competitors that offer services that could compete. Because the Law School Centralized Application Platform Submarket is a distinct and recognized submarket, it functions as a market for antitrust purposes.

274. All 197 LSAC Member Law Schools use LSAC's Law School Application Platform. One of 28 active non-member schools uses LSAC's Law School Application Platform, according to LSAC's website.

275. Barriers to entry exist in the Law School Centralized Application Platform Submarket, including the network effects and economies of scale created by a centralized application platform, LSAC's Exclusivity and Use Policy for Member Law Schools, LSAC's Law School Pricing Policy agreed to by Member Law Schools, and LSAC's sharing of its monopoly profits with Member Law Schools.

**Exclusionary Conduct**

276. No other significant competitors exist in this submarket or can feasibly exist because of LSAC's willful maintenance of its monopoly through explicit and *de facto* exclusive agreements with Member Law Schools.

277. LSAC's Exclusivity & Use Policy requires all Member Law Schools to exclusively use its Law School Application Platform. Otherwise, Member Law Schools risk losing their full membership in LSAC, including the associated benefits and services.

278. LSAC also will not admit as full members law schools that do not exclusively use LSAC's Law School Application Platform.

279. LSAC also creates *de facto* exclusive agreements because they are entered into by LSAC with the members that control LSAC and have a biased interest in LSAC's continued monopolization of the submarket to provide them with payments and services tied to LSAC's supracompetitive Credential Assembly Service fee revenue. The agreements are for one-year terms with automatic renewal.

280. LSAC uses its supracompetitive monopoly revenue from the Law School Application Platform to provide payments and services to the law schools. Indeed, LSAC admits that such revenue is "needed to support LSAC's services to members." Such services include programs, workshops, software, data analysis and reporting, publications, and direct payments to the Member Law Schools. A Member Law School would have to forfeit access to these services to use a competing platform.

281. LSAC also operates an insurance fund for the law schools through which it uses its monopoly revenue from the Law School Application Platform to provide

74

increased direct payments during economic downturns. LSAC made such payments during the 2008 recession. A Member Law School would have to forfeit access to this insurance fund to use a competing platform.

282. No competitor could feasibly compete with LSAC because of LSAC's explicit and *de facto* exclusive arrangements with Member Law Schools.

**Conspiracy**

283. LSAC also has facilitated a conspiracy to monopolize by its Member Law Schools.

284. The Member Law Schools that direct and control LSAC implemented and agreed to the Exclusivity and Use Policy requiring each Member Law School to exclusively use LSAC's Law School Application Platform. The Member Law Schools, through LSAC, enforce this policy, including by denying membership to any law schools that do not exclusively use LSAC's Law School Application Platform and thus threatening Member Law Schools with the loss of membership if they do not exclusively use LSAC's Law School Application Platform.

285. The creation and enforcement of the Exclusivity and Use Policy are overt acts in furtherance of a conspiracy, made by the Member Law Schools through LSAC.

286. The intention of the conspiracy was to cement LSAC's monopoly power and exclude competition, which would result in supracompetitive revenue to be redistributed to the Member Law Schools in the form of free or subsidized services or direct payments.

75

**Damages, Antitrust Standing, and Jurisdiction**

287.    The lack of any feasible competition has enabled LSAC to charge fees for the Application Platform that are far above those that could be charged in a competitive market, and LSAC exploited its monopoly power to charge supracompetitive fees.

288.    There are no procompetitive benefits of LSAC's monopolization scheme, nor was there a legitimate or sufficient business justification.  Any ostensible benefits or justifications do not offset the harm caused by LSAC's anticompetitive and unlawful conduct.

289.    LSAC's monopolization scheme directly and proximately caused Plaintiff and Class Members to be overcharged for LSAC's Law School Application Platform as compared to what they would be charged in a competitive market.

290.    Plaintiff's and Class Members' injuries are of the type the antitrust laws were designed to prevent, and flow from that which makes Defendant's conduct unlawful. Plaintiff is suing, on behalf of Class Members, to recover for injuries that he and the Class Members personally suffered, most notably the supracompetitive Application Platform fees that he and class members paid to LSAC, which would have been lower or nonexistent absent LSAC's unlawful conduct.

## PRAYER FOR RELIEF

Plaintiff and the Class Members seek the following relief:

a.     Certify the Class;

b.     Enter a judgment awarding Plaintiff and the Class Members treble damages for the injuries they suffered as a result of LSAC's unlawful conduct;

c.     Award to Plaintiff and Class Members of their costs of suit, including reasonable attorneys' fees and expenses, pursuant to 15 U.S.C. § 15(a);

d.     Order that LSAC, including its directors, officers, parents, employees, agents, successors, and members, be enjoined and restrained from, in any manner, directly or indirectly, committing any additional violations of the law as alleged herein; and

e.     Such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff respectfully demands a trial by jury on all issues that can be tried to a jury.

Dated: May 12, 2026                         Respectfully submitted,

                                            /s/ *William Burgess*
                                            Peter McCall (PA Bar No. 315917)
                                            HILGERS GRABEN PLLC
                                            301 Grant Street, Suite 270
                                            Pittsburgh, PA 15219
                                            Telephone: (314) 464-9964
                                            Email: pmccall@hilgersgraben.com

77

William Burgess (Pro Hac Vice)
3100 Interstate N. Circle SE
Suite 200, No. 1047
Atlanta, GA 30339
Telephone: (404) 595-7747
wburgess@hilgerslaw.com

Bennett Rawicki (Pro Hac Vice)
8750 N. Central Expy, Suite 750
Dallas, TX 75231
Telephone: (469) 640-6842
Email: brawicki@hilgersgraben.com

*Counsel for Plaintiff and the Proposed Class*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was filed electronically through this Court's ECF System and is available for viewing and downloading from this Court's ECF System. I further certify that an electronic copy of the foregoing was served upon all parties of record through this Court's ECF System.

Dated: May 12, 2026

By:    /s/ *William Burgess*
     William Burgess