**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| LINVEL JAMES RISNER, *on behalf of himself and those similarly situated*,<br><br>        Plaintiff,<br><br>    v.<br><br>LAW SCHOOL ADMISSION COUNCIL, INC.,<br><br>        Defendant. | Civil Action No.: 2:25-cv-04461-JFM<br><br>ORAL ARGUMENT REQUESTED |

**MEMORANDUM OF LAW IN SUPPORT OF LAW SCHOOL ADMISSION COUNCIL, INC.'S MOTION TO DISMISS THE AMENDED COMPLAINT WITH PREJUDICE**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................1

BACKGROUND ................................................................................................................2

ARGUMENT ....................................................................................................................3

I.  Counts I And II Fail Because Plaintiff Still Does Not Allege An Unreasonable Restraint Of Trade..................................................................................................3

    A.  Any Alleged Agreement Is Subject To The Rule Of Reason ...................................3

    B.  Under The Rule Of Reason, Count I Fails.............................................................5

        1.  The Amended Complaint still does not allege competitive harm in any of the Application Markets ...........................................................5

        2.  The Application Markets are implausible..................................................7

            i.  The Law School Application Market is implausible ......................7

            ii.  The Law School Selectivity submarkets and Law School Ranking Tier submarkets are implausible........................................9

    C.  Under The Rule Of Reason, Count II Fails............................................................11

        1.  Plaintiff does not plausibly allege competitive harm in the Platform Markets as a whole................................................................11

            i.  Law School Centralized Application Platform Submarket............11

            ii.  Higher Education Application Platform Market............................14

        2.  The Law School Centralized Application Platform Submarket is implausible..............................................................................15

II.  Count III Still Fails To State A Section 2 Claim .................................................16

    A.  Count III Still Does Not State A Monopolization Claim.......................................16

        1.  Plaintiff still does not allege any exclusionary conduct............................16

        2.  LSAC does not have monopoly power .......................................................18

            i.  Plaintiff still does not plausibly allege direct evidence of monopoly power ........................................................................18

            ii.  Plaintiff still does not plausibly allege indirect evidence of monopoly power ........................................................................19

    B.  Count III Does Not State A Conspiracy To Monopolize Claim.............................20

i

III.    Counts I And II Fail Because Plaintiff Has Not Alleged Concerted Action .....................20

    A.    The Challenged Conduct Is Not Concerted Action As A Matter Of Law .............20

    B.    Plaintiff Still Has Not Plausibly Alleged A Horizontal Conspiracy
        Among The Member Law Schools .........................................................................22

        1.    Plaintiff alleges no direct evidence of an agreement ................................22

        2.    Plaintiff alleges no circumstantial evidence of an agreement...................23

CONCLUSION.......................................................................................................................25

**TABLE OF AUTHORITIES**

Page(s)

**CASES**

*American Needle, Inc. v. National Football League*,
    560 U.S. 183 (2010)..................................................................................................4, 21, 22

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)......................................................................................................8, 10

*Bell Atlantic Corp v. Twombly*,
    550 U.S. 544 (2007).............................................................................................................23

*Brotech Corp. v. White Eagle Int'l Technologies Group, Inc.*,
    2003 WL 22797730 (E.D. Pa. Nov. 18, 2003) ...................................................................10

*Brunson Communications, Inc. v. Arbitron, Inc.*,
    239 F. Supp. 2d 550 (E.D. Pa. 2002) .................................................................................25

*Burtch v. Milberg Factors, Inc.*,
    662 F.3d 212 (3d Cir. 2011)................................................................................................23

*Copperweld Corp. v. Independent Tube Corp.*,
    467 U.S. 752 (1984)..............................................................................................20, 21, 22

*Dai v. SAS Institute Inc.*,
    2025 WL 2078835 (N.D. Cal. July 18, 2025)....................................................................23

*Davis v. Hanna Holdings, Inc.*,
    787 F. Supp. 3d 42 (E.D. Pa. 2025) ...................................................................................25

*Deborah Heart & Lung Center v. Virtua Health, Inc.*,
    833 F.3d 399 (3d Cir. 2016).............................................................................................6, 15

*Eichorn v. AT&T Corp.*,
    248 F.3d 131 (3d Cir. 2001).................................................................................................6

*Eisai, Inc. v. Sanofi Aventis U.S., LLC*,
    821 F.3d 394 (3d Cir. 2016)...................................................................................5, 16, 17

*FTC v. Meta Platforms, Inc.*,
    811 F. Supp. 3d 67 (D.D.C. 2025) ....................................................................................9, 19

*FTC v. Surescripts, LLC*,
    665 F. Supp. 3d 14 (D.D.C. 2023) ......................................................................................19

*Hansen v. Northwestern University*,
    2025 WL 2731378 (N.D. Ill. Sept. 24, 2025) ...................................................................24

*Hicks v. PGA Tour, Inc.*,
    897 F.3d 1109 (9th Cir. 2018) ...................................................................10, 11

*Howard Hess Dental Laby's Inc. v. Dentsply Int'l, Inc.*,
    602 F.3d 237 (3d Cir. 2010)..............................................................................20

*In re Baby Food Antitrust Litigation*,
    166 F.3d 112 (3d Cir. 1999)...............................................................................23

*In re Burlington Coat Factory Securities Litigation*,
    114 F.3d 1410 (3d Cir. 1997)..............................................................................13

*In re Insurance Brokerage Antitrust Litigation*,
    618 F.3d 300 (3d Cir. 2010)...................................................................23, 24, 25

*International Construction Products LLC v. Caterpillar Inc.*,
    2016 WL 264909 (D. Del. Jan. 21, 2016)............................................................9

*Jefferson Parish Hospital District No. 2 v. Hyde*,
    466 U.S. 2 (1984).................................................................................................6

*Kaufman v. Time Warner*,
    836 F.3d 137 (2d Cir. 2016).................................................................................7

*LePage's Inc. v. 3M*,
    324 F.3d 141 (3d Cir. 2003)..........................................................................16, 18

*Lungu v. Antares Pharma Inc.*,
    2022 WL 212309 (3d Cir. Jan. 25, 2022) .........................................................13

*Malheur Forest Fairness Coalition v. Iron Triangle, LLC*,
    164 F.4th 710 (9th Cir. 2026) ..............................................................................7

*Mylan Pharmaceuticals Inc. v. Warner Chilcott Public Ltd.*,
    838 F.3d 421 (3d Cir. 2016)...........................................................................18, 19

*Nanavati v. Burdette Tomlin Memorial Hospital*,
    857 F.2d 96 (3d Cir. 1988)..................................................................................21

*Ohio v. American Express Co.*,
    585 U.S. 529 (2018)..............................................................................12, 14, 15, 16

*Pennsylvania v. NCAA*,
    948 F. Supp. 2d 416 (M.D. Pa. 2013) ..................................................................6

*Philadelphia Taxi Ass'n v. Uber Technologies, Inc.*,
    886 F.3d 332 (3d Cir. 2018)................................................................................20

*Power Analytics Corp. v. Operation Technology., Inc.*,
2018 WL 10231437 (C.D. Cal. July 24, 2018), *aff'd*, 820 F. App'x 1005
(Fed. Cir. 2020)......................................................................................................17

*PSKS, Inc. v. Leegin Creative Leather Products, Inc.*,
615 F.3d 412 (5th Cir. 2010) ...................................................................................9

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
124 F.3d 430 (3d Cir. 1997)..................................................................7, 8, 9, 10

*Relevent Sports, LLC v. U.S. Soccer Federation, Inc.*,
61 F.4th 299 (2d Cir. 2023) ..............................................................................22, 23

*Rock v. NCAA*,
928 F. Supp. 2d 1010 (S.D. Ind. 2013) .................................................................8

*Texaco Inc. v. Dagher*,
547 U.S. 1 (2006)...................................................................................................4

*United States v. Syufy Enterprises*,
903 F.2d 659 (9th Cir. 1990) ................................................................................19

*United States v. U.S. Steel Corp.*,
251 U.S. 417 (1920)...............................................................................................19

*US Airways, Inc. v. Sabre Holdings Corp.*,
938 F.3d 43 (2d Cir. 2019).....................................................................................12

*Winn-Dixie Stores, Inc. v. E. Mushroom Marketing Cooperative, Inc.*,
89 F.4th 430 (3d Cir. 2023) ....................................................................................5

*Yeager's Fuel, Inc. v. Pennsylvania Power & Light Co.*,
953 F. Supp. 617 (E.D. Pa. 1997) .......................................................................17

*ZF Meritor, LLC v. Eaton Corp.*,
696 F.3d 254 (3d Cir. 2012)..............................................................................5, 17

## OTHER AUTHORITIES

Areeda & Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and
Their Application* (5th ed. 2025)...................................................................... 9, 18

**INTRODUCTION**

This Court correctly dismissed Plaintiff's first complaint, holding that the alleged markets were implausible, that it failed to allege competitive harm across both sides of the law school application platform market, and that it did not adequately plead that Law School Admission Council, Inc. possessed monopoly power. The Amended Complaint ("AC") superficially appears to address those concerns, but upon further scrutiny, the allegations remain deficient. Mindful of this Court's instruction that this Motion "will be expected to bring something significantly new to the table," DI 41 at 1 n.1, LSAC respectfully submits that Plaintiff's amended allegations confirm that he has no viable antitrust claim. Plaintiff and his counsel may think LSAC charges too much, but not every unhappy consumer has a valid antitrust claim and it is now apparent that this consumer does not. Plaintiff's case suffers from two overarching defects that require dismissal.

*First*, Plaintiff has not and cannot allege that any supposed agreement among LSAC's Member Law Schools harmed competition between law schools for applicants. Plaintiff's AC concedes, as this Court already found, that "law schools can and do undercut each other on application price" and "compete with each other on their own application prices" even while using LSAC's platform. DI 35 at 19. "[M]ost Member Law Schools" charge additional, school-specific application fees, AC ¶38, demonstrating that LSAC's supposedly fixed platform fees are *below* the competitive price to apply to law school. There are accordingly no facts alleged that, absent the supposed conspiracy, the total cost of applying to any Member Law School would be lower. The challenged conduct therefore did not increase prices or harm consumers. This reality requires dismissal of Count I, as does Plaintiff's continued failure to allege a plausible market for applications to law school.

*Second*, the challenged conduct did not exclude any competing application platforms from any alleged market. This Court previously concluded that "the mere fact that LSAC offers its

product to the law schools for free does not show [an] anticompetitive effect" on both sides of the platform, DI 35 at 33-34. Plaintiff has failed to remedy this defect. His entire theory of competitive harm rests on the existence of a supposed requirement that LSAC Member Law Schools must exclusively use LSAC's platform. The existence of that policy is implausible and unsurprisingly is contradicted by LSAC's own Bylaws, on which Plaintiff extensively relies. Without an exclusivity requirement, Plaintiff cannot show that LSAC's free provision of its platform or other benefits to its Member Law Schools harmed competition, which mandates dismissal of both Plaintiff's Section 1 claim in Count II and his Section 2 claim in Count III. And as before, Plaintiff's alleged application platform markets are implausible, and he has failed to show that LSAC has monopoly power in any market.

These defects defeat the AC in its entirety, so the Court need not revisit the issue of whether Plaintiff has alleged concerted action. While LSAC appreciates the Court's prior ruling, it respectfully submits that Plaintiff failed to plausibly allege concerted action in either complaint. It re-raises its arguments for the Court's consideration and to preserve them for any future appeal.

Plaintiff's complaint has doubled in length but retains the factual and legal flaws that doomed his first complaint. It is obvious that everything Plaintiff can allege, he has alleged. Further amendment would thus be futile, and this case should be dismissed with prejudice.

## BACKGROUND

Plaintiff's lawsuit seeks to attack a long-established, efficient system that allows aspiring law students and law schools to process over 500,000 applications—and millions of recommendations and transcripts—per year. *See* AC ¶1. Under this system, LSAC administers an application platform, which simplifies the application process by collecting an applicant's transcripts, recommendation letters, personal statements, score reports, and other documents. *Id.* ¶27. As part of the application process, applicants pay LSAC a one-time subscription fee of $215

and a $45 per-application fee, and pay most schools a school-specific fee that generally ranges from $50 to $105. *Id.* ¶¶28-29, 38. Plaintiff alleges LSAC and its Member Law Schools agreed to set a "price floor" on law school applications (the "Pricing Policy") and to require schools' use of LSAC as their sole application platform (the "Exclusivity and Use Policy"). *Id.* ¶¶47-63.

The Court dismissed Plaintiff's original complaint, holding, as relevant here, that both the alleged J.D. Education market and the Law School Application Platform market were implausibly defined, that it failed to allege competitive harm to both sides of the Law School Application Platform market, and that it did not adequately plead LSAC's monopoly power. DI 35 at 24-38.

The AC introduces new markets but does not cure the deficiencies in the original complaint. Count I now alleges that, through the Pricing Policy and the Exclusivity and Use Policy, LSAC unreasonably restrains trade in the "Law School Application Market" and select application submarkets. AC ¶¶199, 202-222. Count II likewise challenges the two alleged "policies" as unreasonable restraints of trade in the "Higher Education Application Platform Market" and "Law School Centralized Application Platform Submarket." *Id.* ¶¶ 168, 229-253. Count III alleges the Exclusivity and Use Policy is illegal exclusive dealing and a conspiracy with Member Law Schools to monopolize the Law School Centralized Application Platform Submarket. *Id.* ¶¶260-286.

ARGUMENT

I.    COUNTS I AND II FAIL BECAUSE PLAINTIFF STILL DOES NOT ALLEGE AN UNREASONABLE RESTRAINT OF TRADE

A.    Any Alleged Agreement Is Subject To The Rule Of Reason

This Court already correctly concluded that the supposed conspiracy Plaintiff challenges must be analyzed under the rule of reason. DI 35 at 21-24. Nothing in the AC alters that conclusion. Plaintiff's *per se* claim in Count I, AC ¶¶215-216, and "quick look" claims in Counts I and II, *id.* ¶¶217, 247, should be dismissed again, for three reasons.

3

*First*, as the Court explained, the "admitted benefits" of "centralized application processing … are the type that would justify application of the rule of reason." DI 35 at 23. These benefits remain facially apparent. Plaintiff recognizes that law schools' use of LSAC's platform benefits applicants, allowing them to use a single service to apply to multiple schools at once, "saving [them] time and effort" and sparing them the burden of repetitively submitting the same application materials through multiple channels. AC ¶¶27, 32, 78, 89; *see* DI 35 at 23. Those benefits are enhanced as more law schools use the same platform. *See* AC ¶¶171-172 (platforms become more desirable to both schools and applicants as usage increases). Given the alleged conduct's procompetitive benefits, rule of reason analysis is required. DI 35 at 23-24.

*Second*, crediting Plaintiff's allegation that "[t]he Member Law Schools directed LSAC to develop a suite of software to process electronic applications," AC ¶24, would render LSAC a joint venture to which *per se* condemnation does not apply. A "joint venture involves multiple sources of economic power cooperating to produce a product," *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 199 (2010), such as—as Plaintiff alleges—law schools supposedly cooperating through LSAC to create an application platform for applicants' and schools' use, AC ¶24. And "the pricing decisions of a legitimate joint venture do not fall within the narrow category of activity that is *per se* unlawful under § 1 of the Sherman Act" because they are "not a pricing agreement between competing entities with respect to their competing products." *Texaco Inc. v. Dagher*, 547 U.S. 1, 5-6, 8 (2006). Thus, LSAC's pricing cannot be condemned *per se*. *Id.* at 6; *see also Am. Needle*, 560 U.S. at 202-204 (joint venture actions subject to rule of reason).

*Third*, Plaintiff's new theory that the challenged agreement includes a supposed "policy" requiring all Member Law Schools to exclusively use LSAC's platform, AC ¶¶55-63, only confirms that the rule of reason governs. Plaintiff asserts that maintenance of this "policy" amounts

4

to exclusive dealing. *Id.* ¶276. And "[d]ue to the potentially procompetitive benefits of exclusive dealing arrangements," challenges to them are always "judged under the rule of reason." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 271 (3d Cir. 2012); *Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 403 (3d Cir. 2016).

### B.        Under The Rule Of Reason, Count I Fails

Count I fails under the rule of reason because Plaintiff does not plausibly allege that the "challenged restraint has a substantial anticompetitive effect that harms consumers" in any of the nine alleged application markets, *Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop., Inc.*, 89 F.4th 430, 438 (3d Cir. 2023) (quotation omitted), and because the alleged markets are implausible.

#### 1.        The Amended Complaint still does not allege competitive harm in any of the Application Markets.

Plaintiff's theory of competitive harm in the Application Markets is no different from the one put forth in his first complaint regarding the J.D. Education market, and it fares no better with new names. The theory continues to be that the supposed agreement impairs schools' ability to compete on the price of law school applications. AC ¶¶33, 201, 215. But Plaintiff's own allegations contradict this theory: he concedes that law schools *do* compete on price by setting school-specific application fees in addition to LSAC's fees, which "generally range from $50 to $105." AC ¶¶28, 38. The Court thus observed that "law schools can and do undercut each other on application price" and "can compete with each other on their own application prices" even in the presence of the supposed agreement. DI 35 at 19.

Plaintiff alleges no facts to suggest the supposed agreement somehow inhibited additional competition on application price or that any school would have charged a lower total application fee absent the alleged agreement. The allegations in the AC demonstrate that, in an unrestrained market, schools would make "competitive decisions" about their total application fee based on

5

each school's individual assessment of school-specific demand and applicant willingness to pay. AC ¶¶83, 90 ("[S]chools historically considered some of the best schools in the country" charge higher fees than "less historically prestigious or lower-ranked schools."). Accordingly, if LSAC's fees were less than the total amount applicants would be willing to pay to apply to a given school or the school believed that it could charge more and still "woo applicants," *id.* ¶90, that school could rationally charge an additional fee to capture the applicants' full willingness to pay.

But that is exactly what Plaintiff alleges the Member Law Schools already do. AC ¶38. The Amended Complaint contains no allegations that, by charging an additional school-specific fee, schools are doing anything other than setting their total application fee in accordance with school-specific demand to match applicant willingness to pay. And it is illogical to believe—and Plaintiff does not allege—that law schools that charge an additional fee and have set their total application fee above LSAC's fees would, absent the supposed agreement, change course and decide to lower their total application fee rather than keeping it the same and collecting the entirety of the fees, purportedly a "significant source of revenue for law schools," themselves. *Id.* ¶126.

Moreover, Plaintiff does not identify any school that refrained from charging a school-specific fee because LSAC's fees already exceed applicants' willingness to pay to apply to that school. Only these unspecified schools would have an incentive to lower their total application fee absent the alleged agreement. If any such schools exist, they are a small minority, given that "most" schools charge additional fees. AC ¶38. But as a matter of law, a restraint affecting only a small minority of schools' pricing cannot cause "anticompetitive effects on the overall market." *Deborah Heart & Lung Ctr. v. Virtua Health, Inc.*, 833 F.3d 399, 404 (3d Cir. 2016); *see also, e.g., Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 30-31 (1984); *Eichorn v. AT&T Corp.*, 248 F.3d 131, 140 (3d Cir. 2001); *Penn. v. NCAA*, 948 F. Supp. 2d 416, 431 (M.D. Pa. 2013).

6

**2.    The Application Markets are implausible.**

**i.    The Law School Application Market is implausible.**

Plaintiff's alleged "Law School Application Market"—in which the product is supposedly a "law school application" rather than "admission to, matriculation to, or education from a law school," AC ¶¶115-116—fails because he does not allege there is any demand to only *apply* to law school. That alone is fatal to Plaintiff's hypothesized market. *Kaufman v. Time Warner*, 836 F.3d 137, 143-145 (2d Cir. 2016) (rejecting alleged market for "cable boxes" because plaintiff failed to allege "existence of a demand for … cable boxes separate from the demand for … Cable Services"); *see also Malheur Forest Fairness Coal. v. Iron Triangle, LLC*, 164 F.4th 710, 736 (9th Cir. 2026) (no "distinct market[]" for "logging services" because "absent its need for sawlogs, [plaintiff] would have no need for logging services").

Instead, the AC's alleged limitations on the scope of the market make clear that application demand is entirely derivative of demand for attending schools. The market is limited to law schools because they are "the only available option to receive a J.D. degree," AC ¶118; it excludes non-ABA-approved schools because "[a]pplicants and the industry recognize" their "quality" is "different" from that of ABA-approved schools, *id.* ¶117, and it excludes foreign schools because they "typically will not allow for graduates to be admitted to practice law in the U.S," *id.* ¶111. Absent any facts alleged suggesting separate demand just to apply to law school (rather than to attend), the market fails. *See Kaufman*, 836 F.3d at 143-145.

The market further fails because the Court already concluded that a market comprised of all U.S. law schools is implausible, DI 35 at 26-28, and Plaintiff has not alleged any facts sufficient to alter that conclusion. The relevant question remains whether it is plausible that applicants view all ABA-approved law schools (and applications to them) as reasonably interchangeable. *See Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 437 (3d Cir. 1997). Plaintiff asserts

that "applications to all law schools are reasonably interchangeable for one another" because all applications result in "an admissions decision from a law school." AC ¶128. But the Court already rejected that precise logic with respect to law schools themselves, reasoning that the mere fact that "all law schools in the United States confer J.D. degrees … does not suffice to define the market." DI 35 at 26. So too here for applications, where the AC never explains how an "admissions decision" from, for example, an elite law school in the city in which the applicant hopes to practice law would be "'roughly equivalent … for the use to which it is put'" to a decision from a low-ranked, distant school. *Queen City Pizza*, 124 F.3d at 437; *see also Rock v. NCAA*, 928 F. Supp. 2d 1010, 1021-1022 (S.D. Ind. 2013) (implausible that "lower-tier" athletic programs "offer the same high level of in-kind benefits" as top programs).

Moreover, the AC contains no *factual* allegations plausibly suggesting positive cross-elasticity of demand between applications to all law schools. "[P]ositive cross-elasticity of demand" can be "a measure of reasonable interchangeability" and exists when a "rise in the price of a good … would tend to create a greater demand for other like goods." *Queen City Pizza*, 124 F.3d at 437-439 & nn.6 & 8 (quotation omitted). Here, Plaintiff would have had to allege facts supporting a plausible inference that an increase in the cost to apply to, for example, a school with a selectivity rate of 5.08% would increase applications to, for example, a school with a selectivity rate of 70.25%. AC Ex. A. The AC does not come close: it merely blithely asserts with no supporting facts that an increase or decrease in application fees at some schools would result in a corresponding increase or decrease in applications to others. AC ¶¶129-130. Those conclusory allegations cannot be credited. *See Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009).

Plaintiff's reference to an episode in 2020 when certain, unspecified undergraduate schools allegedly adjusted their application fees for some applicants and saw changes in their application

8

volumes, AC ¶131, does not help. Plaintiff does not identify the schools at issue there or explain how they compare to one another on any dimension relevant to applicants. At best, what these allegations *could* show is that there may be positive demand cross-elasticity across *some* grouping of undergraduate applications. But they do not show that applications to the particular grouping of law schools in this market—*all* ABA-approved law schools—"possess positive cross-elasticity of demand," as they must to be in the same market. *Queen City Pizza*, 124 F.3d at 439 n.8.

### ii.    The Law School Selectivity submarkets and Law School Ranking Tier submarkets are implausible.

Plaintiff's inability to define a single coherent market is not saved by naming several submarkets—instead the problems are only reinforced. The submarkets, which consist of four quartiles of law schools based on the schools' acceptance rates and four tiers of law schools based on the 2026 *U.S. News & World Report* law school rankings, AC ¶¶133-144, 145-152, are arbitrary and therefore implausible.

To start, Plaintiff's decision to label these groupings of schools as "submarkets" does not change what he must allege to render them plausible. "Speaking of submarkets is both superfluous and confusing." Areeda & Hovenkamp, *Antitrust Law* ¶533c. "The only relevant concept is the product market, indivisible as an atom," *FTC v. Meta Platforms, Inc.*, 811 F. Supp. 3d 67, 109 (D.D.C. 2025), and supposed "submarkets" are only valid if "they would be relevant product markets in their own right," *Int'l Constr. Prods. LLC v. Caterpillar Inc.*, 2016 WL 264909, at *8 (D. Del. Jan. 21, 2016) (quotation omitted). Accordingly, "the requirements for pleading a submarket are no different from those for pleading a relevant broader market." *PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*, 615 F.3d 412, 418 (5th Cir. 2010).

These "submarkets" cannot stand on their own. "The test for a relevant market is … commodities reasonably interchangeable by consumers"—here, applicants—"for the same

9

purposes." *Queen City Pizza*, 124 F.3d at 438 (quotation omitted). There are no facts alleged to suggest that applicants would view law schools in different selectivity quartiles and ranking tiers as lacking reasonably interchangeable substitutes. For example, Plaintiff puts Wake Forest University (selectivity rate of 28.41%) in the same market as Yale (selectivity rate of 5.08%), but a different market from Wayne State University (selectivity rate of 28.73%). *See* AC Ex. A at 2-3. Likewise, Plaintiff's ranking-based markets put school #50 and school #51 in different markets. AC ¶148. It makes no sense that two schools with virtually identical selectivity rates and rankings would be in different markets. Plaintiff certainly does not allege that such similarly situated schools, which fall within different selectivity quartiles or ranking tiers, would not be reasonable substitutes for one another. Plaintiff's failure to plausibly "allege that there are no substitute[s]" outside each of these markets renders them implausible. *Brotech Corp. v. White Eagle Int'l Techs. Grp., Inc.*, 2003 WL 22797730, at *5 (E.D. Pa. Nov. 18, 2003).

Moreover, Plaintiff offers no factual support for the core premise of these alleged markets: that selectivity and rankings are the only relevant attributes for applicants in deciding which law school to attend. A routine application of this Court's "'judicial experience and common sense' require[s] rejecting" that contention. *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1121 (9th Cir. 2018) (quoting *Iqbal*, 556 U.S. at 679). The absurd consequences of Plaintiff's theory demonstrate why. Students may apply to schools with different selectivity rates and rankings based on various factors. But according to Plaintiff, for example, an applicant planning to study and practice law in Philadelphia would view applications to Temple or Drexel as reasonably interchangeable with one to the University of Hawaii—all schools in the supposed "Quartile 2 Selectivity Market." AC Ex. A at 3-4. Likewise, a Catholic applicant seeking on-campus religious life would be indifferent between "Quartile 1 Selectivity Market" schools Notre Dame and Villanova on the one hand, and

10

Brigham Young University on the other. *Id.* at 2-3. These markets must be rejected because they are "artificial," and depend on the implausible premise that applicants would ignore all but one of the factors that might influence their decision of where to apply. *Hicks*, 897 F.3d at 1121.

### C.    Under The Rule Of Reason, Count II Fails

Count II fails because Plaintiff still does not allege anticompetitive harm across both sides of either of the two-sided platform markets at issue. He alleges a restraint in the alleged "Higher Education Application Platform Market" and the "Law School Centralized Application Platform Submarket," which are the markets for electronic platforms to process applications to U.S. higher education programs and U.S. law schools, respectively. AC ¶¶158, 168. The latter market is essentially identical to the "Law School Application Platform" market that this Court previously concluded was implausible and for which Plaintiff did not show anticompetitive harm to both sides. DI 35 at 28-35. The AC does not cure either of these defects.

#### 1.    Plaintiff does not plausibly allege competitive harm in the Platform Markets as a whole.

##### i.    Law School Centralized Application Platform Submarket.

The "Law School Centralized Application Platform Submarket" consists only of platforms for processing law school applications and is thus substantially the same as the "Law School Application Platform" market from Plaintiff's first complaint. AC ¶168. As this Court recognized—and as Plaintiff now acknowledges, *id.* ¶157—this is a two-sided platform market, so Plaintiff must plausibly allege harm to both sides. DI 35 at 32-34. He still does not do so.

Plaintiff has again only alleged harm to the applicant side of the market. His theory is that LSAC "charge[s] supracompetitive prices that have raised the costs to applicants by such a substantial degree that the harm to applicants strongly outweighs any benefits." AC ¶96; *see id.* ¶¶97-104. The only harm identified is to applicants. And Plaintiff still alleges no facts showing

11

schools would have somehow benefited *more* without LSAC or that "the net prices charged to" users on both sides "*combined* exceeded the prices that would have been charged" absent the challenged conduct. *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 59 (2d Cir. 2019).

Plaintiff's attempts to show that LSAC has "restrained competition on the school side" by (1) offering the platform to schools for free, (2) providing schools with "free or subsidized services, including grants and direct subsidies," and (3) requiring Member Law Schools to use LSAC's platform, AC ¶¶105-106, 243-253, do not hold water. To begin, the Court already rejected Plaintiff's theory that LSAC's school-side pricing practices could plausibly harm competition: "the mere fact that LSAC offers its product to the law schools for free does not show anticompetitive effect." DI 35 at 33-34. And as the Court explained based on the Supreme Court's decision in *Ohio v. American Express Co.* ("*Amex*"), "'[t]he optimal price'" for a two-sided platform "'might require charging the side with more elastic demand at below-cost (or even negative price).'" DI 35 at 33 (quoting *Amex*, 585 U.S. 529, 536-537 (2018)). It accordingly recognized that providing benefits to schools reflects a standard competitive strategy for a two-sided platform operator, akin to credit card issuers "offering rewards" to cardholders, *Amex*, 585 U.S. at 537, while "pass[ing] costs on to the side"—applicants—that LSAC "sees has having more elastic demand," DI 35 at 34 n.12.

The only innovation in the AC's theory of competitive harm on the school side is Plaintiff's invention of a supposed "Exclusivity and Use Policy," the existence of which is entirely implausible. According to Plaintiff, "[a]s a condition of full voting membership, LSAC mandates that all Member Law Schools require their applicants to exclusively use LSAC's Law School Application Platform for electronic applications." AC ¶55. He further alleges that "any Member Law School that does not require exclusive use of LSAC's Law School Application Platform risks

12

being stripped of its LSAC membership and denied corresponding benefits." *Id.* ¶60. The Court cannot credit Plaintiff's allegations that this purported policy exists, for at least two reasons.

*First*, the policy's existence is directly contradicted by LSAC's Bylaws.[1] The Bylaws explain that the only LSAC membership eligibility conditions for U.S. law schools are that the school "requires that substantially all of its applicants for admission take the Law School Admission Test" and be "approved by the American Bar Association or a member of the Association of American Law Schools." Declaration of Alan E. Schoenfeld ("Schoenfeld Decl.") Ex. 1, Bylaws of Law School Admission Council, Inc., art. I, §1. Further, a law school can lose its membership only if it voluntarily withdraws or "fails to maintain the conditions for eligibility" listed above. *Id.*, art. I, §3. Accordingly, the Bylaws establish—contrary to Plaintiff's allegation— that use of LSAC's application platform (exclusively or otherwise) is not a condition of membership. The Court must therefore disregard Plaintiff's contradictory allegation. *See Lungu v. Antares Pharma Inc.*, 2022 WL 212309, at *5 n.14 (3d Cir. Jan. 25, 2022) ("When an allegation in the complaint is contradicted by a document incorporated in it by reference, the document controls and the allegation is not accepted as true.").

*Second*, the so-called "evidence" Plaintiff points to does not plausibly establish the existence of such a policy. Plaintiff's allegation is based on a single 2019 letter from LSAC's Working Group on International Membership Applications. AC ¶¶57-58; Schoenfeld Decl. Ex. 2. In this letter—incorporated by reference into the AC, *see Burlington Coat Factory*, 114 F.3d at 1426—the Working Group recommended against admitting three law schools based in India, Bhutan, and China as full LSAC members. Plaintiff zeroes in on the letter's explanation that these

---

[1] Plaintiff relies extensively on the Bylaws and they are integral to his claim that LSAC engaged in concerted action, *see* AC ¶¶18 & n.2, 205-206, 233, so they are incorporated by reference into the AC, *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).

three international law schools "do not require their applicants to use LSAC's other admission products" beyond the LSAT, but completely ignores the main rationale given: that "regular membership [of these schools] would impose significant costs on LSAC" in the form of "travel subsidies." Schoenfeld Decl. Ex. 2 at 3. He also ignores that the Working Group recommended admitting these schools as affiliate members with, among other things, access to LSAC's "[c]orrelation studies," "educational programs," "law school forums," and "research reports," *id.*—contrary to the allegation that the Working Group sought to deny these schools "the services provided from the Law School Application Platform's revenue," AC ¶58. Indeed, the only benefit the Working Group proposed withholding from these three schools were "travel subsidies"—the source of the "significant costs" of their memberships. Schoenfeld Decl. Ex. 2 at 3.

Without a plausibly alleged exclusive use policy, Plaintiff's theory of competitive harm on the school side of the platform falls apart. Plaintiff alleges that LSAC's provision of services to Member Law Schools "excludes potential competitors" because it "would be irrational" for schools "to abandon the services and payments they receive … in exchange for requiring applicants to use LSAC's Law School Application Platform." AC ¶106. But Plaintiff does not plausibly allege that any of these benefits are conditioned on schools' use of LSAC's platform. Thus, as before, he does not allege they "are used as a mechanism to induce the loyalty of the law schools," DI 35 at 35, or pose an impediment to a competitor likewise charging applicant-side fees to offer its platform at a negative price on the school side to compete with LSAC for schools' business. *See, e.g.*, *Amex*, 585 U.S. at 536-537 (noting the prevalence of this strategy in two-sided markets).

### ii.    Higher Education Application Platform Market.

Plaintiff also fails to allege competitive harm to both sides of his new Higher Education Application Platform Market. The allegations of harm in this market are the same allegations as those in the law-school specific market. *See* AC ¶96. The claim thus fails for the same reason—

that Plaintiff "does not allege anticompetitive harm on both sides of the platform." DI 35 at 33; *see supra* pp.11-12. As with the law-school specific market, Plaintiff's only theory of harm on the school side is based on the implausibly alleged exclusivity policy. *See supra* pp.12-14. Because that policy is implausible, so is the supposed harm to the school side of the platform, and Plaintiff has failed to show the requisite harm to both sides of the market. *See Amex*, 585 U.S. at 546.

Plaintiff's claim predicated on this alleged market fails for an additional, independently dispositive reason. The alleged restraints Plaintiff challenges are only imposed on law schools, and there are no allegations that they impact any application platform's ability to compete for customers beyond law schools and law school applicants. AC ¶¶49-54, 55-63. Plaintiff does not allege (nor could he) that LSAC has market power in this broader, all higher-education application platform market. Nor does he even allege the share of this broader market that the challenged restraints impact. Absent these allegations, the AC does not raise a plausible inference that the challenged conduct caused "anticompetitive effects on the overall market." *Deborah Heart & Lung*, 833 F.3d at 403-404 (restraint imposed by a defendant without market power impacting no more than 5-8% of the relevant market cannot cause cognizable anticompetitive effect).

### 2. The Law School Centralized Application Platform Submarket is implausible.

Count II should also be dismissed because the Law School Centralized Application Platform Submarket is implausible. The Court already rejected Plaintiff's effectively identical "Law School Application Platform Market" because the "allegations of the complaint undermine th[e] position" that "application platforms for other schools are inadequate substitutes." DI 35 at 29. Those allegations remain in the AC. Plaintiff continues to allege that "law school admissions do not pose any unique technical requirements that could not be addressed by experienced vendors," and those vendors "very likely would be competitive forces in the relevant market." AC

15

¶94; *see* DI 35 at 29 (citing identical allegations in dismissing market). Adding the word "centralized" to the defined market does not solve this fundamental problem.

None of the minor adjustments the AC makes to this market cure its deficiencies. Plaintiff changes the participants in the market to include both platforms "used to process applications" to law school and those that "could promptly develop" such functionality. AC ¶168. But as the Court already noted, "that just does not square with the allegations that other application platforms are inadequate substitutes." DI 35 at 29. And while Plaintiff limits the market to just "centralized" application platforms, AC ¶¶168, he also alleges that "the same platform can often be implemented both for individual programs" in any higher education category "and at scale as a centralized higher education platform," *id.* ¶162. At bottom, Plaintiff has entirely failed to justify a separate market for application platforms servicing law schools, so Count II should be dismissed to the extent it is predicated on this market for the same reasons as before. *See* DI 35 at 29-30.

## II.    COUNT III STILL FAILS TO STATE A SECTION 2 CLAIM

### A.    Count III Still Does Not State A Monopolization Claim

Plaintiff does not plausibly allege either element of a monopolization claim: "(1) the possession of monopoly power in the relevant market" and (2) "exclusionary or predatory conduct without a valid business justification." *LePage's Inc. v. 3M*, 324 F.3d 141, 149, 152 (3d Cir. 2003).

#### 1.    Plaintiff still does not allege any exclusionary conduct.

None of the conduct Plaintiff challenges qualifies as exclusionary as a matter of law. Where, as here, the allegedly monopolized market is for a two-sided transaction platform, Plaintiff must show that the challenged conduct caused anticompetitive harm across both sides of the platform to be exclusionary. *See Amex*, 585 U.S. at 546; *Eisai*, 821 F.3d at 407 (conduct must "cause anticompetitive effects in the relevant market" to be exclusionary). As explained, Plaintiff only alleges harms on the applicant side of his "Law School Centralized Application Platform

Submarket." *Supra* pp.11-14. The Court should thus dismiss Plaintiff's monopolization claim for the same reasons as his Section 1 claim pertaining to the law school application platform market.

Moreover, Plaintiff's efforts to challenge Member Law Schools' arrangements with LSAC to use the application platform as "explicit and *de facto* exclusive agreements" fail. AC ¶276. The Court previously refused to credit Plaintiff's "conclusory allegation that the LSAC enters into exclusive agreements with the member law schools." DI 35 at 20 n.7, 34. The AC adds no facts to remedy this independently dispositive defect in Plaintiff's sole exclusionary conduct theory. There are still no factual allegations that the schools' agreements with LSAC include any terms under which they "agree[] to purchase certain goods or services only from a particular seller for a certain period of time," *ZF Meritor*, 696 F.3d at 270, or that they "require[] the purchaser not to deal in the goods of a competitor of the seller," *Yeager's Fuel, Inc. v. Pa. Power & Light Co.*, 953 F. Supp. 617, 655 (E.D. Pa. 1997) (quotation omitted). The supposed "Exclusivity and Use Policy" cannot supply these missing terms because, as explained, the existence of that policy is implausible. *See supra* pp.12-14. Accordingly, Plaintiff still has not "plausibly allege[d] that [the challenged] agreement[s] require[] exclusivity." *Power Analytics Corp. v. Operation Tech., Inc.*, 2018 WL 10231437, at *15-18 (C.D. Cal. July 24, 2018), *aff'd*, 820 F. App'x 1005 (Fed. Cir. 2020).

Nor does LSAC's provision of grants, services, and subsidies to schools plausibly support a *de facto* exclusive dealing theory. Given the absence of any plausibly alleged conditions tying the receipt of these benefits to the use of LSAC's application platform, LSAC has not engaged in any practice to coerce or otherwise pressure schools into refraining from using alternative application platforms—as is required for a *de facto* exclusive dealing claim. *See Eisai*, 821 F.3d at 407. Schools' free platform use is not alleged to be contingent on exclusivity or anything else, and grants and other benefits to schools are not even alleged to be related to schools' platform use.

17

There are accordingly no facts alleged to suggest these practices could induce exclusivity or "foreclose" competition from other platforms for the schools' business. *LePage's*, 324 F.3d at 155. There is thus no *de facto* exclusive dealing, and dismissal of the monopolization claim is required.

### 2. LSAC does not have monopoly power.

#### i. Plaintiff still does not plausibly allege direct evidence of monopoly power.

Plaintiff does not allege monopoly power through direct evidence because he has failed to plausibly allege that LSAC both charged supracompetitive prices *and* restricted output. As this Court correctly held, both are required. *See* DI 35 at 36. Plaintiff's new direct evidence theory rests on the period from 2010 to 2015, during which the total number of law school applications declined. *See* AC ¶¶261-272. According to Plaintiff, LSAC increased its fees during this time while maintaining similar levels of revenue, which supposedly constitutes direct evidence of monopoly power. *Id.* ¶270. This theory fails for at least two reasons.

*First*, Plaintiff does not plausibly allege—as he must—"that *the defendant* restricted output" in the alleged market during this period. *Mylan Pharms. Inc. v. Warner Chilcott Pub. Ltd.*, 838 F.3d 421, 434 (3d Cir. 2016) (quotation omitted) (emphasis added); *see also* Areeda & Hovenkamp ¶501 ("Market power is the ability to raise price profitably *by restricting output*." (emphasis added)). The AC is clear that LSAC neither restricted output from 2010-2015, nor was capable of doing so. As Plaintiff acknowledges, "law schools"—not LSAC—"sell applications." AC ¶119. Because LSAC is not itself alleged to have reduced output, as a matter of law its pricing in response to the downturn cannot constitute direct evidence of monopoly power.

*Second*, market conditions in 2010 to 2015 are irrelevant to Plaintiff's claims here, which concern the present day and a class period dating back to four years before the filing of this lawsuit. AC ¶185. The appropriate time period for evaluating a defendant's monopoly power is the period

18

for which the Plaintiff seeks relief. In suits for injunctive relief—which Plaintiff requests here—courts have consistently required that the defendant possess monopoly power in the present day. *See Meta Platforms*, 811 F. Supp. 3d at 88; *FTC v. Surescripts, LLC*, 665 F. Supp. 3d 14, 39 (D.D.C. 2023) (collecting cases); *United States v. U.S. Steel Corp.*, 251 U.S. 417, 444-445 (1920) ("[O]ur consideration should be of, not what the corporation had power to do or did, but what it has now power to do and is doing."). Likewise, Plaintiff's damages claims require him to prove that LSAC had monopoly power during the class period. During the class period, applications have increased, AC ¶36, which, as the Court aptly explained, "is the opposite of reduced output," DI 35 at 38. Plaintiff has therefore failed to meet his burden of alleging direct evidence of monopoly power during the time period relevant to this suit.

### ii. Plaintiff still does not plausibly allege indirect evidence of monopoly power.

Plaintiff also fails to allege monopoly power through indirect evidence because the AC does not plead a plausible relevant market in which LSAC holds market power protected by significant barriers to entry. *See Mylan Pharms.*, 838 F.3d at 435. As explained, the "Law School Centralized Application Platform Submarket" is implausible, *supra* pp.15-16, so Plaintiff cannot show that LSAC has monopoly power through indirect evidence. *See* DI 35 at 38.

Further, Plaintiff does not plausibly allege significant entry barriers. He first asserts that the challenged conduct itself creates entry barriers. AC ¶275. But as explained, none of those actions are plausibly alleged to have caused an anticompetitive effect on the school side of the alleged market or excluded competitors, *supra* pp.11-14, so Plaintiff's attempt to repackage those allegations as entry barriers fails. If anything, LSAC's alleged school-side pricing practices are "efficient, aggressive competition," which is not "a structural barrier to entry." *United States v. Syufy Enters.*, 903 F.2d 659, 667 (9th Cir. 1990). Plaintiff also alleges in conclusory fashion that

"network effects and economies of scale created by a centralized application platform" constitute entry barriers. AC ¶275. But he elsewhere concedes that "law school admissions do not pose any unique technical requirements," that "[m]ultiple outside vendors" could enter the market, and that existing platforms "often can be implemented … at scale as a centralized … platform." AC ¶¶93-94, 162. Because new firms can easily enter, the market necessarily lacks entry barriers. *See Phila. Taxi Ass'n v. Uber Techs., Inc.*, 886 F.3d 332, 342 n.6 (3d Cir. 2018).

### B.    Count III Does Not State A Conspiracy To Monopolize Claim

The Court should also dismiss Plaintiff's new "conspiracy to monopolize" theory, AC ¶¶283-286, because there is no alleged "agreement to monopolize," *Howard Hess Dental Laby's Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 253 (3d Cir. 2010). The only alleged "agreement" challenged in this claim is LSAC and the Member Law Schools' alleged creation of the "Exclusivity and Use Policy." AC ¶¶284-285. But as explained, there are no facts plausibly suggesting that this "policy" in fact exists. *See supra* pp.12-14. Accordingly, Plaintiff has failed to "allege facts plausibly suggesting 'a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement'" necessary to support a conspiracy to monopolize claim. *Howard Hess*, 602 F.3d at 254, 257 (quoting *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 771 (1984)) (affirming dismissal for same reason).

### III.    COUNTS I AND II FAIL BECAUSE PLAINTIFF HAS NOT ALLEGED CONCERTED ACTION

LSAC recognizes the Court's finding that the original complaint "plausibly allege[d] concerted action." DI 35 at 14. But it respectfully submits, both for the Court's consideration here and to preserve this issue for any future appeal, that Plaintiff has failed to allege concerted action.

### A.    The Challenged Conduct Is Not Concerted Action As A Matter Of Law

Plaintiff at most challenges the "internally coordinated conduct of a corporation" or "internal agreement[s]" within a firm—such as between a corporation and its members—"to

implement a single, unitary firm's policies," which Section 1 does not cover. *Copperweld*, 467 U.S. at 769-771 (quotation omitted). LSAC is a membership corporation whose members include the Member Law Schools. AC ¶¶14-15. "[A]greements within a single firm" are "presum[ed]" to be "independent action," not concerted action. *Am. Needle*, 560 U.S. at 200.

The presumption of independent action holds here. It can only be rebutted "in rare cases" upon a showing that (1) "the parties to the agreement act[ed] on interests separate from those of the firm itself," and in so doing (2) deprived the relevant market of "actual or potential competition." *Am. Needle*, 560 U.S. at 195, 200-201. Plaintiff does not plausibly allege either.

*First*, the AC contains no allegations that any Member Law School had or acted on any "interests separate from" those of LSAC itself in purportedly directing LSAC to set fees. *Am. Needle*, 560 U.S. at 200. Rather, the schools "st[and] to gain or lose from the successful operation of [LSAC's application platform] as d[oes] [LSAC] itself," *Nanavati v. Burdette Tomlin Mem'l Hosp.*, 857 F.2d 96, 118 (3d Cir. 1988), because they allegedly share in LSAC's success via free services and subsidies, which Plaintiff alleges come from the platform's revenue. AC ¶¶70-72.

*Second*, Plaintiff does not plausibly allege that any Member Law School is an actual or potential competitor of LSAC. *See Am. Needle*, 560 U.S. at 197. There are no facts plausibly suggesting that any Member Law School would or could independently develop its own application platform, much less operate it in competition with LSAC by selling access to such a platform to other law schools. *See id.* at 200 (NFL teams were potential competitors in IP market because each could "grant[] … licenses to use its trademarks" in competition with one another and challenged IP licensing joint venture.). Member Law Schools are therefore consumers, not competitors, of application platforms.

LSAC respectfully submits that this Court read *American Needle* too broadly in its prior

21

order. *See* DI 35 at 11-14. That case involved a "rare" situation in which actual or potential competitors in one market—IP licensing—centralized what would otherwise be their independent competitive decision-making and thereby removed themselves as separate competitors in the IP licensing market. *See Am. Needle*, 560 U.S. at 200-201. It did not address the situation here, where an organization is comprised of *buyers* of a service (application platforms) that may compete with one another in a different market (for applications themselves). Contrary to the Court's reasoning, an alleged "group of competitors' creation of an entity to do their bidding—in a way materially related [to] the operation and financial success of their respective businesses," DI 35 at 14—does not remove "actual or potential competition" from any market when that entity operates solely in a market which its founders do not compete, *Am. Needle*, 560 U.S. at 197. It therefore does not rebut the presumption of independent action established by *Copperweld*.

**B.      Plaintiff Still Has Not Plausibly Alleged A Horizontal Conspiracy Among The Member Law Schools**

**1.      Plaintiff alleges no direct evidence of an agreement.**

Plaintiff's effort to show direct evidence by labelling LSAC's practices as pricing and exclusivity "policies"—to fit his case into the Second Circuit's framework from *Relevent Sports, LLC v. U.S. Soccer Federation, Inc.*, 61 F.4th 299 (2d Cir. 2023)—is misguided. Under *Relevent Sports*, if "the plaintiff adequately alleges that the policy or rule is the agreement itself, then it need not allege any further agreement." *Id.* at 308. Neither purported policy can sustain this theory. First, as explained, the existence of the "Exclusivity and Use Policy" is implausible. *Supra* pp.12-14. Second, because that policy is implausible, the "Pricing Policy" cannot "impose[] duties and restrictions in the conduct of [the Member Law Schools'] separate businesses" because there are no plausible allegations that Member Law Schools are required to use LSAC's platform. *Relevent Sports*, 61 F.4th at 307 (quotation omitted). LSAC's prices are charged by LSAC, and its purported

22

"Pricing Policy" does not require Member Law Schools to do or refrain from doing anything. *Relevent Sports* therefore does not apply. And regardless, *Relevent Sports* conflicts with the Third Circuit's decision in *In re Insurance Brokerage Antitrust Litigation*, which held that members' "common adoption of [a] trade group's suggestions" was insufficient to plausibly establish an agreement. 618 F.3d 300, 349 (3d Cir. 2010). In this Circuit, then, adherence to a membership organization's policies does not constitute direct (or circumstantial) evidence of an agreement. *Id.*

Nor is there any other "explicit" evidence of a conspiracy alleged. *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 118 (3d Cir. 1999). The AC still simply lumps the Member Law Schools together and makes conclusory allegations that, as a group, they "direct the development, operation, and implementation of" LSAC's platform and "facilitate concerted action." AC ¶¶207-208, 232-234. Plaintiff does not allege any facts explaining how the Member Law Schools "direct" LSAC's activities, or how their election of Board members translates to involvement in LSAC's operational decisions. The allegations "furnish[] no clue as to which of the" schools "supposedly agreed, or when and where." *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 565 n.10 (2007).

### 2.     Plaintiff alleges no circumstantial evidence of an agreement.

Plaintiff also does not plausibly plead circumstantial evidence of an agreement. This requires both parallel conduct and "plus factors" that place the parallel conduct "'in a context that raises a suggestion of a preceding agreement'" and "'tend[s] to rule out the possibility that the [schools] were acting independently.'" *Ins. Brokerage*, 618 F.3d at 321-322 (quoting *Twombly*, 550 U.S. at 554, 557).

*First*, the AC does not plausibly allege parallel conduct. There are still no allegations about "when any of the" schools "began to use" LSAC's platform. *Dai v. SAS Inst. Inc.*, 2025 WL 2078835, at *3 (N.D. Cal. July 18, 2025). Conduct occurring at "different time[s]" is not "parallel." *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 228 (3d Cir. 2011). Though Plaintiff now alleges

23

that some unspecified schools "requested [the] creation of the predecessor to" LSAC's platform in 1970 and that schools "reaffirm" their use of the platform each year, AC ¶25, that still provides no information about when each school first began to use the platform. "[T]he potential that the period of time" over which they all adopted the platform could have been decades "calls into question whether the use of [it] suggests coordinated action." *Hansen v. Nw. Univ.*, 2025 WL 2731378, at *9 (N.D. Ill. Sept. 24, 2025) (discussing nearly 20-year time period).

*Second*, Plaintiff fails to allege plus factors that tend to suggest any parallel conduct was the product of an agreement. As this Court already found, he "does not fairly suggest that the law schools have acted contrary to their own interests" because it is "rational for self-interested, competing law schools to decide to use a centralized application service to maximize the number of applications each receives." DI 35 at 18. The AC does not add any allegations to alter this conclusion and indeed appears to abandon the theory that schools' use of the platform would be irrational but for a supposed conspiracy. *See Ins. Brokerage*, 618 F.3d at 331-332.

Plaintiff also does not allege any plausible "motive to conspire" by the Member Law Schools. AC ¶48. His theory is that the schools agreed to forgo collecting application fees themselves—supposedly a "significant source of revenue," *id.* ¶126—to enrich LSAC at their own expense so that LSAC could in turn provide the schools with various services and subsidies drawn from application fee revenues and with the free use of LSAC's application platform, *id.* ¶¶69-74. But the AC alleges no facts plausibly suggesting that schools' receipt of these benefits is in any way tied to or contingent upon their use of LSAC's platform. *See supra* pp.12-14. Plaintiff also claims that schools supposedly entered the conspiracy to "receive stability" and "insulat[e]" themselves from the need to make competitive decisions concerning their application platform. AC ¶73. But he offers no explanation for why schools so value this impressionistic sense of peace

24

that they would forgo potentially hundreds of thousands of dollars per year in application fees to achieve it. *See id.* ¶126. Courts will not infer a conspiracy where, as here, the participants "had no rational motive to join" it and the theory "makes no economic sense." *Brunson Commc'ns, Inc. v. Arbitron, Inc.*, 239 F. Supp. 2d 550, 563-564 (E.D. Pa. 2002) (quotation omitted).

Plaintiff also cannot rely on so-called "evidence of a traditional conspiracy." AC ¶48. That plus factor "consists of non-economic evidence that there was an actual, manifest agreement not to compete, which may include proof that the defendants got together and exchanged assurances of common action or otherwise adopted a common plan." *Ins. Brokerage*, 618 F.3d at 322 (cleaned up). LSAC recognizes that the Court previously concluded that Plaintiff's allegations "imply a traditional conspiracy" because "LSAC was created and is controlled by the law schools, which elect the LSAC's Board … and receive kickbacks for their participation." DI 35 at 21. LSAC respectfully submits that this finding was inconsistent with "binding precedent hold[ing] that joining a trade organization, helping develop its rules, and enforcing those rules … do[es] not plausibly establish the existence of a prior and separate horizontal agreement." *Davis v. Hanna Holdings, Inc.*, 787 F. Supp. 3d 42, 60 (E.D. Pa. 2025); *see Ins. Brokerage*, 618 F.3d at 313, 349.

## CONCLUSION

Plaintiff's Amended Complaint should be dismissed with prejudice.

Dated: May 29, 2026

Respectfully submitted,

/s/ *Alan E. Schoenfeld*
Alan E. Schoenfeld (*pro hac vice*)
David Z. Gringer (*pro hac vice*)
Paul Vanderslice (*pro hac vice*)
Kimberly Chen (*pro hac vice*)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: (212) 230-8800
Alan.Schoenfeld@wilmerhale.com
David.Gringer@wilmerhale.com
Paul.Vanderslice@wilmerhale.com
Kimberly.Chen@wilmerhale.com

Medha Gargeya (*pro hac vice*)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: (202) 663-6000
Medha.Gargeya@wilmerhale.com

George P. Varghese (Pennsylvania Bar No. 94329)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
George.Varghese@wilmerhale.com

*Attorneys for Defendant Law School Admission Council, Inc.*

26

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing does not exceed 25 pages, exclusive of the cover page, table of contents, table of authorities, and signature page, and adheres to the requirements set forth in Section 9 of this Court's policies and procedures.

Dated: May 29, 2026                                  /s/ *Alan E. Schoenfeld*
                                                     Alan E. Schoenfeld